**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 10-70470-TNW |
| | ) | |
| P & J RESOURCES, INC. | ) | CHAPTER 11 |
| | ) | |
| DEBTOR. | ) | Honorable Tracey N. Wise |
| | ) | |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR RELIEF FROM AUTOMATIC STAY**

Come the Raymond E. Fontaine Trust dated 12/2/88, as amended, ("Fontaine Trust");

Jean Webster, as Successor Co-Trustee of the Fontaine Trust; Patricia Fontaine, as Successor

Co-Trustee of the Fontaine Trust; Kathleen Fowler, as Successor Co-Trustee of the Fontaine

Trust; Mary Fontaine Carlson, as Successor Co-Trustee of the Fontaine Trust; the MPJ Fontaine

Trust, U.A. DTD 10/26/98 (the "MPJ Trust"); Jean Webster, as Co-Trustee of the MPJ Trust;

Patricia Fontaine, as Co-Trustee of the MPJ Trust; Mary Fontaine Carlson, as Co-Trustee of the

MPJ Trust; Jean Webster, individually; Gary Webster, individually; Patricia Fontaine,

individually; Mary Fontaine Carlson, individually; Robert Carlson, individually; Dylan

Klempner, individually; The Raymond E. and Marie V. Fontaine Family Foundation, Inc.

("Fontaine Foundation"); The Raymond Street Group, LLC (the "Raymond Street Group"); the

Nora Carlson Irrevocable Trust ("Carlson Trust"); Robert Carlson, as Co-Trustee of the Carlson

Trust; Cherry Driveway, LLC ("Cherry Driveway"), a limited liability company organized and

existing under the laws of the State of Washington; Joan Casartello, individually; Patricia

Carucci Schwartz, individually; Arlene Everett, individually; The Piaker Family Irrevocable

Trust ("Piaker Trust"); Matthew Piaker, as Co-Trustee of the Piaker Trust; Alan Piaker, as

Co-Trustee of the Piaker Trust; Susan Kasper, as Co-Trustee of the Piaker Trust; and Rosemary Hillery, individually, (collectively, "Movants," "Plaintiffs" or "Fontaines"[1]), and file this Memorandum in Support of their Motion for Relief From Automatic Stay to allow them to proceed with litigation pending in the United States District Court for the Eastern District of Kentucky, Pikeville Division, against P & J Resources, Inc., Pamela Williams and Richard Williams, Civil Action No. 07-08:CV-220-ART (the "District Court Litigation"), and to pursue their claims to final, non-appealable judgment. The Fontaines do not seek relief to record any judgment lien or collect any judgment awarded against P & J except in the context of the Debtor's bankruptcy proceeding.

## FACTS

On November 28, 2008, Plaintiffs initiated the District Court Litigation against P & J Resources, Inc., a Kentucky oil and gas exploration and production company (the "Debtor" or "P & J"), Pamela Williams, the sole owner and an officer of P & J ("Pamela"), and her husband Richard Williams, also an officer of P & J ("Richard") (collectively, the "Defendants"). The original complaint asserted fraud and breach of contract claims. The complaint was later amended to add additional fraud claims. Copies of the Complaint and the Amended Complaint are attached hereto as **Exhibit A**.

---

[1] For ease of reference, the Movants (and Mr. Fontaine where applicable) will be referred to collectively as the "Fontaines" notwithstanding that some of the Plaintiffs are not actually family members.

At the center of the District Court Litigation is the investment of millions of dollars by the Plaintiffs or Raymond E. Fontaine (who was the predecessor-in-interest to some of the Plaintiffs) in oil and gas wells[2] located in eastern Kentucky and West Virginia.

Raymond Fontaine was a successful entrepreneur who lived most of his life in Massachusetts, but in 1985 became a resident of the State of Florida. Prior to September 2002, Mr. Fontaine entered into some oil and gas investments in the Appalachian Basin with persons and entities other than the Defendants.

In connection with those investments, Richard was introduced to Mr. Fontaine, and Mr. Williams communicated with Mr. Fontaine to induce him to make additional oil and gas investments with the Williamses and P & J. At that time, and at all relevant times thereafter, Richard and Pamela purported to represent and to act on behalf of P & J in communications and transactions involving the Fontaines with the actual or apparent authority to bind P & J.

After September 2002, the Defendants engaged in a fraudulent scheme pursuant to which they induced Mr. Fontaine, acting variously for and on behalf of himself and others of the Fontaines and various of the Fontaines directly, to enter into various transactions involving the Wells. Each of those transactions is detailed in the Complaint. Between 2002 and 2006, the Fontaines invested $7,473,800.00 with the Defendants to purchase interests in oil and gas wells. Mr. Fontaine and certain of the Fontaines invested an additional $2,300,000.00 in other ventures with the Defendants.

---

[2] The Fontaines have asserted in their Complaint that many of the wells were never actually drilled. That contention is based in part on the lack of information and incorrect or conflicting information provided by the Defendants. All of the wells in which any of the Fontaines may have an interest, regardless of the well name, are referred to collectively as the "Wells."

Until his death on June 30, 2007, Mr. Fontaine was the principal contact for the Fontaines with regard to their investments with the Defendants.  Consequently, the other Fontaines had very little regular contact with the Defendants.  After Mr. Fontaine's death, the Fontaines asked Robert Carlson (one of Mr. Fontaine's sons-in-law) to deal with the investments with the Defendants.

For many months, Mr. Carlson tried repeatedly to secure information about the Fontaines' investments from the Defendants, and from Richard in particular.  When meaningful responses and information were not forthcoming, the Fontaines employed counsel, and the District Court Litigation ultimately resulted.

On February 19, 2010, the Fontaines filed a Motion for Summary Judgment in the District Court Litigation seeking judgment against the Defendants on several but not all of the counts alleged in the Complaint.  Particularly, the Fontaines sought summary judgment against the Defendants (1) on Counts II and III for breach of the 30-Month Guarantee and 100-MCF Production Guarantee; (2) on Count V, for breach of the $300,000 Loan Agreement; (3) on Count X, for declaration that the Fontaines are not part of CDDL, Inc.; and (4) on Count IX to pierce the corporate veil of P & J and find that Pamela and Richard are jointly and severally liable for the damages suffered by the Fontaines.

On April 14, 2010, the District Court granted the Fontaines' Motion for Summary Judgment on all counts that were the subject of the motion except for Count IX, which was denied without prejudice.  A copy of the Memorandum Opinion and Order is attached hereto as **Exhibit B**.  The District Court declined to grant the Motion for Summary Judgment on Count IX, concluding that because the Fontaines had not sought summary judgment on the fraud claims

4

and, therefore, did not introduce the necessary evidence that linked the abuse of the corporate form of P & J and a fraud or injustice caused to the Fontaines, therefore, the Court could not grant summary judgment on Count IX. According to the Order tendered with the Motion for Summary Judgment, the amount of damages awarded to the Fontaines pursuant to the Memorandum Opinion and Order is between $5 million and $7 million dollars.[3]

Several counts remain undecided. Particularly, Count I which is a claim for reformation of multiple documents, Count IV which is a contract claim for the failure to drill wells, Count VI which alleges fraud, Count VII which alleges conversion, Count VIII which is for an accounting, and Count IX to pierce the corporate veil of P & J and find Pamela and Richard to be jointly and severally liable with P & J. Judgment in favor of the Plaintiffs on these remaining counts could increase the aggregate amount awarded to the Fontaines and against P & J to as much as $17 million, excluding punitive damages.

On information and belief, the Memorandum Opinion was not made final because trial on all remaining counts, including Count IX was to occur within a matter of weeks.

The trial of the District Court Litigation was scheduled to begin on May 18, 2010, and to last no more than five (5) days. The Defendants have requested a jury trial. On April 19, the Fontaines filed their Pre-trial Memorandum, Jury Instructions and Witness List. On May 3, a final pre-trial conference was held in anticipation of the five-day trial. On May 4, P & J served

---

[3] *See* **Exhibit C**. **Exhibit C** has not been signed, but the Memorandum Opinion and Order at **Exhibit B** granting judgment on several counts quantified on **Exhibit C** would seem to constitute judgment in the corresponding amounts shown on **Exhibit C**.

its Amended Exhibit and Witness List.  On May 11, the trial date was vacated due to a superseding criminal trial.

On May 12, a status conference was held to re-schedule the trial.  At that time, in an effort to avoid prolonged delay, the parties agreed to have the trial conducted by the Federal Magistrate, and a status conference with the Magistrate for the purpose of re-scheduling the trial was set for June 17, 2010.  On June 11, P & J filed its Chapter 11 petition.  On June 17, the pre-trial conference with the Magistrate was conducted, and the Magistrate offered possible trial dates in mid-July and mid-August.[4]  The Fontaines advised the Magistrate that they would be seeking relief from the stay so that the trial could be conducted as to all Defendants.

## LAW AND ARGUMENT

On request of a party in interest after notice and a hearing, the court shall grant relief from the stay for cause.  11 U.S.C. § 362(d)(1).  Cause is not defined in the Bankruptcy Code and courts often conduct a fact based balancing test examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay.  *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997).

**I.**    **Relief from the stay may be granted when necessary to permit litigation to be concluded in another forum.**

The legislative history to section 363(d)(1) notes the section's applicability to pending lawsuits in another court.  "It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from any duties that

---

[4] The District Court Litigation was not stayed as to Pamela and Richard.

may be handled elsewhere."  H.R. Rep. No. 595, 95th Cong., 1st Sess., 341 (1977), U.S. Code

Cong. & Admin. News 1978, pp. 5787, 6297.

## II.    The Court should apply a three part balancing test.

Recognizing that "[m]ost courts follow this logic and apply an equitable balancing test to

determine if cause exists to lift the stay to allow pending litigation to proceed or continue in

another forum," the District of Delaware has developed a three prong balancing test to determine

whether to grant the stay:

> 1.    Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;
>
> 2.    Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and
>
> 3.    The probability of the creditor prevailing on the merits.

*In re The SCO Group, Inc.*, 395 B.R. 852 (Bankr. D. Del. 2007, citing *Izzarelli v. Rexene (In re*

*Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

### A.    No great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit.

In *SCO*, the debtors argued that allowing the trial to go forward would require the

Debtors and their top management to focus all of their attention on the trial, to the detriment and

exclusion of the reorganization efforts at a critical stage in the bankruptcy case.  In that case

involving facts very similar to the case before this Court, the defendant filed its bankruptcy

petition three days before the trial was to begin.  The plaintiffs filed the motion for relief within

about three weeks thereafter.  There, as in this case, the motion for relief was filed at the outset

of the bankruptcy case to accommodate a trial that the parties had been virtually prepared to

commence at the time the bankruptcy case was filed.  Acknowledging that the trial would likely

require the attendance of SCO's primary officers and directors, the Delaware bankruptcy court nevertheless concluded that SCO's attention to the lawsuit would "certainly not harm the estate."

Although the same is true in this case, the Debtor may not even suggest the distraction of its primary officers is grounds to deny relief. P & J's primary officers are Pamela and Richard to whom the stay does not apply, and who are also defendants in their individual capacities. Therefore, P & J will face the prospect that its officers will be involved in the trial even if P & J is not. For that reason, if required to go to trial, P & J will suffer no greater harm from any alleged pre-occupation of its officers than it would if it was not required to go to trial.

As in *SCO*, P & J's litigation counsel is different from its bankruptcy counsel. Therefore, even as its litigation counsel conducts the defense of P & J, its bankruptcy counsel will be free to focus on the bankruptcy case. In addition, P & J's litigation counsel should have virtually completed its trial preparation since the trial date was vacated only seven (7) days before it was scheduled to begin. The original trial date was May 18, 2010, and that date was not vacated until May 11.

Finally, no great prejudice to the Debtor or its estate will occur if P & J is required to defend. P & J must ultimately face the claims of the Fontaines so that such claims can be administered in the bankruptcy case. This process cannot be avoided. Considering the potential size of the Fontaines' claims, it is important to the other creditors, and should be important to the

Debtor, to know the full amount of the Fontaines' claims as early in the bankruptcy case as possible.[5]

Finally, because the Fontaines cannot jump ahead of the estate at this stage by recording a judgment lien, and do not seek stay relief to collect any judgment they obtain, the estate cannot be harmed.

**B.    Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor.**

The liability of Pamela and Richard to the Fontaines relies largely on proof of fraud by P & J linked with abuse of the corporate form.  Although the stay does not affect the Fontaines' claims against Pamela and Richard, the nature of the claims against Pamela and Richard requires that the Fontaines be allowed to adjudicate their claims against P & J.  Therefore, the rejection of this Motion effectively denies the Fontaines the ability to pursue claims against individuals they believe to be personally responsible for the Fontaines' substantial losses.  This result would constitute a significant hardship on the Fontaines who are then left without a timely remedy against any responsible party notwithstanding their diligent efforts to pursue their remedies in an appropriate forum.  Courts that have recognized that a party may be effectively denied the opportunity to litigate if relief from the stay is not lifted, have held that this factor should be given great weight.  *In re Rexene Prod. Co.*, 141 B.R. 574 (Bankr. D. Del. 1992).  Even if it were fair to force the Fontaines to try the case in two stages, thus doubling their costs, they cannot effectively adjudicate all of their claims against Pamela and Richard without <u>first</u> adjudicating

---

[5] The Debtor's schedules reflect unsecured non-priority claims of $1,000,000.  The Fontaines' claims already exceed that number by at least five (5) times and may potentially exceed it by sixteen (16) times, excluding punitive damages.

their claims against P & J.  The hardship that will be suffered by the Fontaines if stay relief is not granted far outweighs the burden on P & J to submit to trial and possible judgment.

### C.    The probability of the creditor prevailing on the merits.

In *SCO*, the Court stated that it must consider whether the "movant has <u>some</u> probability of success on the merits of the pending litigation."  (Emphasis added.)  Certain or absolute success is not required.  "Even a slight probability of success on the merits may be sufficient to support lifting the automatic stay in an appropriate case."  *International Business Machines v. Fernstrom Storage & Van Co. (In re Fernstrom Storage and Van Co.)*, 938 F.2d 731, 737 (7th Cir. 1991).

The Fontaines have already been awarded summary judgment on several counts.  The evidence of fraud related to their remaining counts is overwhelming.  They were prepared and are anxious to go to trial.  They are incurring costs in connection with this Motion.  Were they not confidant of their success on the merits of the remaining claims, they would not be so willing to expend the additional resources necessary to obtain relief from the stay.

These factors alone constitute the "slight" probability of success required to satisfy this prong of the three prong test.

### III.    Judicial Economy and Conservation of this Court's Resources.

Other factors considered by the courts in the context of this balancing test include judicial economy and the conservation of judicial resources.  Granting relief is noted to be an appropriate way to conserve judicial resources.  *In re Pro Football Weekly, Inc.*, 60 B.R. 824 (N.D. Ill. 1986).  In addition, "the existence of a more appropriate forum than the bankruptcy court is 'cause' for relief . . ."  Here, the District Court Litigation has been pending in the Federal District

Court since its inception.  There is nothing about the District Court Litigation that suggests it should be heard in any forum other than the Federal District Court, the Court most familiar with the case to date.  There is nothing "bankruptcy specific" about the District Court Litigation nor anything about the case that is connected to the bankruptcy; indeed, it would be a poor use of this Court's time and resources to prepare for and conduct that trial, even if it could conduct a jury trial.  Instead, it should grant relief from the stay and allow the Federal court system to fully and completely resolve all claims of the Fontaines against P & J, enabling the Fontaines to deliver a final liquidated claim to the bankruptcy process for appropriate administration.

## IV.   Conclusion.

Not a single factor supports the denial of stay relief in this case other than the mere existence of 11 U.S.C. § 362, and that is simply not enough to deny the Fontaines their day in court with all of their defendants.  The trial preparation is complete or virtually complete.  The parties were poised for trial.  The Magistrate is standing by, ready with trial dates within the next few weeks.  This is the early stage of the bankruptcy case; indeed, the Unsecured Creditors Committee has just been formed and has not yet retained counsel.  The denial of relief exposes the Fontaines to the risk of substantial delay in obtaining remedies against third persons who are not debtors and who may be transferring assets as we speak.  There is no connection between the District Court Litigation and the bankruptcy case, and no reason that it should not be allowed to go forward in the parties' chosen forum.  The claims must be liquidated at some point. Considering the potential size of the claims, it is better that this occur sooner rather than later.  It may even be argued that until these claims are fixed and liquidated, the creditors will not have adequate information to vote on a plan.  Stay relief should be granted to allow the Fontaines to

(1) pursue their claims to final, non-appealable judgment against P & J, and (2) seek entry of a

Federal District Court Order making the Memorandum Opinion and Order final.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP


 /s/ Mary L. Fullington
Mary L. Fullington
Karen J. Greenwell
Daniel I. Waxman
G. Brian Wells
250 West Main Street, Suite 1600
Lexington, Kentucky  40507-1746
Telephone:  (859) 233-2012
Facsimile:  (859) 259-0649
E-mail:  Lexbankruptcy@wyattfirm.com

COUNSEL FOR THE FONTAINES

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Memorandum in Support of Motion for Relief From Automatic Stay has been served this 30th day of June, 2010, in the method established under the CM/ECF Administrative Procedures Manual, and the Local Court Standing Order dated July 25, 2002, and to the parties listed below via facsimile, electronic and/or first-class, postage prepaid U.S. mail.

P & J Resources, Inc.
HC 60 Lakeville Road
P.O. Box 707
Salyersville, KY  41465

Dean A. Langdon
T. Kent Barber
DelCotto Law Group PLLC
200 North Upper Street
Lexington, KY  40507

Philip L. Hanrahan
Office of the U.S. Trustee
100 East Vine Street, #500
Lexington, KY  40507

Ellen Arvin Kennedy
Fowler Measle & Bell PLLC
300 West Vine Street, Suite 600
Lexington, KY  40507

Superior Well Service
c/o George McNinch
1380 Rt. 286 E, Suite 121
Indiana, PA  15701

Hazard Petroleum Co.
c/o Timothy Clemons
P.O. Box A
Combs, KY  41729

Universal Well Services, Inc.
c/o John B. Brautigam
201 Arch Street
Meadville, PA  16335

   /s/ Mary L. Fullington
Mary L. Fullington

30558990.4

# EXHIBIT A

UNITED STATES DISTRICT COURT
PIKEVILLE DIVISION
CIVIL ACTION NO. _____


RAYMOND E. FONTAINE TRUST,            )
DATED 12/2/88, AS AMENDED, BY         )
AND THROUGH JEAN WEBSTER,             )
PATRICIA FONTAINE, KATHLEEN           )
FOWLER, AND MARY FONTAINE             )
CARLSON, SUCCESSOR CO-                )
TRUSTEES;                             )
                                      )
and                                   )
                                      )
MPJ FONTAINE TRUST, U.A. DTD          )
10/26/98, BY AND THROUGH JEAN         )
WEBSTER, PATRICIA FONTAINE,           )
AND MARY FONTAINE CARLSON,            )
CO-TRUSTEES;                          )
                                      )
and                                   )
                                      )
JEAN WEBSTER, INDIVIDUALLY;           )
                                      )
and                                   )
                                      )
GARY WEBSTER, INDIVIDUALLY;           )
                                      )
and                                   )
                                      )
PATRICIA FONTAINE,                    )
INDIVIDUALLY;                         )
                                      )
and                                   )
                                      )
MARY FONTAINE CARLSON,                )
INDIVIDUALLY;                         )
                                      )
and                                   )
                                      )
ROBERT CARLSON, INDIVIDUALLY;         )
                                      )
and                                   )
                                      )
DYLAN KLEMPNER,                       )

INDIVIDUALLY;                               )
                                           )
and                                        )
                                           )
THE R.E. AND M.V. FONTAINE                 )
FAMILY FOUNDATION, INC.;                   )
                                           )
and                                        )
                                           )
THE NORA CARLSON                           )
IRREVOCABLE TRUST, BY AND                  )
THROUGH ROBERT CARLSON, AND                )
MARY FONTAINE CARLSON, CO-                 )
TRUSTEES;                                  )
                                           )
and                                        )
                                           )
THE RAYMOND STREET GROUP,                  )
LLC;                                       )
                                           )
and                                        )
                                           )
CHERRY DRIVEWAY, LLC;                      )
                                           )
and                                        )
                                           )
JOAN CASARTELLO,                           )
INDIVIDUALLY;                              )
                                           )
and                                        )
                                           )
PATRICIA CARUCCI SCHWARTZ,                 )
INDIVIDUALLY;                              )
                                           )
and                                        )
                                           )
PIAKER FAMILY IRREVOCABLE                  )
TRUST, BY AND THROUGH,                     )
MATTHEW PIAKER, ALAN PIAKER                )
AND SUSAN PIAKER, CO-TRUSTEES              )
                                           )
and                                        )
                                           )
ROSEMARY HILLARY,                          )
INDIVIDUALLY;                              )
                                           )

2

and                                              )
                                                 )
ARLENE EVERETT, INDIVIDUALLY    )   PLAINTIFFS
                                                 )
                                                 )
v.                                               )
                                                 )
P& J RESOURCES, INC.                  )
SERVE:  Jean Williams                    )
          P.O. Box 707                       )
          HC 60 Oakley Road             )
          Salyersville, Kentucky 41465  )
                                                 )
                                                 )
and                                              )
                                                 )
RICHARD WILLIAMS                     )
SERVE: RICHARD WILLIAMS        )
          Lakeville Road                     )
          Salyersville, Kentucky 41465  )
                                                 )
PAMELA WILLIAMS                      )
SERVE: PAMELA WILLIAMS          )
          Lakeville Road                     )
          Salyersville, Kentucky 41465  )   DEFENDANTS

## COMPLAINT

For their Complaint herein, the Plaintiffs state as follows:

Parties:

1.      The Raymond E. Fontaine Trust, dated 12/22/88, as amended   ("Fontaine

Trust") is a Trust formed and existing pursuant to the laws of the State of Florida,

with a mailing address of 5 MacGregor Way, Acton, Middlesex County,

Massachusetts 01720.

2.      Raymond E. Fontaine who was the settlor and the original trustee of the Fontaine Trust, died a citizen of the state of Florida, on or about June 30, 2007.

3.      On or about July 5, 2007, Jean Webster became a Successor Co-Trustee of the Fontaine Trust, and she is a citizen of the State of Massachusetts, County of Middlesex, with a mailing address of 5 MacGregor Way, Acton, Massachusetts 01720.

4.      On or about July 5, 2007, Patricia Fontaine became a Successor Co-Trustee of the Fontaine Trust, and she is a citizen of the State of Vermont, County of Chittenden, with a mailing address of 291 Ordway Shore Road, Shelburne, Vermont 05482.

5.      On or about July 5, 2007, Kathleen Fowler became a Successor Co-Trustee of the Fontaine Trust, and she is a citizen of the State of Massachusetts, County of Barnstable, with a mailing address of P.O. Box 1079, Dennis, Massachusetts 02638.

6.      On or about July 5, 2007, Mary Fontaine Carlson became a Successor Co-Trustee of the Fontaine Trust, and she is a citizen of the State of Washington, County of Kitsap, with a mailing address of P.O. Box 11590, Bainbridge Island, Washington 98110.

7.      The MPJ Fontaine Trust, U.A. DTD 10/26/98 (the "MJP Trust") is a Trust formed and existing pursuant to the laws of the State of Massachusetts, with a mailing address of 5 MacGregor Way, Acton, Massachusetts, 01720.

8.      Jean Webster is a Co-Trustee of the MPJ Trust, and she is a citizen of the State of Massachusetts, County of Middlesex, with a mailing address of 5 MacGregor Way, Acton, Massachusetts 01720.

9.      Patricia Fontaine is a Co-Trustee of the MPJ Trust, and she is a citizen of the State of Vermont, County of Chittenden, with a mailing address of 291 Ordway Shore Road, Shelburne, Vermont 05482.

10.      Mary Fontaine Carlson is a Co-Trustee of the MPJ Trust, and she is a citizen of the State of Washington, County of Kitsap, with a mailing address of P.O. Box 11590, Bainbridge Island, Washington 98110.

11.      Jean Webster, individually, is a citizen of the State of Massachusetts, County of Middlesex, with a mailing address of 5 MacGregor Way, Acton, Massachusetts 01720.

12.      Gary Webster, individually, is a citizen of the State of Massachusetts, County of Middlesex, with a mailing address of 5 MacGregor Way, Acton, Massachusetts 01720.

13.      Patricia Fontaine, individually, is a citizen of the State of Vermont, County of Chittenden, with a mailing address of 291 Ordway Shore Road, Shelburne, Vermont 05482.

14.      Mary Fontaine Carlson, individually, is a citizen of the State of Washington, County of Kitsap, with a mailing address of P.O. Box 11590, Bainbridge Island, Washington 98110.

5

15.     Robert Carlson, is a citizen of the State of Washington, County of Kitsap, with a mailing address of P.O. Box 11590, Bainbridge Island, Washington 98110.

16.     Dylan Klempner, individually, is a citizen of the State of Massachusetts, County of Middlesex, with a mailing address of P.O. Box 390202, Cambridge, Massachusetts 02139.

17.     The Raymond E. and Marie V. Fontaine Family Foundation, Inc. ("Fontaine Foundation") is a non-profit corporation organized and existing under the laws of the State of Massachusetts, with a mailing address of 5 MacGregor Way, Acton, Massachusetts 01720.

18.     The Raymond Street Group, LLC (the "Raymond Street Group") is a limited liability company organized and existing under the laws of the State of Washington with a mailing address of P.O. Box 11590, Bainbridge Island, Washington 98110.

19.     The Nora Carlson Irrevocable Trust ("Carlson Trust"), is a Trust organized and existing under the laws of the State of Washington, with a mailing address of P.O. Box 11590, Bainbridge Island, Washington 98110.

20.     Robert Carlson is the Co-Trustee of the Carlson Trust, and he is a citizen of the State of Washington, County of Kitsap, with a mailing address of P. O. Box 11590, Bainbridge Island, Washington 989110.

21.     Cherry Driveway, LLC ("Cherry Driveway"), is a limited liability company organized and existing under the laws of the State of Washington with a mailing address of 24663 Big Valley Road, Poulsbo, Washington 98370.

22.     Joan Casartello, is a citizen of the State of Massachusetts, County of Barnstable, with a mailing address of 111 Stage Coach Drive, S. Chatham, Massachusetts 02659.

23.     Patricia Carucci Schwartz, is a citizen of the State of New Jersey, County of Bergen, with a mailing address of 80 Ardmore Road, Ho-Ho-Kus, New Jersey 07423.

24.     The Piaker Family Irrevocable Trust ("Piaker Trust"), is a trust organized and existing under the laws of the State of Massachusetts, with a mailing address of 100 Cummings Center, Suite 454C, Beverley, Massachusetts 01915.

25.     Matthew Piaker is the Co-Trustee of the Piaker Trust, with a mailing address of 100 Cummins Center, Suite 454C, Beverly Massachusetts 01915.

26.     Alan Piaker is the Co-Trustee of the Piaker Trust, with a mailing address of 4713 Deerfield Place, Vestal, New York 13850.

27.     Susan Kasper is a Co-Trustee of the Piaker Trust, with a mailing address of 74 Aldrich Avenue, Binghamton, New York 13903.

28.     Arlene Everett is a citizen of the state of Florida, County of Broward, with a mailing address of 3900 NE 18th Avenue #1, Ft. Lauderdale, Florida 33334.

29.     Rosemary Hillary, is a citizen of the State of Florida, County of Palm Beach, with a mailing address of 141 N. Lakeshore Drive, Hypoluxo, Florida 33462.

30.     The Defendant, P&J Resources, Inc. ("P&J") is a corporation created and existing pursuant to the laws of the Commonwealth of Kentucky, with its principal

place of business located at HC 60 Oakley Rd., Salyersville, Magoffin County, Kentucky 41465.  Its agent for service of process is Jean Williams at that same address.

31.    Richard Williams is an individual who is a citizen of the Commonwealth of Kentucky with a mailing address of Lakeville Road, Salyersville, Kentucky 41465, in Magoffin County.  On information and belief he is an owner of P&J.

32.    Pamela Williams is an individual who is a citizen of the Commonwealth of Kentucky with a mailing address of Lakeville Road, Salyersville, Kentucky 41465, in Magoffin County, and she is the President of P&J.

33.    Richard Williams and Pamela Williams both participate in the operation of P&J and other business activities, and on information and belief they are husband and wife.

Jurisdiction And Venue

34.    This action is between citizens of different states, such that there is complete diversity of citizenship between each of the Plaintiffs and the Defendants.

35.    The amount in controversy, exclusive of costs and interest, exceeds $100,000.

36.    This court has diversity jurisdiction over the matters asserted herein pursuant to 28 U.S.C. §1332(a).

37.    Venue is proper in this court pursuant to 28 U.S.C. §1391(a)(2).

38.     This matter is properly filed in the Pikeville jury division of the Eastern District of Kentucky because the property interests referenced herein are located primarily in Magoffin County, and the majority of the actions complained of herein occurred or originated in Magoffin County, Kentucky.

<u>Factual Statements</u>

39.     Raymond E. Fontaine was a successful entrepreneur who lived most of his life in Massachusetts, but in 1985 became a resident of the State of Florida.  Despite being a Florida resident, Mr. Fontaine continued to own and frequently visit his residence in Massachusetts.  Prior to September 2002, Mr. Fontaine entered into some oil and gas investments in the Appalachian Basin with persons and entities other than the Defendants.

40.     After learning of those investments, Richard Williams contacted Mr. Fontaine to induce Mr. Fontaine to make additional oil and gas investments with him and with P&J.

41.     At that time, and at all relevant times thereafter, Richard Williams and Pamela Williams purported to represent and to act on behalf of P&J in communications and transactions involving Plaintiffs with the actual or apparent authority to bind P&J.

42.     After September 2002, the Defendants engaged in a fraudulent scheme pursuant to which they induced Mr. Fontaine, acting variously for and on behalf of himself and the Fontaine Trust, the MPJ Trust, the Fontaine Foundation and various family members, to engage in transactions described herein.  References hereinafter to "Mr. Fontaine" will include the applicable trust, person or entity.

*Circle J. Farm Wells #4 And #5*

43.    On September 27, 2002 Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in Circle J. Farm Well #4 and Circle J. Farm Well #5 (the "Circle J. 4 and 5 Letter Agreement"). A copy of the Circle J. 4 and 5 Letter Agreement is attached hereto as Exhibit 1.

44.    Pursuant to the terms of the Circle J. 4 and 5 Letter Agreement, and to induce Mr. Fontaine to make the investment, the Defendants agreed to pay 75% of the net revenue produced from each of the wells until the initial investment had been repaid ("Payout"), at which time the revenue interest would be reduced to 50% of the net revenue of the wells.

45.    Pamela Williams on behalf of P&J executed the assignments related to the Circle J. Farm Well #4 and Circle J. Farm Well #5 which are attached hereto as Exhibits 2 and 3, respectively (the "Circle J. 4 and 5 Assignments").

46.    On information and belief, it was the intention of the parties to the Circle J. 4 and 5 Letter Agreement that Mr. Fontaine receive a fifty-percent (50%) working interest in each of the referenced wells.

47.    On information and belief, the Circle J #4 and #5 Assignments do not correctly state the working interests which was supposed to be transferred to Mr. Fontaine, nor do they reflect the net revenue interests provided for in the Circle J. 4 and 5 Letter Agreement, and they should be reformed to accurately reflect the parties' agreement.

48.      Prior to his death, Mr. Fontaine assigned his interest in Circle J. Farm Well #5, and all claims related thereto, to the Fontaine Trust.

49.      Prior to his death, Mr. Fontaine assigned his interest in the Circle J. Farms Well #4 and all claims related thereto to the Plaintiff Rosemary Hillary.

*Circle J. Farm Well #1 And #2*

50.      On or about November 8, 2002, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted by U.S. Mail to him in Massachusetts on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in Circle J. Farm Well #1 and Circle J. Farm Well #2 for a purchase price of $135,000 per well (the "Circle J. 1 and 2 Letter Agreement").  A copy of the Circle J. 1 and 2 Letter Agreement is attached hereto as Exhibit 4.

51.      Pursuant to the terms of the Circle J. 1 and 2 Letter Agreement, and to induce Mr. Fontaine to make the investment, the Defendants agreed to pay 75% of the net revenue produced from the wells until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the wells.

52.      Pamela Williams on behalf of P&J executed the assignments related to Circle J. Farm Well #1 and Circle J. Farm Well #2 which are attached hereto as Exhibits 5 and 6, respectively (the "Circle J. 1 and 2 Assignments").

53.      On information and belief, it was the intention of the parties to the Circle J. 1 and 2 Letter Agreement that Mr. Fontaine receive a fifty-percent (50%) working interest in each of the referenced wells.

54.    The Circle J. 1 and 2 Assignments do not correctly state the working interests which were supposed to be transferred to Mr. Fontaine.  Nor do they reflect the net revenue interests provided for in the Circle J. 1 and 2 Letter Agreement, and they should be reformed to accurately reflect the parties' intentions.

55.    As a further inducement to Mr. Fontaine to make the investment, P&J guaranteed the repayment of Mr. Fontaine's investment by the thirtieth month following the date the wells were placed into production.  This provision is hereafter referred to as the "30-Month Guarantee."

56.    As a further inducement to Mr. Fontaine to make the investment, P&J agreed to the following provision in the Circle J. 1 and 2 Letter Agreement:

> P&J Resources, Inc. shall guarantee to pay you based upon the production of 100,000 cubic feet of gas per day for each well, cumulatively or collectively.

Pursuant to this provision (hereafter referred to as the "100 MCF Guarantee") P&J was obligated to make net revenue payments to Mr. Fontaine and his successors based on a guaranteed production of 100,000 cubic feet ("100 MCF") of gas per day from each of Circle J. Well #1 and Circle J. Well #2, regardless of whether or not the wells actually produced gas in that amount, or any amount.

57.    On information and belief, Circle J. Farm Well #1 and Circle J. Farm Well #2 were placed into production more than thirty months prior to the date of this Complaint.  Despite requests therefor, P&J has not made the payments required by the 30-Month Guarantee.

58.     Despite requests therefor, P&J has not made payments consistent with the 100 MCF Guarantee.

59.     Prior to his death, Mr. Fontaine assigned his interest in Circle J. Farm Well #2, and all claims related thereto, to the Fontaine Trust.

60.     Prior to his death, Mr. Fontaine assigned his interest in the Circle J. Farm Well #1, and all claims related thereto, to the Plaintiff Rosemary Hillary.

*Fred Howard #1 Well and Kash Arnett #2 Well*

61.     On or about January 28, 2003, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Florida on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in the Fred Howard #1 Well and the Kash Arnett #2 Well for a total purchase price of $255,000 (the "Fred Howard 1 and Kash Arnett 2 Letter Agreement"), with the understanding that those interests and the rights related thereto would be assigned to his daughters, Jean Webster, Patricia Fontaine and Mary Fontaine Carlson.  A copy of the Fred Howard 1 and Kash Arnett 2 Letter Agreement is attached hereto as <u>Exhibit 7</u>.

62.     Pursuant to the terms of the Fred Howard 1 and Kash Arnett 2 Letter Agreement, and to induce Mr. Fontaine to make the investment for the benefit of his daughters, the Defendants agreed to pay 75% of the net revenue produced from the wells until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of each well.

63.     Pamela Williams on behalf of P&J executed the assignments relating to the Fred Howard #1 Well and the Kash Arnett #2 Well to Plaintiffs, Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson, which are attached hereto as Exhibits 8 and 9, 10 and 11, and 12 and 13, respectively (the "Fred Howard 1 and Kash Arnett 2 Assignments").

64.     On information and belief, it was the intention of the parties to the Fred Howard 1 and Kash Arnett 2 Letter Agreement that Jean Webster, Patricia Fontaine and Mary Fontaine Carlson collectively receive a fifty-percent (50%) working interest in the referenced wells.

65.     On information and belief, the Fred Howard 1 and Kash Arnett 2 Assignments do not correctly state the working interest which was supposed to be transferred to Jean Webster, Patricia Fontaine and Mary Fontaine Carlson.  Nor do they reflect the net revenue interests provided for in the Fred Howard 1 and Kash Arnett 2 Letter Agreement, and they should be reformed to correctly reflect the parties' intention.

66.     To induce Mr. Fontaine to make the investment, the Defendants included in the Fred Howard 1 and Kash Arnett 2 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above,  and the 100 MCF Guarantee, described in Paragraph 56, above.

67.     The 100 MCF Guarantee requires that P&J pay the working interest owners based on a guaranteed production of 100 MCF of gas per day from the Fred Howard #1 Well and The Kash Arnett #2 Well, regardless of whether the wells actually produced that amount, or any amount, of gas.

14

68.     On information and belief, and notwithstanding false reports from P&J to the contrary, the Fred Howard #1 Well and the Kash Arnett #2 Well were never drilled, and the amounts paid for those wells were wrongfully converted by the Defendants for their own use and benefit.

### P&R Trust #1 Well and P&R Trust #2 Well

69.     On or about February 28, 2003, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Florida on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in the P&R Trust #1 Well and P&R Trust #2 Well for a purchase price of $135,000 for each well (the "P&R Trust 1 and 2 Letter Agreement"), with the understanding that those interests and any rights related thereto would be assigned to his grandson Dylan Klempner and his daughters, Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson.  A copy of the P&R Trust 1 and 2 Letter Agreement is attached hereto as <u>Exhibit 14</u>.

70.     Pursuant to the terms of the P&R Trust 1 and 2 Letter Agreement, and to induce Mr. Fontaine to make the investment, the Defendants agreed to pay 75% of the net revenue produced from each well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the wells.

71.     Pamela Williams on behalf of P&J executed assignments relating to the P&R Trust #1 Well to each of Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson, copies of which are attached hereto as <u>Exhibits 15</u>, <u>16</u>, and <u>17</u>, respectively (the "P&R Trust 1 Assignments").

72.     Pamela Williams on behalf of P&J executed the assignment relating to the P&R Trust #2 Well to Plaintiff, Dylan Klempner, a copy of which is attached hereto as Exhibit 18 (the "P&R Trust 2 Assignment"; together with the P&R Trust 1 Assignment the "P&R Trust 1 and 2 Assignments").

73.     On information and belief, it was the intention of the parties to the P&R Trust 1 and 2 Letter Agreement that Mr. Fontaine (or his designees) receive a fifty-percent (50%) working interest in the referenced wells.

74.     On information and belief, the P&R Trust 1 and 2 Assignments do not correctly state the working interest which was supposed to be transferred to Mr. Fontaine (or his designees).  Nor do they reflect the net revenue interests provided for in the P&R Trust 1 and 2 Letter Agreement, and they should be reformed to correctly reflect the parties' intention.

75.     To induce Mr. Fontaine to make the investment for the benefit of his designees, the Defendants included in the P&R Trust 1 and 2 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above,  and the 100 MCF Guarantee, described in Paragraph 56, above.

76.     On information and belief, the P&R Trust #1 Well and the P&R Trust #2 Well were placed into production more than thirty months prior to the date of this Complaint.  Despite requests therefor, P&J has not made the payments required by the 30-Month Guarantee.

77.    The 100 MCF Guarantee requires that P&J pay the working interest owners based on a guaranteed production of 100 MCF of gas per day from the P&R Trust #1 Well and the P&R Trust #2 Well, regardless of whether the wells actually produced that amount, or any amount, of gas.

78.    Despite requests therefor, P&J has not made payments consistent with the 100 MCF Guarantee.

*P&R Trust #3 Well*

79.    On or about April 1, 2003, Mr. Carlson executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Washington on behalf of P&J, pursuant to which Mr. Carlson agreed to purchase a working interest in the P&R Trust #3 Well for a purchase price of $135,000 (the "P&R Trust 3 Letter Agreement").  A copy of the P&R Trust 3 Letter Agreement is attached hereto as <u>Exhibit 19</u>.

80.    Pursuant to the terms of the P&R Trust 3 Letter Agreement, and to induce Mr. Carlson to make the investment, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the well.

81.    Pamela Williams on behalf of P&J executed the assignment relating to the P&R Trust #3 Well which is attached hereto as <u>Exhibit 20</u> (the "P&R Trust 3 Assignment").

82.    Mr. Carlson assigned his interest in the P&R Trust #3 Well, and all claims related thereto, to the Raymond Street Group.  A copy of which assignment is attached hereto as Exhibit 21.

83.    On information and belief, it was the intention of the parties to the P&R Trust 3 Letter Agreement that Mr. Carlson (or his designee) receive a 50% working interest in the well.

84.    On information and belief, the P&R Trust 3 Assignment does not correctly state the working interest which was supposed to be transferred to Mr. Carlson.  Nor does it reflect the net revenue interests provided for in the P&R Trust 3 Letter Agreement, and it should be reformed to correctly reflect the parties' intention.

85.    To induce Mr. Carlson to make the investment, the Defendants included in the P&R Trust 3 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above, and the 100 MCF Guarantee, described in Paragraph 56, above.

86.    On information and belief, the P&R Trust #3 Well was placed into production more than thirty months prior to the date of this Complaint.  Despite requests therefor, P&J has not made the payment required by the 30-Month Guarantee.

87.    The 100 MCF Guarantee requires that P&J pay the working interest owner based on a guaranteed production of 100 MCF of gas per day from the P&R Trust #3 Well, regardless of whether the well actually produced that amount, or any amount, of gas.

88.    Despite requests therefor, P&J has not made payments consistent with the 100 MCF Guarantee.

*F.S. Martin #3 Well*

89.    On information and belief, on or about July 28, 2003, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in the F.S. Martin #3 Well for a purchase price of $135,000 (the "F.S. Martin 3 Letter Agreement") with the understanding that those interests and any rights related thereto would be assigned to his grandson, Dylan Klempner.  A copy of the F.S. Martin 3 Letter Agreement is attached hereto as Exhibit 22.

90.    Pursuant to the terms of the F.S. Martin 3 Letter Agreement, and to induce Mr. Fontaine to make the investment for the benefit of Dylan Klempner, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the well.

91.    Pamela Williams on behalf of P&J executed the assignment relating to the F.S. Martin #3 Well to Dylan Klempner which is attached hereto as Exhibit 23 (the "F.S. Martin 3 Assignment").

92.    On information and belief, it was the intention of the parties to the F.S. Martin 3 Letter Agreement that Dylan Klempner receive a combined fifty-percent (50%) working interest in the referenced well.

93.    On information and belief, the F.S. Martin 3 Assignments do not correctly state the working interest which was supposed to be transferred to Dylan Klempner. Nor do they reflect the net revenue interests provided for in the F.S. Martin 3 Letter Agreement, and they should be reformed to correctly reflect the parties' intention.

94.    To induce Mr. Fontaine to make the investment, the Defendants included in the F.S. Martin 3 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above, and the 100 MCF Guarantee, described in Paragraph 56, above.

95.    The 100 MCF Guarantee requires that P&J pay the working interest owners based on a guaranteed production of 100 MCF of gas per day from the F.S. Martin #3 Well, regardless of whether the well actually produced that amount, or any amount, of gas.

96.    On information and belief, the F.S. Martin #3 Well was never drilled, and the Defendants wrongfully converted the amounts paid for that well for their own use and benefit.

*Prater #1 Well*

97.    On information and belief, on or about July 28, 2003, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in the Prater #1 Well for a purchase price of $135,000 (the "Prater 1 Letter Agreement"), with the understanding that those interests and any rights related thereto would be assigned to the MPJ Trust.  A copy of the Prater 1 Letter Agreement is attached hereto as <u>Exhibit 24.</u>

98.    Pursuant to the terms of the Prater 1 Letter Agreement, and to induce Mr. Fontaine to make the investment for the benefit of the MPJ Trust, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the well.

99.    Pamela Williams on behalf of P&J executed the assignment relating to the Prater #1 Well to the MPJ Trust.  That assignment is attached hereto as Exhibit 25 (the "Prater 1 Assignment").

100.    On information and belief, it was the intention of the parties to the Prater 1 Letter Agreement that the MPJ Trust receive a fifty-percent (50%) working interest in the referenced well.

101.    On information and belief, the Prater 1 Assignment does not correctly state the working interest which was supposed to be transferred to the MPJ Trust.  Nor does it reflect the net revenue interests provided for in the Prater 1 Letter Agreement, and it should be reformed to correctly reflect the parties' intention.

102.    To induce Mr. Fontaine to make the investment, the Defendants included in the Prater 1 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above,  and the 100 MCF Guarantee, described in Paragraph 56, above.

103.    On information and belief, the Prater #1 Well was placed into production more than thirty months prior to the date of this Complaint.  Despite requests therefor, P&J has not made the payment required by the 30-Month Guarantee.

104.    The 100 MCF Guarantee requires that P&J pay the working interest owners based on a guaranteed production of 100 MCF of gas per day from the Prater #1 Well, regardless of whether the well actually produced that amount, or any amount, of gas.

105.    Despite requests therefor, P&J has not made payments consistent with the 100 MCF Guarantee.

*F.S. Martin #4 Well*

106.    On or about July 30, 2003, Mr. Carlson executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Washington on behalf of P&J, pursuant to which Mr. Carlson agreed to purchase a working interest in the F.S. Martin #4 Well for a purchase price of $135,000 (the "F.S. Martin 4 Letter Agreement") with the understanding that those interests and any rights related thereto would be assigned to the Nora Carlson Irrevocable Trust.  A copy of the F.S. Martin 4 Letter Agreement is attached hereto as <u>Exhibit 26</u>.

107.    Pursuant to the terms of the F.S. Martin 4 Letter Agreement, and to induce Mr. Carlson to make the investment for the benefit of the Carlson Trust, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% from the net revenue of the well.

108.    Pamela Williams on behalf of P&J executed the assignment relating to the F.S. Martin #4 Well to the Carlson Trust.  That assignment is attached hereto as <u>Exhibit 27 </u>(the "F.S. Martin 4 Assignment").

109.    On information and belief, it was the intention of the parties to the F.S. Martin 4 Letter Agreement that the Carlson Trust receive a fifty-percent (50%) working interest in the referenced well.

110.    On information and belief, the F.S. Martin 4 Assignment does not correctly state the working interest which was supposed to be transferred to the Carlson Trust. Nor does it reflect the net revenue interests provided for in the F.S. Martin 4 Letter Agreement, and it should be reformed to correctly reflect the parties' intention.

111.    To induce Mr. Carlson to make the investment for the benefit of the Carlson Trust, the Defendants included in the F.S. Martin 4 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above, and the 100 MCF Guarantee, described in Paragraph 56, above.

112.    The 100 MCF Guarantee requires that P&J pay the working interest owner based on a guaranteed production of 100 MCF of gas per day from the F.S. Martin #4 Well, regardless of whether the well actually produced that amount, or any amount, of gas.

113.    On information and belief, the F.S. Martin #4 Well was never drilled, and the amounts paid for those wells were wrongly converted by the Defendants for their own use and benefit.

*P&R Trust #4 Well*

114.    On or about April 10, 2003, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Florida on behalf of P&J, pursuant to

which Mr. Fontaine agreed to purchase a 50% working interest in the P&R Trust #4 Well for a purchase price of $135,000 (the "P&R Trust 4 Letter Agreement"). A copy of the P&R Trust 4 Letter Agreement is attached hereto as <u>Exhibit 28</u>.

115.    Pursuant to the terms of the P&R Trust 4 Well Letter Agreement, and to induce Mr. Fontaine to make the investment, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the well.

116.    Pamela Williams on behalf of P&J executed the assignment relating to the P&R Trust #4 Well which is attached hereto as <u>Exhibit 29</u> (the "P&R Trust 4 Assignment").

117.    On information and belief, it was the intention of the parties to the P&R Trust 4 Letter Agreement that Mr. Fontaine receive a fifty-percent (50%) working interest in the referenced well.

118.    On information and belief, the P&R Trust 4 Assignment does not correctly state the working interest which was supposed to be transferred to Mr. Fontaine. Nor does it reflect the net revenue interests provided for in the P&R Trust 4 Letter Agreement, and it should be reformed to correctly reflect the parties' intention.

119.    To induce Mr. Fontaine to make the investment, the Defendants included in the P&R Trust 4 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above,  and the 100 MCF Guarantee, described in Paragraph 56, above.

120.    The 100 MCF Guarantee requires that P&J pay the working interest owners based on a guaranteed production of 100 MCF of gas per day from the P&R Trust #4 Well, regardless of whether the well actually produced that amount, or any amount, of gas.

121.    Despite requests therefor, P&J has not made payments consistent with the 100 MCF Guarantee.

122.    On information and belief, and notwithstanding false reports from P&J to the contrary, the P&R Trust #4 Well was never drilled, and the amounts paid for those wells were wrongfully converted by the Defendants for their own use and benefit.

123.    Prior to his death, Mr. Fontaine transferred his interest in the P&R Trust #4 Well, and all claims relating thereto, to the Fontaine Trust.

*Minix Wells #1 And #2*

124.    On or about May 5, 2003, Mr. Fontaine executed a letter agreement Mr. Williams transmitted by U.S. Mail to him in Florida on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in the Minix #1 Well and the Minix #2 Well for a purchase price of $135,000 for each well (the "Minix 1 and 2 Letter Agreement").   A copy of the Minix 1 and 2 Letter Agreement is attached hereto as Exhibit 30.

125.    Pursuant to the terms of the Minix 1 and 2 Letter Agreement, and to induce Mr. Fontaine to make the investment, the Defendants agreed to pay 75% of the net

revenue produced from the wells until Payout, at which time the revenue interest would be reduced to 50% of the net revenue from the wells.

126.    Pamela Williams on behalf of P&J executed the assignments relating to the Minix #1 Well and the Minix #2 Well which are attached hereto as <u>Exhibits 31</u> and <u>32</u>, respectively (the "Minix 1 and 2 Assignments").

127.    On information and belief, it was the intention of the parties to the Minix 1 and Minix 2 Letter Agreement that Mr. Fontaine receive a fifty-percent (50%) working interest in each of the referenced wells.

128.    On information and belief, the Minix 1 and 2 Assignments do not correctly state the working interest which was supposed to be transferred to Mr. Fontaine.  Nor do they reflect the net revenue interests provided for in the Minix 1 and 2 Letter Agreement, and they should be reformed to properly reflect the parties' agreement.

129.    To induce Mr. Fontaine to make the investment, the Defendants included in the Minix 1 & 2 Letter Agreement the 30-Month Guarantee, referenced in Paragraph 55, above, and 100 MCF Guarantee, referenced in Paragraph 56, above.

130.    On information and belief, the Minix #2 Well was placed into production more than thirty months prior to the date of this Complaint. Despite requests therefor, P&J has not made the payments required by the 30-Month Guarantee.

131.    The 100 MCF Guarantee requires that P&J pay the working interest owners based on a guaranteed production of 100 MCF per day from each of the Minix #1

Well and the Minix #2 Well, regardless of whether those wells actually produced that amount, or any amount, of gas.

132.    Despite requests therefor, P&J has not made payments consistent with the 100 MCF Guarantee.

133.    On information and belief, the Minix #1 well was never drilled and the amounts paid for those wells were wrongfully converted by the Defendants for their own use and benefit.

134.    Prior to his death, Mr. Fontaine transferred his interest in the Minix #1 Well and the Minix #2 Well, and all claims related thereto, to the Fontaine Trust.

*F.S. Martin #2 Well*

135.    On or about June 19, 2003, Mr. Webster executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Mr. Webster agreed to purchase a working interest in the F.S. Martin #2 Well for a purchase price of $135,000 (the "F.S. Martin 2 Letter Agreement").  A copy of the F.S. Martin 2 Letter Agreement is attached hereto as Exhibit 33.

136.    Pursuant to the terms of the F.S. Martin 2 Letter Agreement, and to induce Mr. Webster to make the investment, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time Mr. Webster's revenue interest would be reduced to 50% of the net revenue of the well.

137.    Pamela Williams on behalf of P&J executed the assignment relating to the F.S. Martin #2 Well which is attached hereto as <u>Exhibit 34</u> (the "F.S. Martin 2 Assignment").

138.    On information and belief, it was the intention of the parties to the F.S. Martin 2 Letter Agreement that Mr. Webster receive a fifty-percent (50%) working interest in the referenced well.

139.    On information and belief, the F.S. Martin 2 Assignment does not correctly state the working interest which was supposed to be transferred to Mr. Webster.  Nor does it reflect the net revenue interests provided for in the F.S. Martin 2 Letter Agreement, and it should be reformed to correctly reflect the parties' intention.

140.    To induce Mr. Webster to make the investment, the Defendants included in the F.S. Martin 2 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above, and the 100 MCF Guarantee, described in Paragraph 56, above.

141.    On information and belief, the F.S. Martin #2 Well was placed into production more than thirty months prior to the date of this Complaint.  Despite requests therefor, P&J has not made the payment required by the 30-Month Guarantee.

142.    The 100 MCF Guarantee requires that P&J pay the working interest owners based on a guaranteed production of 100 MCF of gas per day from the F.S. Martin #2 Well, regardless of whether the well actually produced that amount, or any amount, of gas.

143.    Despite requests therefor, P&J has not made payments consistent with the 100 MCF Guarantee.

*Twenty-Well Program*

144.    On or about October 15, 2003, Mr. Fontaine executed a letter agreement transmitted by U.S. Mail to him in Florida by Richard Williams on behalf of P&J pursuant to which Mr. Fontaine agreed to purchase a working interest in each of twenty wells for a total purchase price of $1,350,000 (the "Twenty-Well Letter Agreement") with the understanding that certain of those interests and any rights related thereto would be assigned to his daughters, Jean Webster, Patricia Fontaine and Mary Fontaine Carlson. A copy of the Twenty-Well Letter Agreement is attached hereto as <u>Exhibit 35</u>.

145.    To induce Mr. Fontaine to make the investment for the benefit of himself and his daughters, Jean Webster, Patricia Fontaine and Mary Fontaine Carlson in the Twenty-Well Program, the Defendants agreed that Mr. Fontaine or his designee would receive 75% of the net revenue produced from each of the wells for a period of twenty-four months, or until they had received $2,000,000 ("Payout"), whichever was later. After Payout, the revenue interest would be reduced to 50% of the net revenue from each of the wells.

146.    The wells which made up the Twenty-Well Program, and the assignments of interests in such wells (collectively the "Twenty-Well Program Assignments") are as follows:

(a)     Minix #3, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 36</u>;

(b)     Bailey #1, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 37</u>;

(c)     Prater #2, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 38</u>;

(d)     Prater #3, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 39</u>;

(e)     Bates #1, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 40</u>;

(f)     Arnett #7, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 41</u>;

(g)     Arnett #8, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 42</u>;

(h)     Reed #1, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 43</u>;

(i)     Reed #2, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 44</u>;

(j)     Reed #3, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 45</u>;

(k)     Reed #4, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 46</u>;

(l)     Rowe #1, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 47</u>;

(m)     Dunn et al. #2, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 48</u>;

(n)     Dunn et al. #3, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 49</u>;

(o)     P&R Trust #5, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 50</u>;

(p)     A. Bailey #2, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 51</u>;

(q)     Circle J. Farms #3, the assignment for which was executed by Pamela Williams on behalf of P&J and is attached as <u>Exhibit 52</u>;

(r)     May #10, the assignments for which was executed by Pamela Williams on behalf of P&J to Jean Webster, Patricia Fontaine and Mary Fontaine Carlson, and are attached as <u>Exhibits 53</u>, <u>54</u>, and <u>55</u>, respectively;

(s)     May #11, the assignment for which was executed by Pamela Williams on behalf of P&J to Jean Webster, Patricia Fontaine and Mary Fontaine Carlson, and are attached as <u>Exhibits 56</u>, <u>57</u>, and <u>58</u>, respectively; and

(t)     May #12, the assignment for which was executed by Pamela Williams on behalf of P&J to Jean Webster, Patricia Fontaine and Mary Fontaine Carlson, and are attached as <u>Exhibits 59</u>, <u>60</u>, and <u>61</u>, respectively.

147.    On information and belief, it was the intention of the parties to the Twenty-Well Letter Agreement that Mr. Fontaine (or his designees) receive a fifty-percent (50%) working interest in each of the referenced wells.

148.    On information and belief, the Twenty-Well Program Assignments do not correctly state the working interest which was supposed to be transferred to Mr. Fontaine or his designees in each well.  Nor do they reflect the net revenue interests provided for in the Twenty-Well Letter Agreement, and they should each be reformed to correctly reflect the parties' intention.

149.    Prior to his death, Mr. Fontaine transferred his interest in all of the wells referenced in Paragraph 146 (a) through (q), and all claims related thereto, to the Fontaine Trust.

150.    The interests related to May #10 Well, May #11 Well, and May #12 Well were assigned to his daughters, Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson.

31

151.    On information and belief, and notwithstanding false reports from P&J to the contrary, some of the wells which were represented to be a part of the Twenty-Well Program (and particularly Minix #3, May #10, Arnett #8, and P&R Trust #5, Dunn #2, Dunn #3, Rowe #1, Bailey #1, and A. Bailey #2) were never drilled, and the Defendants wrongfully converted the amounts paid by in connection with those wells to their own use and benefit.

*Puckett #1 Well*

152.    On or about December 9, 2003, Mr. Carlson executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Washington on behalf of P&J, pursuant to which Mr. Carlson agreed to purchase a working interest in the Puckett #1 Well for a purchase price of $135,000 (the "Puckett 1 Letter Agreement").  A copy of the Puckett 1 Letter Agreement is attached hereto as Exhibit 62.

153.    Pursuant to the terms of the Puckett 1 Letter Agreement, and to induce Mr. Carlson to make the investment, for the benefit of himself and Cherry Driveway, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the well.

154.    Pamela Williams on behalf of P&J executed the assignments relating to the Puckett #1 Well to his designees Robert and Mary Fontaine Carlson, and to Cherry Driveway, which are attached hereto as Exhibits 63 and 64 (the "Puckett 1 Assignments").

32

155.    On information and belief, it was the intention of the parties to the Puckett 1 Letter Agreement that Mr. Carlson (or his designees) together receive a fifty-percent (50%) working interest in the referenced well.

156.    On information and belief, the Puckett 1 Assignments do not correctly state the working interest which was supposed to be transferred to Mr. Carlson's designees. Nor do they reflect the net revenue interests provided for in the Puckett 1 Letter Agreement, and they should be reformed to correctly reflect the parties' intention.

157.    To induce Mr. Carlson to make the investment, the Defendants included in the Puckett 1 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above,  and the 100 MCF Guarantee, described in Paragraph 56, above.

158.    On information and belief, and notwithstanding false reports from P&J to the contrary, the Puckett#1 Well was never drilled, and the amount paid for such well was wrongfully converted by the Defendants for their own use and benefit.

159.    The 100 MCF Guarantee requires that P&J pay the working interest owners based on a guaranteed production of 100 MCF of gas per day from the Puckett #1 Well, regardless of whether the well actually produced that amount, or any amount, of gas.

160.    Despite requests therefor, P&J has not made payments consistent with the 100 MCF Guarantee.

*J.W. Howard #3 Well*

161.    On or about May 5, 2004, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in the J.W. Howard #3 Well for a purchase price of $67,500.00 (the "J.W. Howard 3 Letter Agreement").  A copy of the J.W. Howard 3 Letter Agreement is attached hereto as Exhibit 65.

162.    Pursuant to the terms of the J.W. Howard 3 Letter Agreement, and to induce Mr. Fontaine to make the investment, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the well.

163.    Pamela Williams on behalf of P&J executed the assignment related to the J.W. Howard #3 Well which is attached hereto as Exhibit 66 (the "J.W. Howard 3 Assignment").

164.    On information and belief, it was the intention of the parties to the J.W. Howard 3 Letter Agreement that Mr. Fontaine receive a fifty-percent (50%) working interest in the referenced well.

165.    On information and belief, the J.W. Howard 3 Assignment does not correctly state the working interest which was supposed to be transferred to Mr. Fontaine.  Nor does it reflect the net revenue interests provided for in the J.W. Howard 3 Letter Agreement, and it should be reformed to accurately reflect the agreement of the parties.

34

166.    To induce Mr. Fontaine to make the investment, the Defendants included in the J.W. Howard 3 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above.

167.    On information and belief, and notwithstanding false reports from P&J to the contrary, the J.W. Howard #3 Well was never drilled, and the amount paid for such well was wrongfully converted by the Defendants for their own use and benefit.

168.    Prior to his death, Mr. Fontaine conveyed all of his interest, rights and claims relating to the J.W. Howard #3 Well to the Fontaine Trust.

<u>Circle J. Farm #7 Well</u>

169.    On information and belief, on or about June 3, 2004, Dylan Klempner executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Mr. Klempner agreed to purchase a working interest in the Circle J. Farm #7 Well for a purchase price of $67,500.00 (the "Circle J. Farm 7 Letter Agreement").  A copy of the Circle J. Farm 7 Letter Agreement is attached hereto as <u>Exhibit 67</u>.

170.    Pursuant to the terms of the Circle J. Farm 7 Letter Agreement, and to induce Mr. Klempner to make the investment, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue from the well.

171.     Pamela Williams on behalf of P&J executed the assignment related to the Circle J. Farm #7 Well which is attached hereto as Exhibit 68 (the "Circle J. Farm 7 Assignment").

172.     On information and belief, it was the intention of the parties to the Circle J. Farm 7 Letter Agreement that Mr. Klempner receive a fifty-percent (50%) working interest in the referenced well.

173.     On information and belief, the Circle J. Farm 7 Assignment does not correctly state the working interest which was supposed to be transferred to Mr. Klempner. Nor does it reflect the net revenue interest provided for in the Circle J. Farm 7 Letter Agreement, and it should be reformed to accurately reflect the agreement of the parties.

174.     To induce Mr. Klempner to make the investment, the Defendants included in the Circle J. Farm 7 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above.

175.     On information and belief, the Circle J. Farm #7 Well was placed into production more than thirty months prior to the date of this Complaint.  Despite requests therefor, P&J has not made the payments required by the 30-Month Guarantee.

*Arnett #10 Well*

176.     On information and belief, Arlene Everett executed a letter agreement that Mr. Williams transmitted to her by U.S. Mail in Florida, on behalf of P&J, pursuant to

which Ms. Everett agreed to purchase a working interest in a well known as the Arnett #10 Well (the "Arnett 10 Letter Agreement") A copy of the Arnett 10 Letter Agreement is attached hereto as <u>Exhibit 69</u>.

177.    Pamela Williams on behalf of P&J executed an assignment related to the Arnett #10 Well which is attached hereto as <u>Exhibit 70</u> (the "Arnett 10 Assignment").

178.    Pursuant to the terms of the Arnett 10 Letter Agreement, and to induce Ms. Everett to make the investment, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue of the well.

179.    On information and belief, it was the intention of the parties to the Arnett 10 Letter Agreement, that Ms. Everett receive a fifty-percent (50%) working interest in the referenced well.

180.    On information and belief, the Arnett 10 Assignment does not correctly state the working interest which was supposed to be transferred to Ms. Everett.  Nor does it reflect the net revenue interests provided for in the Arnett 10 Letter Agreement, and it should be reformed to accurately reflect the agreement of the parties.

181.    To induce Ms. Everett to make the investment, the Defendants included in the Arnett 10 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above, and the 100 MCF Guarantee, described in Paragraph 56, above.

182.    The 100 MCF Guarantee requires that P&J pay the working interest owner based on a guaranteed production of 100 MCF of gas per day from the Arnett #10

Well, regardless of whether the wells actually produced that amount, or any amount, of gas.

183.    On information and belief, and notwithstanding false reports from P&J to the contrary, the Arnett #10 Well was never drilled, and the Defendants wrongfully converted the amount paid for such well for their own use and benefit.

*P&J #1 Well - Carlson*

184.    On or about November 15, 2004, Mr. Carlson executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Washington on behalf of P&J, pursuant to which Mr. Carlson agreed to purchase a working interest in the P&J Well #1 for the purchase price of $100,000 (the "Carlson P&J 1 Letter Agreement") which was to be a deep well.  A copy of the Carlson P&J 1 Letter Agreement is attached hereto as Exhibit 71.

185.    Pursuant to the terms of the Carlson P&J 1 Letter Agreement, and to induce Mr. Carlson to make the investment, the Defendants agreed that Mr. Carlson would receive a 25% working interest and a 25% net revenue interest in the P&J #1 Well.

186.    Pamela Williams on behalf of P&J executed the assignment relating to the P&J #1 Well which is attached hereto as Exhibit 72 (the "Carlson P&J 1 Assignment").

187.    On information and belief, it was the intention of the parties to the Carlson P&J 1 Letter Agreement that Mr. Carlson receive a 25% working interest and a 25% net revenue interest in the well.

188.    On information and belief, the P&J 1 Assignment does not correctly state the working interest which was supposed to be transferred to Mr. Carlson.  Nor does it reflect the net revenue interests provided for in the Carlson P&J 1 Letter Agreement, and it should be reformed to correctly reflect the parties' intention.

189.    On information and belief, and notwithstanding false reports by P&J to the contrary, P&J #1 Well was never drilled, and the Defendants wrongfully converted the amount paid by Mr. Carlson for that well for their own use and benefit.

*P&J #1 Well-Fontaine*

190.    On or about November 17, 2004, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Mr. Fontaine agreed to purchase a working interest in the P&J Well #1 for the purchase price of $150,000 (the "Fontaine P&J 1 Letter Agreement") which was to be a deep well.  A copy of the Fontaine P&J 1 Letter Agreement is attached hereto as Exhibit 73.

191.    Pursuant to the terms of the Fontaine P&J 1 Letter Agreement, and to induce Mr. Fontaine to make the investment, the Defendants agreed that Mr. Fontaine would receive 37.5% of the working interest and a 37.5% net revenue interest in the P&J #1 Well.

192.    Pamela Williams on behalf of P&J executed the assignment relating to the P&J #1 Well which is attached hereto as Exhibit 74 (the "Fontaine P&J 1 Assignment").

193.    On information and belief, the Fontaine P&J 1 Assignment incorrectly lists the well assigned to Mr. Fontaine as the P&J Williams #1.  If, however, the Fontaine P&J 1 Assignment relates to a well other than the P&J #1 Well, P&J has failed to execute an assignment to Mr. Fontaine in the P&J #1 Well despite his investment of $150,000 therefor.

194.    On information and belief, it was the intention of the parties to the Fontaine P& J 1 Letter Agreement that Mr. Fontaine receive a 37.5% working interest and a 37.5% net revenue interest in the well.

195.    On information and belief, the Fontaine P&J 1 Assignment does not state the correct name of the well that was purportedly assigned.  Nor does it reflect the correct working interest which was supposed to be assigned or the net revenue interests provided for in the Fontaine P&J 1 Letter Agreement, and it should be reformed to correctly reflect the parties' intention.

196.    On information and belief, and notwithstanding false reports from P&J to the contrary, P&J Well #1 was never drilled, and the Defendants wrongfully converted the amount paid for that well for their own use and benefit.

197.    Prior to his death, Mr. Fontaine conveyed all of his interest, rights and claims relating to the P&J 1 Letter Agreement and the P&J #1 Well to the Fontaine Trust.

*P&R Trust #8 and #9 Wells*

198.    On or about February 25, 2005, Mr. Fontaine executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J,

pursuant to which Mr. Fontaine agreed to purchase a working interest in the P&R Trust #8 and #9 Wells for the purchase price of $135,000 (the "P&R Trust 8 and 9 Letter Agreement") with the understanding that those interests and any rights related thereto would be assigned to the Fontaine Foundation .  A copy of the P&R Trust 8 and 9 Letter Agreement is attached hereto as Exhibit 75.

199.    Pursuant to the terms of the P&R Trust 8 and 9 Letter Agreement, and to induce Mr. Fontaine to make the investment for the benefit of the Fontaine Foundation, the Defendants agreed to pay 75% of the net revenue interest in the P&R Trust #8 and #9 Wells until Payout, at which time the net revenue interest would be reduced to 50% of the net revenue from the wells.

200.    Pamela Williams on behalf of P&J, executed the assignments relating to the P&R Trust #8 and #9 Wells to the Fontaine Foundation.  Those assignments are attached hereto as Exhibits 76 and 77 (the "P&R Trust 8 and 9 Assignments").

201.    On information and belief, it was the intention of the parties to the P&R Trust 8 and 9 Letter Agreement that the Fontaine Foundation would receive a fifty-percent (50%) working interest in the referenced wells.

202.    On information and belief, the P&R Trust 8 and 9 Assignments do not correctly state the working interest which was supposed to be transferred to the Fontaine Foundation.  Nor do they reflect the net revenue interests provided for in the P&R Trust 8 and 9 Letter Agreement, and it should be reformed to correctly reflect the parties' intention.

203.    To induce Mr. Fontaine to make the investment for the benefit of the Fontaine Foundation, the Defendants included in the P&R Trust 8 and 9 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above.

204.    On information and belief, and notwithstanding false reports from P&J to the contrary, the P&R Trust #8 and #9 Wells were never drilled, and the Defendants wrongfully converted the amount paid for such wells for their own use and benefit.

*Fontaine #1 Well - Fontaine*

205.    Prior to February 21, 2005, Mr. Fontaine paid P&J $200,000 for an interest in the Fontaine #1 Well, which was to be a deep well.

206.    Pamela Williams on behalf of P&J executed the assignment related to the Fontaine #1 Well which is attached hereto as <u>Exhibit 78</u> (the "Fontaine 1 Assignment-Fontaine").

207.    On information and belief it was the intention of the parties that Mr. Fontaine receive a 50% working interest and a 50% net revenue interest in the Fontaine #1 Well.

208.    On information and belief, the Fontaine 1 Assignment-Fontaine does not correctly reflect the working interests and revenue interests that were to be conveyed to Mr. Fontaine, and it should be reformed to accurately reflect those interests.

209.    On information and belief, and notwithstanding false reports from P&J to the contrary, the Fontaine #1 Well was never drilled, and the Defendants wrongfully converted the amount paid for such well for their own use and benefit.

210.    Prior to his death, Mr. Fontaine conveyed all of his interest, rights and claims relating to the Fontaine #1 Well to the Fontaine Trust.

*Fontaine #1 Well - Carlson*

211.    On or about March 1, 2005, Mr. Carlson executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Washington on behalf of P&J, pursuant to which Mr. Carlson agreed to purchase a working interest in the Fontaine #1 Well, which was to be a deep well, for the purchase price of $100,000 (the "Fontaine 1 Letter Agreement-Carlson"). A copy of the Fontaine 1 Letter Agreement-Carlson is attached hereto as Exhibit 79.

212.    On information and belief, despite the payment of $100,000, no assignment was issued to Mr. Carlson, and no well was drilled by P&J pursuant to the Fontaine 1 Letter Agreement-Carlson, and no well interests were conveyed to Mr. Carlson.

213.    On information and belief, and notwithstanding false reports from P&J to the contrary, the Fontaine #1 Well was never drilled, and the Defendants wrongfully converted the amount paid for such well for their own use and benefit.

*Johnson #1 Well*

214.    On or about June 17, 2005, Mr. Fontaine wrote a check to P&J Resources in the amount of $400,000 for a working interest in a new deep well, identified as the Johnson #1 Well.

215.    Despite that payment, no assignment was ever executed to Mr. Fontaine or any designee for working interests or net revenue interests in the Johnson #1 Well.

43

216.    On information and belief, and notwithstanding false reports from P&J to the contrary, the Johnson #1 Well was never drilled, and the Defendants wrongfully converted the amount paid by Mr. Fontaine for such well for their own use and benefit.

217.    Prior to his death, Mr. Fontaine conveyed all of his interest, rights and claims relating to the Johnson #1 Well to the Fontaine Trust.

*Frazier #11 And #12 Wells*

218.    On or about July 28, 2006, October 17, 2006, and March 19, 2007, Mr. Fontaine transmitted a total of $700,000 to P&J for the purchase of working interests in the Frazier #11 Well and the Frazier #12 Well, which were to be drilled in West Virginia.

219.    Pamela Williams on behalf of P&J executed the assignments related to Frazier #11 Well and Frazier #12 Well, which are attached hereto as Exhibits 80 and 81, respectively (the "Frazier 11 and 12 Assignments").

220.    On information and belief, it was the intention of the parties that Mr. Fontaine would receive a one hundred percent (100%) working interest in each of the Frazier #11 and #12 wells.

221.    On information and belief, the Frazer 11 and 12 Assignments do not correctly state the working interest which was supposed to be transferred to Mr. Fontaine, and they should be reformed to correctly reflect that intent.

222.    On information and belief, and notwithstanding false reports from P&J to the contrary, the Frazier #11 Well and Frazier #12 Well were never drilled, and the amounts paid for those wells were wrongfully converted by the Defendants for their own use and benefit.

223.    Prior to his death, Mr. Fontaine conveyed all of his interest, rights and claims relating to the Frazier #11 and Frazier #12 wells to the Fontaine Trust.

*Circle J. Farm Well #11 and Circle J. Farm #12 Well*

224.    On information and belief, on or about January 3, 2005, Joan Casartello executed a letter agreement that Mr. Williams transmitted to her by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Ms. Casartello agreed to purchase a working interest in the Circle J. Farm #11 Well and Circle J. Farm #12 Well for a total purchase price of $135,000 for both wells (the "Circle J. 11 and 12 Letter Agreement").  A copy of the Circle J. 11 and 12 Letter Agreement is attached hereto as Exhibit 82.

225.    Pursuant to the terms of the Circle J. 11 and 12 Letter Agreement, and to induce Ms. Casartello to make the investment, the Defendants agreed to pay 75% of the net revenue produced from each well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue from the wells.

226.    Pamela Williams on behalf of P&J executed the assignments relating to the Circle J. Farm #11 Well and the Circle J. Farm #12 Well, copies of which are attached hereto as Exhibits 83 and 84 (the "Circle J. 11 and 12 Assignments").

227.    On information and belief, it was the intention of the parties to the Circle J. 11 and 12 Letter Agreement that Ms. Casartello receive a fifty-percent (50%) working interest in the referenced wells.

228.    On information and belief, the Circle J. 11 and 12 Assignments do not correctly state the working interest which was supposed to be transferred to Ms Casartello.  Nor do they reflect the net revenue interests provided for in the Circle J. 11 and 12 Letter Agreement, and they should be reformed to correctly reflect the parties' intention.

229.    To induce Ms. Casartello to make the investment, the Defendants included in the Circle J. 11 and 12 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above.

230.    On information and belief, and notwithstanding false reports from P&J to the contrary, the Circle J. Farm #11 and Circle J. Farm #12 wells were never drilled, and the amounts paid for such wells were wrongfully converted by the Defendants for their own use and benefit.

*KN Salyer #2 and #3 Wells*

231.    On or about January 18, 2005, Patricia Carucci Schwartz executed a letter agreement that Mr. Williams transmitted to her by U.S. Mail in New Jersey on behalf of P&J, pursuant to which Ms. Schwartz agreed to purchase a working interest in the KN Salyer #2 and KN Salyer #3 Wells for a total purchase price of $135,000 for both wells (the "KN Salyer 2 and 3 Letter Agreement").  A copy of the KN Salyer 2 and 3 Letter Agreement is attached hereto as <u>Exhibit 85</u>.

232.    Pursuant to the terms of the KN Salyer 2 and 3 Letter Agreement, and to induce Ms. Schwartz to make the investment, the Defendants agreed to pay 75% of the net revenue produced from each well until Payout, at which time the revenue interest would be reduced to 50% from the net revenue of the wells.

233.    Pamela Williams on behalf of P&J executed assignments relating to the KN Salyer #2 and KN Salyer #3 Wells, copies of which are attached hereto as Exhibits 86 and 87 (the "KN Salyer 2 and 3 Assignments").

234.    On information and belief, it was the intention of the parties to the KN Salyer 2 and 3 Letter Agreement that Ms. Schwartz receive a fifty-percent (50%) working interest in the referenced wells.

235.    On information and belief, the KN Salyer 2 and 3 Assignments do not correctly state the working interest which was supposed to be transferred to Ms. Schwartz.  Nor do they reflect the net revenue interests provided for in the KN Salyer 2 and 3 Letter Agreement, and they should be reformed to correctly reflect the parties' intention.

236.    To induce Ms. Schwartz to make the investment, the Defendants included in the KN Salyer 2 and 3 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above.

237.    On information and belief, the KN Salyer #2 Well and the KN Salyer #3 Well were placed into production more than thirty months prior to the date of this

Complaint.  Despite requests therefor, P&J has not made the payments required by the 30-Month Guarantee.

*Circle J. Farm #6 Well*

238.    On or about April 26, 2004, Matthew Piaker ("Mr. Piaker") executed a letter agreement that Mr. Williams transmitted to him by U.S. Mail in Massachusetts on behalf of P&J, pursuant to which Mr. Piaker agreed to purchase a working interest in the Circle J. Farm #6 Well for a purchase price of $67,500.00 (the "Circle J. Farm 6 Letter Agreement") with the understanding that those interests, and any rights related thereto, would be assigned to the Piaker Trust.  A copy of the Circle J. Farm 6 Letter Agreement is attached hereto as Exhibit 88.

239.    Pursuant to the terms of the Circle J. Farm 6 Letter Agreement, and to induce Mr. Piaker to make the investment, the Defendants agreed to pay 75% of the net revenue produced from the well until Payout, at which time the revenue interest would be reduced to 50% of the net revenue from the well.

240.    Pamela Williams on behalf of P&J executed the assignment related to the Circle J. Farm #6 Well which is attached hereto as Exhibit 89 (the "Circle J. Farm 6 Assignment").

241.    On information and belief, it was the intention of the parties to the Circle J. Farm 6 Letter Agreement that the Piaker Trust receive a fifty-percent (50%) working interest in the referenced well.

242.    On information and belief, the Circle J. Farm 6 Assignment does not correctly state the working interest which was supposed to be transferred to Mr. Piaker, or his designee.  Nor does it reflect the net revenue interests provided for in the Circle J. Farm 6 Letter Agreement, and it should be reformed to accurately reflect the agreement of the parties.

243.    To induce Mr. Piaker to make the investment, the Defendants included in the Circle J. Farm 6 Letter Agreement the 30-Month Guarantee described in Paragraph 55, above.

244.    On information and belief, the Circle J. Farm #6 Well was placed into production more than thirty months prior to the date of this Complaint.  Despite requests therefor, P&J has not made the payments required by the 30-Month Guarantee.

### *Isom Stephens Wells #1, #2 And #3, And*
### *K.N. Salyer Wells  #4 And #5*

245.    On or about January 11, 2007, Mr. Fontaine transmitted funds via wire transfer to P&J for the purchase of working interests in five wells from P&J Resources for a total purchase price of $700,000.   These wells were the Isom Stephens Well #1, Isom Stephens Well #2, Isom Stephens Well #3, K.N. Salyer Well #4 and K.N. Salyer Well #5.

246.    Pam Williams on behalf of P&J executed the assignments for those wells as follows (collectively the "Five-Well Package Assignments"):

(a)     Isom Stephens Well #1, the assignment for which is attached as <u>Exhibit 90</u>;

(b)     Isom Stephens Well #2, the assignment for which is attached as <u>Exhibit 91</u>;

(c)     Isom Stephens Well #3, the assignment for which is attached as <u>Exhibit 92</u>;

(d)     K.N. Salyer Well #4, the assignment for which is attached as <u>Exhibit 93</u>; and

(e)     K.N. Salyer Well #5, the assignment for which is attached as <u>Exhibit 94</u>.

247.    On information and belief, it was the intention of the parties that Mr. Fontaine would receive a one hundred-percent (100%) working interest in the referenced wells.

248.    On information and belief, the Five-Well Package Assignments do not correctly reflect the interests and net revenue purchased by Mr. Fontaine, and they should be reformed to accurately reflect those interests.

249.    On information and belief, the K.N. Salyer Wells #4 and #5 were never drilled, and the amounts by Mr. Fontaine for those wells were wrongfully converted by the Defendants for their own use and benefit.

250.    Prior to his death, Mr. Fontaine conveyed all of his interest, rights and claims relating to each of the Isom Stephens Wells #1, #2 and #3, and the K.N. Salyer #4 and #5 Wells to the Fontaine Trust.

*Three-Well Drilling Program*

251.    On or about April 7, 2004, Jean Webster authorized the disbursement of funds to P&J for the purchase of a working interest in three wells for a purchase price of

$187,500 for the benefit of Jean Webster, Patricia Fontaine and Mary Fontaine Carlson.

252.    On information and belief, the J. Puckett #1 Well, the Martin #1 Well and the Martin #5 Well are the wells associated with the Three-Well Drilling Program.

253.    Pamela Williams on behalf of P&J executed the assignments related to each of the wells associated with the Three-Well Drilling Program to Plaintiffs, Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson which are attached hereto as <u>Exhibits 95</u>, <u>96</u>, and <u>97</u>, <u>98</u>, <u>99</u> and <u>100</u>, and <u>101</u>, <u>102</u> and <u>103</u> respectively (the "Three-Well Drilling Program Assignments").

254.    On information and belief, it was the intention of the parties to the Three-Well Drilling Program that Jean Webster, Patricia Fontaine and Mary Fontaine Carlson collectively receive a fifty-percent (50%) working interest in the referenced wells.

255.    On information and belief, the Three-Well Drilling Program Assignments do not correctly state the working interest which was supposed to be transferred to Jean Webster, Patricia Fontaine and Mary Fontaine Carlson.  Nor do they reflect the net revenue interests provided for in the Three-Well Drilling Program Letter Agreement, and it should be reformed to accurately reflect the agreement of the parties.

256.    On information and belief, and notwithstanding false reports from P&J to the contrary, the Martin #1 Well and Martin #5 Well are associated with the Three-Well Drilling Program, and were never drilled, and Mr. Fontaine's payment for such wells was wrongfully converted by the Defendants for their own use and benefit.

*Three-Well Drilling Program II*

257.    On or about March 19, 2004, Mr. Fontaine caused a payment of $187,500 to be made to P&J in connection with a three-well drilling program (the "Three-Well Program II Letter Agreement").

258.    On information and belief, despite the payment of $187,500, no assignments were issued to Mr. Fontaine or his designees, no wells were drilled by P&J pursuant to the Three-Well Program II, and no well interests were conveyed to Mr. Fontaine.

259.    To induce Mr. Fontaine to make the investment, the Defendants included in the Three-Well Drilling Program II Letter Agreement the 30-Month Guarantee described in Paragraph 55, above.  Despite requests therefor, P&J has not made the payments required by the 30-Month Guarantee

260.    On information and belief, Mr. Fontaine's $187,500 payment was wrongfully converted by the Defendants for their own use and benefit.

*Two-Well Drilling Program*

261.    On or about October 28, 2005, Mr. Fontaine caused a payment of $284,000 to be made to P&J in connection with a two-well drilling program (the "Two-Well Drilling Program").

262.    On information and belief, despite the payment of $284,000, no assignments were issued to Mr. Fontaine or his designees, no wells were drilled by P&J pursuant to the Two-Well Program, and no well interests were conveyed to Mr. Fontaine or his designees.

263.    On information and belief, Mr. Fontaine's $284,000 payment was wrongfully converted by the Defendants for their own use and benefit.

*$300,000 Loan*

264.    On or about June 14, 2004, Mr. Fontaine loaned P&J $300,000.  A promissory note reflecting that loan which establishes a term of six months and an interest rate of 10% was executed by P&J Resources and Richard Williams personally.  A copy of that promissory note is attached hereto as Exhibit 104 (the "P&J Note").

265.    To secure the P&J Note, P&J conveyed interests in five wells to Mr. Fontaine as follows:

(a)    R. Wireman #1, for which an assignment was executed by Pamela Williams on behalf of P&J, a copy of which is attached as Exhibit 105;

(b)    R. Wireman #2, for which an assignment was executed by Pamela Williams on behalf of P&J, a copy of which is attached as Exhibit 106;

(c)    R. Wireman #3, for which an assignment was executed by Pamela Williams on behalf of P&J, a copy of which is attached as Exhibit 107;

(d)    Reed #5, for which an assignment was executed by Pamela Williams on behalf of P&J, a copy of which is attached as Exhibit 108;

(e)    Reed #6, for which an assignment was executed by Pamela Williams on behalf of P&J, a copy of which is attached as Exhibit 109.

266.    The P&J Note is now due and owing.

267.    As of the date of this Complaint none of the principal or interest has been paid on the P&J Note, and $465,736.03 in principal and interest at the rate of ten percent (10%) per annum is presently due and owing.

268.    On information and belief, prior to his death Mr. Fontaine conveyed all of his interest, rights and clams relating to the $300,000 Loan to the Fontaine Trust.

## COUNT I
### (Contract Claim-Reformation Of Assignments)

269.    The Plaintiffs restate and re-allege every averment contained in Paragraphs 1 through 268 as if set out here in full.

270.    On information and belief the Circle J. 4 and 5 Assignments referenced in Paragraph 45, above, do not correctly reflect the interests purchased by Mr. Fontaine, and they should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

271.    On information and belief the Circle J. 1 and 2 Assignments referenced in Paragraph 52, above, do not correctly reflect the interests purchased by Mr. Fontaine, and they should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

272.    On information and belief the Fred Howard 1 and Kash Arnett 2 Assignments referenced in Paragraph 63, above, do not correctly reflect the interests purchased for the benefit of Jean Webster, Patricia Fontaine and Mary Fontaine Carlson, and they should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

273.    On information and belief the P&R Trust 1 and P&R Trust 2 Assignments referenced in Paragraphs 71 and 72, above, do not correctly reflect the interests purchased for the benefit of Dylan Klempner, Jean Webster, Patricia Fontaine and Mary Fontaine Carlson, and they should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

274.    On information and belief the P&R Trust 3 Assignment referenced in Paragraph 81, above, does not correctly reflect the interests purchased for the benefit of the Raymond Street Group, and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of the well after Payout.

275.    On information and belief the F.S. Martin 3 Assignment referenced in Paragraph 91, above, does not correctly reflect the interests purchased for the benefit of Dylan Klempner, and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of the well after Payout.

276.    On information and belief the Prater 1 Assignment referenced in Paragraph 99, above, does not correctly reflect the interests purchased for the benefit of the MPJ Trust, and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of the well after Payout.

277.    On information and belief the F.S. Martin 4 Assignment referenced in Paragraph 108, above, does not correctly reflect the interests purchased for the benefit of the Carlson Trust, and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of the well after Payout.

278.    On information and belief the P&R Trust 4 Assignment referenced in Paragraph 116, above, does not correctly reflect the interests purchased by Mr. Fontaine, and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

279.    On information and belief the Minix 1 and 2 Assignments referenced in Paragraph 126, above, do not correctly reflect the interests purchased by Mr. Fontaine, and they should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

280.    On information and belief the F.S. Martin 2 Assignment referenced in Paragraph 137, above, does not correctly reflect the interests purchased by Mr. Webster, and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of the well after Payout.

281.    On information and belief the Twenty-Well Program Assignments referenced in Paragraph 146, above, do not correctly reflect the interests purchased by Mr.

Fontaine, for his own benefit and for the benefit of Jean Webster, Patricia Fontaine, Mary Fontaine Carlson and they should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

282.    On information and belief the Puckett 1 Assignments referenced in Paragraph 154, above, do not correctly reflect the interests purchased for the benefit of Robert and Mary Fontaine Carlson, and Cherry Driveway, LLC, and they should be reformed to reflect an assignment of a combined 50% working interest as well as a combined net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of the well after Payout.

283.    On information and belief the J.W. Howard 3 Assignment referenced in Paragraph 163, above, does not correctly reflect the interests purchased by Mr. Fontaine, and it should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

284.    On information and belief the Circle J. Farm 7 Assignment referenced in Paragraph 171, above, does not correctly reflect the interests purchased by Mr. Klempner, and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of the well after Payout.

285.    On information and belief the Arnett 10 Assignment referenced in Paragraph 177, above, does not correctly reflect the interests purchased by Ms. Everett, and it

should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of the well after Payout.

286.   On information and belief the Carlson P&J 1 Assignment referenced in Paragraph 186, above, does not correctly reflect the interests purchased by Mr. Carlson and it should be reformed to reflect an assignment of a 25% working interest as well as a net revenue interest of 25%.

287.   On information and belief the Fontaine P&J 1 Assignment referenced in Paragraph 192, above, does not correctly identify the well to be assigned nor does it reflect the interests purchased by Mr. Fontaine and it should be reformed to reflect the correct name of the well and an assignment of a 37.5% working interest as well as a net revenue interest of 37.5%.

288.   On information and belief the P&R Trust 8 and 9 Assignments referenced in Paragraph 200, above, do not correctly reflect the interests purchased for the benefit of the Fontaine Foundation, and they should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

289.   On information and belief the Fontaine 1 Assignment-Fontaine referenced in Paragraph 206, above, does not correctly reflect the interests purchased by Mr. Fontaine and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 50%.

290.    On information and belief, despite the payment of funds for the purchase of a working interest and net revenue interest in the Fontaine #1 Well, there was not an assignment executed by P&J for any such interest, and Mr. Carlson should be granted an assignment to reflect a 25% working interest as well as a net revenue interest of 25%.

291.    On information and belief, despite the payment of funds for the purchase of a working interest and net revenue interest in the Johnson #1 Well, there was not an assignment executed by P&J for any such interest, and the Fontaine Trust should be granted an assignment to reflect a 100% working interest as well as a net revenue interest of 81.5%.

292.    On information and belief the Frazier 11 and 12 Assignments referenced in Paragraph 219, above, do not correctly reflect the interests purchased by Mr. Fontaine, and they should each be reformed to reflect an assignment of a 100% working interest as well as a net revenue interest of 81.5%.

293.    On information and belief the Circle J. Farm 11 and 12 Assignments referenced in Paragraph 226, above, do not correctly reflect the interests purchased by Ms. Casartello, and they should each be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

294.    On information and belief the KN Salyer 2 and 3 Assignments referenced in Paragraph 233, above, do not correctly reflect the interests purchased by Ms. Schwartz, and they should each be reformed to reflect an assignment of a 50%

working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

295.    On information and belief the Circle J. Farm 6 Assignment referenced in Paragraph 240, above, does not correctly reflect the interests purchased for the benefit of the Piaker Trust, and it should be reformed to reflect an assignment of a 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

296.    On information and belief the Five-Well Package Assignments referenced in Paragraph 246, above, do not correctly reflect the interests purchased by Mr. Fontaine, and they should each be reformed to reflect an assignment of a 100% working interest as well as a net revenue interest of 81.5%.

297.    On information and belief the Three-Well Drilling Program Assignments referenced in Paragraph 253, above, do not correctly reflect the interests purchased for the benefit of Jean Webster, Patricia Fontaine and Mary Fontaine Carlson, and they should each be reformed to reflect an assignment of 50% working interest as well as a net revenue interest of 75% of the net revenue prior to Payout and 50% of the net revenue of each well after Payout.

## COUNT II
*(Contract Claim - Thirty-Month Guarantees)*

298.    The Plaintiffs restate and re-allege each and every averment contained in Paragraphs 1 through 268, as if set out here in full.

*Circle J #1 and #2 Wells*

299.    In the Circle J. 1 and 2 Letter Agreement referenced in Paragraph 50, above, P&J guaranteed the repayment of the investment of $270,000 by the thirtieth month following the date in which those wells were placed into production.

300.    On information and belief, Circle J. Wells #1 and #2 were placed into production more than thirty months prior to the date of this Complaint.

301.    As of the date of this Complaint, no more than $155,749.34 of the investment had been repaid, and the Fontaine Trust should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest related to the Circle J. #2 Well. Rosemary Hillary should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest related to the Circle J. #1 Well.

*Fred Howard 1 and Kash Arnett #2 Wells*

302.    In the Fred Howard 1 and Kash Arnett 2 Letter Agreement referenced in Paragraph 61, above, P&J guaranteed the repayment of $255,000 by the thirtieth month following the date in which those wells were placed into production.

303.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the wells into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the wells into production.

304.    As of the date of this Complaint, no more than $129,989.05 of the original investment has been repaid, and Jean Webster, Patricia Fontaine and Mary Fontaine

Carlson should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

### *P&R Trust #1 and P&R Trust #2 Wells*

305.    In the P&R Trust 1 and 2 Letter Agreement referenced in Paragraph 69, above, P&J guaranteed the repayment of the investment of $270,000 by the thirtieth month following the date in which those wells were placed into production.

306.    On information and belief, P&R Trust #1 Well and P&R Trust #2 Well were placed into production more than thirty months prior to the date of this Complaint.

307.    As of the date of this Complaint, no more than $136,010.15 of the investment had been repaid, and the designees of Mr. Fontaine should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

### *P&R Trust #3 Well*

308.    In the P&R Trust 3 Letter Agreement referenced in Paragraph 79, above, P&J guaranteed the repayment of Mr. Carlson's investment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

309.    On information and belief, the P&R Trust #3 Well was placed into production more than thirty months prior to the date of this Complaint.

310.    As of the date of this Complaint, no more than $77,744.71 of Mr. Carlson's investment had been repaid, and the Raymond Street Group should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*F.S. Martin #3 Well*

311.    In the F.S. Martin 3 Letter Agreement referenced in Paragraph 89, above, P&J guaranteed the repayment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

312.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the well into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the wells into production.

313.    As of the date of this Complaint, no more than $52,398.81 of the original investment has been repaid, and Dylan Klempner should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*Prater #1 Well*

314.    In the Prater 1 Letter Agreement referenced in Paragraph 97, above, P&J guaranteed the repayment of the investment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

315.    On information and belief, the Prater #1 Well was placed into production more than thirty months prior to the date of this Complaint.

316.    As of the date of this Complaint, no more than $50,888.99 of the investment had been repaid, and MPJ Trust should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*F.S. Martin #4 Well*

317.    In the F.S. Martin 4 Letter Agreement referenced in Paragraph 106, above, P&J guaranteed the repayment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

318.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the well into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the well into production.

319.    As of the date of this Complaint, no more than $47,751.67 of the original investment has been repaid, and the Nora Carlson Trust should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*P&R Trust #4 Well*

320.    In the P&R Trust 4 Letter Agreement referenced in Paragraph 114, above, P&J guaranteed the repayment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

321.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the well into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the well into production.

322.    As of the date of this Complaint, no more than $74,048.06 of the original investment has been repaid, and the Fontaine Trust should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*Minix #1 Well*

323.    In the Minix 1 and 2 Letter Agreement referenced in Paragraph 124, above, P&J guaranteed the repayment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

324.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the well into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the well into production.

325.    As of the date of this Complaint, no more than $70,734.24 of the original investment has been repaid, and the Fontaine Trust should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*Minix #2 Well*

326.    In the Minix 1 and 2 Letter Agreement referenced in Paragraph 124, above, P&J guaranteed the repayment of the investment of $270,000 by the thirtieth month following the date in which those wells were placed into production.

327.    On information and belief, Minix #2 Well was placed into production more than thirty months prior to the date of this Complaint.

328.    As of the date of this Complaint, no more than $138,051.02 of the investment had been repaid, and the Fontaine Trust should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*F.S. Martin #2 Well*

329.    In the F.S. Martin 2 Letter Agreement referenced in Paragraph 135, above, P&J guaranteed the repayment of the investment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

330.    On information and belief, the F.S. Martin #2 Well was placed into production more than thirty months prior to the date of this Complaint.

331.    As of the date of this Complaint, no more than $54,548.96 of the investment had been repaid, and Mr. Webster should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*Puckett #1 Well*

332.    In the Puckett#1 Letter Agreement referenced in Paragraph 152 above, P&J guaranteed the repayment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

333.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the well into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the well into production.

334.   As of the date of this Complaint, no more than $43,091.46 of the original investment has been repaid, and Robert and Mary Fontaine Carlson, and Cherry Driveway should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

### *J.W. Howard #3 Well*

335.   In the J.W. Howard 3 Letter Agreement referenced in paragraph 161, above, P&J guaranteed the repayment of $67,500 by the thirtieth month following the date in which those wells were placed into production.

336.   Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the well into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the well into production.

337.   As of the date of this Complaint, no more than $14,122.18 of the original investment has been repaid, and the Fontaine Trust should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

### *Circle J. Farm #7 Well*

338.   In the Circle J. Farm 7 Agreement referenced in Paragraph 169, above, P&J guaranteed the repayment of Mr. Klempner's investment of $67,500 by the thirtieth month following the date in which those wells were placed into production.

339.   On information and belief, the Circle J. Farm #7 Well was placed into production more than thirty months prior to the date of this Complaint.

340.    As of the date of this Complaint, no more than $8,013.83 of Mr. Klempner's investment had been repaid, and Mr. Klempner should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*Arnett #10 Well*

341.    In the Arnett 10 Letter Agreement referenced in Paragraph 176, above, P&J guaranteed the repayment of $67,500 by the thirtieth month following the date in which those wells were placed into production.

342.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the well into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the well into production.

343.    As of the date of this Complaint, no more than $21,566.32 of the original investment has been repaid, and Arlene Everett should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*P&R Trust #8 and #9 Well*

344.    In the P&R Trust 8 and 9 Letter Agreement referenced in Paragraph 198, above, P&J guaranteed the repayment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

345.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the wells into production, and should not

be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the wells into production.

346.    As of the date of this Complaint, no more than $5,451.22 of the original investment has been repaid, and the Fontaine Foundation should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*Circle J.#11 and #12 Wells*

347.    In the Circle J. 11 and 12  Letter Agreement referenced in Paragraph 224, above, P&J guaranteed the repayment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

348.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the wells into production, and should not be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the wells into production.

349.    As of the date of this Complaint, no more than $9,307.76 of the original investment has been repaid, and Joan Casartello should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*KN Salyer #2 and KN Salyer #3 Wells*

350.    In the KN Salyer 2 and 3 Letter Agreement referenced in Paragraph 231, above, P&J guaranteed the repayment of the investment of $135,000 by the thirtieth month following the date in which those wells were placed into production.

351.    On information and belief, KN Salyer #2 Well and the KN Salyer #3 Well were placed into production more than thirty months prior to the date of this Complaint.

352.    As of the date of this Complaint, no more than $2,566.80 of the investment had been repaid, and Ms. Schwartz should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*Circle J. Farm #6 Well*

353.    In the Circle J. Farm #6 Letter Agreement referenced in Paragraph 238, above, P&J guaranteed the repayment of the investment of $67,500 by the thirtieth month following the date in which the well was placed into production.

354.    On information and belief, Circle J. Farm #6 Well was placed into production more than thirty months prior to the date of this Complaint.

355.    As of the date of this Complaint, no more than $20,966.57 of the investment had been repaid, and the Piaker Trust should be granted judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

*Three Well Drilling Program II*

356.    In the Three-Well Drilling Program Agreement referenced in Paragraph 257, above, P&J guaranteed the repayment of the investment of $187,500 by the thirtieth month following the date in which the well was placed into production.

357.    Upon information and belief, Defendants did not carry out their obligations in good faith, have intentionally failed to place the wells into production, and should not

be permitted to avoid their obligations pursuant to the 30-Month Guarantee as a result of their intentional failure to place the wells into production.

358.    As of the date of this Complaint, none of the original investment has been repaid, and the Fontaine Trust should be granted a judgment for all unpaid amounts along with pre-judgment and post-judgment interest.

### COUNT III
#### (Contract Claim-1000 MCF Guarantee)

359.    The Plaintiffs restate and re-allege each and every averment contained in Paragraphs 1 thorough 268 of the Complaint as if set out here in full.

*Circle J. #1 and #2 Wells*

360.    Pursuant to the 100 MCF Guarantee contained in the Circle J. 1 and 2 Letter Agreement, P&J guaranteed payment to Mr. Fontaine and his successors based on a production of one thousand cubic feet of gas per day from each of the Circle J. Well #1 and Circle J. Well #2, regardless of whether or not the wells actually produced gas in that amount, or in any amount.

361.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

362.    The Fontaine Trust should be granted a judgment on the 100 MCF Guarantee relating to Circle J. Farm Well #2 in an amount equal to the difference between any amount previously paid to Mr. Fontaine with regard thereto and the proceeds of Mr. Fontaine's applicable net revenue interest calculated based on the production of 100 MCF of gas per day from such well.

363.    Rosemary Hillary should be granted a judgment on the 100 MCF Guarantee relating to Circle J. Farm Well #1 in an amount equal to the difference between any amount previously paid to Ms. Hillary with regard thereto, and the proceeds of her applicable net revenue interest calculated based on the production of 100 MCF of gas per day from such well.

### Fred Howard #1 and Kash Arnett #2 Wells

364.    Pursuant to the 100 MCF Guarantee contained in the Fred Howard 1 and Kash Arnett 2 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from each of the Fred Howard #1 and Kash Arnett #2 Wells, regardless of whether or not the wells actually produced gas in that amount, or in any amount.

365.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

366.    Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson should be granted a judgment on the 100 MCF Guarantee relating to the Fred Howard #1 and Kash Arnett #2 Wells in an amount equal to the difference between any amount previously paid to Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson with regard thereto and the proceeds of their applicable net revenue interest calculated based on the production of 100 MCF of gas per day from each well.

### P&R Trust #1 Well and P&R Trust #2 Well

367.    Pursuant to the 100 MCF Guarantee contained in the P&R Trust 1 and 2 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from each of the P&R Trust #1 Well and the P&R Trust #2

Well, regardless of whether or not the wells actually produced gas in that amount, or in any amount.

368.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

369.    Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson should be granted a judgment on the 100 MCF Guarantee relating to the P&R Trust #1 Well in an amount equal to the difference between any amounts previously paid to Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson with regard thereto and the proceeds of their applicable net revenue interest calculated based on the production of 100 MCF of gas per day from the well.

370.    Dylan Klempner should be granted judgment on the 100 MCF Guarantee relating to the P&R Trust #2 Well in an amount equal to the difference between any amounts previously paid to Dylan Klempner and the proceeds of his applicable net revenue interest calculated based on the production of the 100 MCF of gas per day from the well.

*P&R Trust #3 Well*

371.    Pursuant to the 100 MCF Guarantee contained in the P&R Trust 3 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from the P&R Trust #3 Well, regardless of whether or not the well actually produced gas in that amount, or in any amount.

372.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

373.    The Raymond Street Group should be granted a judgment on the 100 MCF Guarantee relating to P&R Trust #3 Well in an amount equal to the difference between any amount previously paid to the Raymond Street Group and the proceeds of the Raymond Street Group's applicable net revenue interest calculated based on the production of the 100 MCF of gas per day from the well.

### F.S. Martin #3 Well

374.    Pursuant to the 100 MCF Guarantee contained in the F.S. Martin 3 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from the F.S. Martin #3 Well, regardless of whether or not the well actually produced gas in that amount, or in any amount.

375.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

376.    Dylan Klempner should be granted a judgment on the 100 MCF Guarantee relating to F.S. Martin #3 Well in an amount equal to the difference between any amounts previously paid to Mr. Klempner with regard thereto and the proceeds of his applicable net revenue interests calculated based on the production of 100 MCF of gas per day from such well.

### Prater #1 Well

377.    Pursuant to the 100 MCF Guarantee contained in the Prater 1 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from the Prater #1 Well, regardless of whether or not the well actually produced gas in that amount, or in any amount.

378.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

379.    The MPJ Trust should be granted a judgment on the 100 MCF Guarantee relating to Prater #1 Well in an amount equal to the difference between any amount previously paid to it with regard thereto and the proceeds of its applicable net revenue interests calculated based on the production of 100 MCF of gas per day from the well.

### F.S. Martin #4 Well

380.    Pursuant to the 100 MCF Guarantee contained in the F.S. Martin 4 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from the F.S. Martin #4 Well, regardless of whether or not the well actually produced gas in that amount, or in any amount.

381.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

382.    The Nora Carlson Irrevocable Trust should be granted a judgment on the 100 MCF Guarantee relating to F.S. Martin #4 Well in an amount equal to the difference between any amount previously paid to the Nora Carlson Irrevocable Trust with regard thereto and the proceeds of its applicable net revenue interest calculated based on the production of 100 MCF of gas per day from the well.

### P&R Trust #4 Well

383.    Pursuant to the 100 MCF Guarantee contained in the P&R Trust 4 Letter Agreement, P&J guaranteed payment to Mr. Fontaine and his successors based on a production of one thousand cubic feet of gas per day from the P&R Trust #4 Well,

regardless of whether or not the well actually produced gas in that amount, or in any amount.

384.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

385.    The Fontaine Trust should be granted a judgment on the 100 MCF Guarantee relating to P&R Trust #4 Well in an amount equal to the difference between any amount previously paid to Mr. Fontaine and Mr. Fontaine's applicable net revenue interest calculated based on the production of 100 MCF of gas per day from the well.

### Minix #1 and #2 Wells

386.    Pursuant to the 100 MCF Guarantee contained in the Minix 1 and 2 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from each of the Minix #1 and #2 Wells, regardless of whether or not the wells actually produced gas in that amount, or in any amount.

387.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

388.    The Fontaine Trust should be granted a judgment on the 100 MCF Guarantee relating to the Minix #1 and #2 Wells in an amount equal to the difference between any amount previously paid to Mr. Fontaine with regard thereto and the proceeds of Mr. Fontaine's applicable net revenue interest calculated based on the production of 100 MCF of gas per day from each well.

### F.S. Martin #2 Well

389.    Pursuant to the 100 MCF Guarantee contained in the F.S. Martin 2 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic

feet of gas per day from the F.S. Martin #2 Well, regardless of whether or not the well actually produced gas in that amount, or in any amount.

390.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

391.    Mr. Webster should be granted a judgment on the 100 MCF Guarantee relating to F.S. Martin #2 Well in an amount equal to the difference between any amount previously paid to Mr. Webster with regard thereto and the proceeds of Mr. Webster's applicable net revenue interest calculated based on the production of 100 MCF of gas per day from the well.

*Puckett #1 Well*

392.    Pursuant to the 100 MCF Guarantee contained in the Puckett 1 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from the Puckett #1 Well, regardless of whether or not the well actually produced gas in that amount, or in any amount.

393.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

394.    Robert Carlson and Mary Fontaine Carlson and Cherry Driveway should be granted a judgment on the 100 MCF Guarantee relating to Puckett #1 Well in an amount equal to the difference between any amount previously paid to them with regard thereto and the proceeds of applicable net revenue interests calculated based on the production of 100 MCF of gas per day from the well.

*Arnett #10 Well*

395.    Pursuant to the 100 MCF Guarantee contained in the Arnett 10 Letter Agreement, P&J guaranteed payment based on a production of one thousand cubic feet of gas per day from the Arnett #10 Well, regardless of whether or not the well actually produced gas in that amount, or in any amount.

396.    P&J has failed to make payments consistent with the 100 MCF Guarantee.

397.    Arlene Everett should be granted a judgment on the 100 MCF Guarantee relating to Arnett #10 Well in an amount equal to the difference between any amount previously paid to her with regard thereto and the proceeds of applicable net revenue interests calculated based on the production of 100 MCF of gas per day from the well.

## COUNT IV
### (Contract Claim - Undrilled Wells)

398.    The Plaintiffs restate and re-allege each and every averment contained in Paragraphs 1 through 268 as if set out here in full.

*Fred Howard #1 and Kash Arnett #2 Well*

399.    Despite the payment of $255,000 for an interest in the Fred Howard #1 and the Kash Arnett #2 Well, and the receipt of the Fred Howard 1 and Kash Arnett 2 Assignments executed by Pamela Williams, on information and belief, the Fred Howard #1 Well and the Kash Arnett #2 Well were never drilled, and the Defendants wrongfully converted the amounts paid for those wells for their own use and benefit.

400.    If the Fred Howard #1 Well and the Kash Arnett #2 Well were drilled, Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson are entitled to evidence of

their existence, an accounting for all revenue and other income from the Fred Howard #1 Well and the Kash Arnett #2 Well, and judgment for all amounts due and owning to them associated with the Fred Howard 1 and Kash Arnett 2 Letter Agreement.

*F.S. Martin #3 Well*

401.    Despite payment of $135,000 for an interest in the F.S. Martin #3 Well, and the receipt of the F.S. Martin 3 Assignment, on information and belief, the F.S. Martin #3 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

402.    If the F.S. Martin #3 Well was drilled, Dylan Klempner is entitled to evidence of such existence, an accounting for all revenue and other income from the F.S. Martin #3 Well, and judgment for all amounts due and owning to him associated with the F.S. Martin 3 Letter Agreement.

*F.S. Martin #4 Well*

403.    Despite the payment of $135,000, and the receipt of the F.S. Martin 4 Assignment, on information and belief, the F.S. Martin #4 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

404.    If the F.S. Martin #4 Well was drilled, the Nora Carlson Trust is entitled to evidence of such existence, an accounting for all revenue and other income from the F.S. Martin #4 Well, and judgment for all amounts due and owning to it associated with the F.S. Martin 4 Letter Agreement.

*P&R Trust #4*

405.    Despite the payment of $135,000, and the receipt of the P&R Trust 4 Assignment, on information and belief, the P&R Trust #4 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

406.    If the P&R Trust #4 Well was drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue and other income from the P&R Trust #4 Well, and judgment for all amounts due and owning to it associated with the P&R Trust 4 Letter Agreement.

*Minix #1 Well*

407.    Despite the payment of $135,000, and the receipt of the Minix 1 Assignment, on information and belief, the Minix #1 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

408.    If the Minix #1 Well was drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue and other income from the Minix #1 Well, and judgment for all amounts due and owning to it associated with the Minix 1 Letter Agreement.

*Puckett #1 Well*

409.    Despite the payment of $135,000, and the receipt of the Puckett 1 Assignment, on information and belief, the Puckett #1 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

410.    If the Puckett #1 Well was drilled, Robert Carlson and Mary Fontaine Carlson and Cherry Driveway are entitled to evidence of such existence, an accounting for all revenue and other income from the Puckett #1 Well, and judgment for all amounts due and owning to it associated with the Puckett 1 Letter Agreement

*Twenty-Well Program*

411.    Despite the payment of $1,350,000, and the receipt of the Twenty-Well Program Assignments, on information and belief, the Minix #3 Well, the May #10 Well, the Arnett #8 Well, the P&R Trust #5 Well, the Dunn #2 Well, the Dunn #3 Well, the Rowe #1 Well, the Bailey #1 Well, and the A. Bailey #2 Well were never drilled, and the Defendants wrongfully converted the amounts paid for those wells for their own use and benefit.

412.    If the above-referenced wells (except the May #10 Well) were drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue and other income from each of the above wells, and judgment for all amounts due and owing to it associated with the Twenty-Well Program Letter Agreement.

413.    If the May #10 Well was drilled, Jean Webster, Patricia Fontaine and Mary Fontaine Carlson are entitled to evidence of such existence, an accounting for all revenue and other income from the May #10 Well, and judgment for all amounts due and owning to them associated with the Twenty-Well Letter Agreement.

*J.W. Howard #3 Well*

414.    Despite the payment of $67,500, and the receipt of the J. W. Howard 3 Assignment, on information and belief, the J.W. Howard #3 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

415.    If the J.W. Howard #3 Well was drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue and other income from the J.W. Howard #3 Well, and judgment for all amounts due and owning to it associated with the J.W. Howard 3 Letter Agreement.

*Arnett #10 Well*

416.    Despite the payment of $67,500 for an interest in the Arnett #10 Well, and the receipt of the Arnett 10 Assignment, on information and belief, the Arnett#10 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

417.    If the Arnett #10 Well was drilled, Arlene Everett is entitled to evidence of such existence, an accounting for all revenue and other income from the Arnett #10 Well, and judgment for all amounts due and owning to her associated with the Arnett 10 Letter Agreement.

*P&J #1 Well - Fontaine*

418.    Despite the payment of $150,000 for an interest in P&J #1 Well, and the receipt of the Fontaine P&J 1 Assignment, on information and belief, the P&J #1

82

Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

419.    If the P&J #1 Well was drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue and other income from the P&J #1 Well, and judgment for all amounts due and owning to it associated with the P&J 1 Letter Agreement-Fontaine.

*P&J #1 Well - Carlson*

420.    Despite the payment of $100,000 for an interest in P&J #1 Well, and the receipt of the Carlson P&J 1 Assignment, on information and belief, the P&J #1 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

421.    If the P&J #1 Well was drilled, Robert Carlson is entitled to evidence of such existence, an accounting for all revenue and other income from the P&J #1 Well, and judgment for all amounts due and owning to him associated with the P&J 1 Letter Agreement –Carlson.

*Johnson #1 Well*

422.    Despite the payment of $400,000 for an interest in Johnson #1 Well, no assignment of any working interest or revenue interest in Johnson #1 Well was ever executed or recorded.

423.    If the Johnson #1 Well was drilled, the Fontaine Trust is entitled to an assignment which reflects the ownership in a 100% working interest in Johnson #1 Well  and a 81.5% net revenue interest.

424.    If the Johnson #1 Well was drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue from the Johnson #1 Well, and judgment for all amounts due and owning to it associated with the Johnson 1 Letter Agreement.

### Fontaine #1 Well – Fontaine

425.    Despite the payment of $200,000 for an interest in Fontaine #1 Well, and the receipt of the Fontaine 1 Assignment-Fontaine, on information and belief, the Fontaine #1 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

426.    If the Fontaine #1 Well was drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue and other income from the Fontaine #1 Well, and judgment for all amounts due and owning to it associated with the Fontaine 1 Letter Agreement-Fontaine.

### Fontaine #1 Well – Carlson

427.    Despite the payment of $100,000 for an interest in Fontaine #1 Well, no assignment of any working interest or revenue interest in the Fontaine #1 Well was ever executed or recorded, and on information and belief, the Fontaine #1 Well was never drilled, and the Defendants wrongfully converted the amounts paid for such well for their own use and benefit.

428.    If the Fontaine #1 Well was drilled, Robert Carlson is entitled to an assignment which reflects the ownership in a 25% working interest in Fontaine #1 Well and a 25% net revenue interest.

429.    If the Fontaine #1 Well was drilled, Robert Carlson is entitled to evidence of such existence, an accounting for all revenue and other income from the Fontaine #1 Well, and judgment for all amounts due and owning to him associated with the Fontaine 1 Letter Agreement-Carlson.

*P&R Trust #8 and #9 Wells*

430.    Despite the payment of $135,000 for both wells for an interest in the P&R Trust #8 Well and the P&R Trust #9 Well, and the receipt of the P&R Trust 8 and 9 Assignment, on information and belief, the P&R Trust #8 and P&R Trust #9 Wells were never drilled, and the Defendants wrongfully converted the amounts paid for those wells for their own use and benefit.

431.    If the P&R Trust #8 and P&R Trust #9 Wells were drilled, the Fontaine Foundation is entitled to evidence of such existence, an accounting for all revenue and other income from the P&R Trust #8 and P&R Trust #9 Wells, and judgment for all amounts due and owning to it associated with the P&R Trust 8 and 9 Letter Agreement-Fontaine.

*Frazier #11 and #12 Wells*

432.    Despite the payment of $700,000, and the receipt of the Frazier 11 and 12 Assignments, on information and belief, the Frazier #11 Well and Frazier #12 Well

were never drilled, and the Defendants wrongfully converted the amounts paid for those wells for their own use and benefit.

433.    If the Frazier #11 Well and the Frazier #12 Well were drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue and other income from the Frazier #11 and Frazier #12 Wells, and judgment for all amounts due and owning to it associated with the Frazier 11 and 12 Letter Agreement.

*Circle J. #11 and Circle J. #12 Wells*

434.    Despite the payment of $135,000, and the receipt of the Circle J. 11 and 12 Assignments, on information and belief, the Circle J. #11 Well and Circle J. #12 Well were never drilled, and the Defendants wrongfully converted the amounts paid for those wells for their own use and benefit.

435.    If the Circle J. #11 and Circle J. #12 Wells were drilled, Joan Casartello is entitled to evidence of such existence, an accounting for all revenue and other income from the Circle J. #11 and Circle J. #12 Wells, and judgment for all amounts due and owning to her associated with the Circle J. 11 and 12 Letter Agreement.

*Five-Well Drilling Package*

436.    Despite the payment of $700,000, and the receipt of the Five-Well Package Assignments, on information and belief, the K.N. Salyer Well #4 and K.N. Salyer Well #5 were associated with the Five-Well Package, and were never drilled, and the Defendants wrongfully converted the amounts paid for those wells for their own use and benefit.

437.    If the K.N. Salyer Well #4 and K.N. Salyer Well #5 were drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting for all revenue from the K.N. Salyer #4 and K.N. Salyer #5 Wells, and judgment for all amounts due and owning to it associated with the Five-Well Package Letter Agreement.

### Three-Well Drilling Program

438.    Despite the payment of $187,500 for an interest in the wells to be included in the Three-Well Drilling Program Assignments, and the receipt of the Three-Well Drilling Program Assignments, on information and belief, the Martin #1 Well and Martin #5 Well were associated with the Three-Well Drilling Program, and were never drilled, and the Defendants wrongfully converted the amounts paid for these wells for their own use and benefit.

439.    If the Martin #1 and Martin #5 Wells were drilled, Jean Webster, Patricia Fontaine and Mary Fontaine Carlson are entitled to evidence of such existence, an accounting  for all revenue and other income from the Martin #1 and Martin #5 Wells.

### Three-Well Drilling Program II

440.    Despite the payment of $187,500 for an interest in the wells to be included in the Three-Well Drilling Program II referenced in Paragraph 257, above, no assignments of any working interest or revenue interest in those wells were ever executed or recorded.

441.    If the wells in the Three-Well Drilling Program II were drilled, the Fontaine Trust is entitled to an assignment which reflects the ownership in a 50% working

interest in the wells in the Three-Well Drilling Program, and a 75% net revenue interest until Payout, and a 50% net revenue interest thereafter.

442.    If the Three-Well Drilling Program II wells were drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting  for all revenue and other income from the wells associated with the Three-Well Drilling Program II, and judgment for all amounts due and owning to them associated with the Three-Well Drilling Program II Letter Agreement.

*Two-Well Drilling Program*

443.    Despite the payment of $284,000 for an interest in the wells to be included in the Two-Well Drilling Program referenced in Paragraph 261, no assignments of any working interest or revenue interest in those wells were ever executed or recorded.

444.    If the wells in the Two-Well Drilling Program were drilled, the Fontaine Trust is entitled to an assignment which reflects the ownership in the agreed to working interest and net revenue in the wells in the Two-Well Drilling Program.

445.    If the Two-Well Drilling Program wells were drilled, the Fontaine Trust is entitled to evidence of such existence, an accounting  for all revenue and other income from the wells associated with the Two-Well Drilling Program.

## COUNT V
### (Contract Claim – $300,000 Loan)

446.    The Plaintiffs restate and re-allege each and every averment contained in Paragraphs 1 through 268, as if set out here in full.

447.    As noted in Paragraphs 264 through 268 above, the $300,000 loan evidenced by the P&J Note is due and owing.

448.    Nothing has been paid by or on behalf P&J in connection with the Note.

449.    The Fontaine Trust should be granted a judgment against the Defendants, jointly and severally, for $465,736.03 in principal plus interest calculated at the rate of ten percent (10%) per annum.

## COUNT VI
### (Fraud)

450.    The Plaintiffs restate and re-allege each and every averment contained in Paragraphs 1 through 268, as if set out here in full.

*Circle J. #4 and #5 Wells*

451.    Prior to Mr. Fontaine's execution of the Circle J. 4 and 5 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Fontaine that he would receive an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter.

452.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to enter into the Circle J. Farm 4 and 5 Letter Agreement.

453.    Unaware the representations were false, Mr. Fontaine, for himself and for Rosemary Hillary, relied on the same, and entered into the Circle J. 4 and 5 Letter Agreement.

454.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to Circle J. Wells #4 and #5.

455.    As a direct and proximate result of such reliance and the fraud of the Defendants, Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded of both compensatory and punitive damages.

*Circle J. #1 and #2 Wells*

456.    Prior to the execution of the Circle J. 1 and 2 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

   (f)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

   (g)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

   (h)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of Circle J #1 Well and Circle J. #2 Well.

457.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to enter into the Circle J 1 and 2 Letter Agreement.

458.    Unaware the representations were false, Mr. Fontaine, for himself and Rosemary Hillary, relied on the same, entered into the Circle J 1 and 2 Letter Agreement and paid the Defendants a purchase price of $270,000.

459.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to Circle J. Wells #1 and #2.

460.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine, and the Fontaine Trust as his successor, suffered injury with regard to the Circle J. #2 Well in an amount as yet to be determined, and the Fontaine Trust should be awarded both compensatory and punitive damages.

461.    As a direct and proximate result of such reliance and the fraud of the Defendants Rosemary Hillary, suffered injury with regard to the Circle J. #2 Well in an amount as yet to be determined, and she should be awarded both compensatory and punitive damages

*Fred Howard #1 and Kash Arnett #2*

462.    Prior to the execution of the Fred Howard 1 and Kash Arnett 2 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

(c)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of Fred Howard #1 Well and Kash Arnett #2 Well.

463.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr.

Fontaine, for the benefit of Jean Webster, Patricia Fontaine and Mary Fontaine
Carlson to enter into the Fred Howard 1 and Kash Arnett 2 Letter Agreement.

464.    Unaware the representations were false, Mr. Fontaine relied on the same,
entered into the Fred Howard 1 and Kash Arnett 2 Letter Agreement and paid the
Defendants a purchase price of $255,000, for the benefit of Jean Webster, Patricia
Fontaine and Mary Fontaine Carlson.

465.    On information and belief, the Defendants subsequently transmitted false,
fraudulent, incomplete or misleading information relating to Fred Howard #1 and
Kash Arnett #2 Wells.

466.    As a direct and proximate result of such reliance and the fraud of the
Defendants Jean Webster, Patricia Fontaine and Mary Fontaine Carlson suffered
injury in an amount as yet to be determined for which they should be awarded both
compensatory and punitive damages.

*P&R Trust #1 Well and P&R Trust #2 Wells*

467.    Prior to the execution of the P&R Trust 1 and 2 Letter Agreement, the
Defendants, individually and acting in concert, knowingly and falsely represented:

(a)    That they make receive an assignment of a 50% working interest and a
75% net revenue interest prior to Payout and a 50% revenue interest
thereafter;

(b)    That P&J would repay the investment by the thirtieth month following the
date the wells were placed into production;

(c)    That P&J would pay based on a guaranteed production of 100 MCF of gas
per day from each of P&R Trust #1 Well and the P&R Trust #2 Well.

468.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to enter into the P&R Trust 1 and 2 Letter Agreement for the benefit of Dylan Klempner, Jean Webster, Patricia Fontaine and Mary Fontaine Carlson.

469.    Unaware the representations were false, Mr. Fontaine relied on the same, entered into the P&R Trust 1 and 2 Letter Agreement and paid the Defendants a purchase price of $270,000, for the benefit of Dylan Klempner, Jean Webster, Patricia Fontaine and Mary Fontaine Carlson.

470.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to P&R Trust #1 and P&R Trust #2 Wells.

471.    As a direct and proximate result of such reliance and the fraud of the Defendants Jean Webster, Patricia Fontaine, Mary Fontaine Carlson, and Dylan Klempner suffered injury with regard to the P&R Trust #1 and P&R Trust #2 Wells in an amount as yet to be determined, and should be awarded of both compensatory and punitive damages.

*P&R Trust #3 Well*

472.    Prior to the execution of the P&R Trust 3 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)     That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

(c)     That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of P&R Trust #3 Well.

473.     On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Carlson for the benefit of the Raymond Street Group to enter into the P&R Trust 3 Letter Agreement.

474.     Unaware the representations were false, Mr. Carlson relied on the same, entered into the P&R Trust 3 Letter Agreement and paid the Defendants a purchase price of $135,000, for the benefit of the Raymond Street Group.

475.     On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to P&R Trust #3 Well.

476.     As a direct and proximate result of such reliance and the fraud of the Defendants the Raymond Street Group was injured in an amount as yet to be determined, and they should be awarded both compensatory and punitive damages.

*F.S. Martin #3 Well*

477.     Prior to the execution of the F.S. Martin 3 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)     That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)     That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

(c)     That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of F.S. Martin #3 Well.

478.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine, for the benefit of Dylan Klempner, to enter into the F.S. Martin 3 Letter Agreement.

479.    Unaware the representations were false, Mr. Fontaine relied on the same, entered into the F.S. Martin 3 Letter Agreement and paid the Defendants a purchase price of $135,000, for the benefit of Dylan Klempner.

480.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to F.S. Martin #3 Well.

481.    As a direct and proximate result of such reliance, and the fraud of the Defendants, Dylan Klempner suffered injury with regard to the F.S. Martin #3 Well in an amount as yet to be determined, and Dylan Klempner should be awarded both compensatory and punitive damages.

*Prater #1 Well*

482.    Prior to the execution of the Prater 1 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)     That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)     That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

95

(c)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of  Prater #1 Well.

483.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine, for the benefit of the MPJ Trust, to enter into the Prater 1 Letter Agreement.

484.    Unaware the representations were false, Mr. Fontaine relied on the same, entered into the Prater 1 Letter Agreement and paid the Defendants a purchase price of $135,000, for the benefit of the MPJ Trust.

485.     On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to Prater #1 Well.

486.    As a direct and proximate result of such reliance and the fraud of the Defendants the MPJ Trust suffered injury in an amount as yet to be determined for which it should be entitled to an award of both compensatory and punitive damages.

*F.S. Martin  #4 Well*

487.    Prior to the execution of the F.S. Martin 4 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

(c)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of  F.S. Martin #4 Well.

488.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Carlson, for the benefit of the Carlson Trust, to enter into the F.S. Martin 4 Letter Agreement.

489.    Unaware the representations were false, Mr. Carlson relied on the same, entered into the F.S. Martin 4 Letter Agreement and paid the Defendants a purchase price of $135,000, for the benefit of the Carlson Trust.

490.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to F.S. Martin #4 Well.

491.    As a direct and proximate result of such reliance and the fraud of the Defendants, the Carlson Trust suffered injury in an amount as yet to be determined, and it is entitled to an award of both compensatory and punitive damages.

*P&R Trust #4 Well*

492.    Prior to the execution of the P&R Trust 4 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Fontaine:

(a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

(c)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of  P&R Trust #4 Well.

493.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine,  to enter into the P&R Trust 4 Letter Agreement.

494.    Unaware the representations were false, Mr. Fontaine relied on the same, entered into the P&R Trust 4 Letter Agreement and paid the Defendants a purchase price of $135,000.

495.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the P&R Trust #4 Well.

496.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Minix #1 and #2 Wells*

497.    Prior to the execution of the Minix 1 and 2 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

   (a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

   (b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

   (c)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of  Minix #1 Well and Minix #2 Well.

498.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to enter into the Minix 1 and 2 Letter Agreement.

499.    Unaware the representations were false, Mr. Fontaine relied on the same, entered into the Minix 1 and 2 Letter Agreement and paid the Defendants a purchase price of $270,000.

500.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Minix #1 and Minix #2 Wells.

501.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be determined, for which they should be awarded both compensatory and punitive damages.

*F.S. Martin  #2 Well*

502.    Prior to the execution of the F.S. Martin 2 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

    (a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

    (b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

    (c)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of  F.S. Martin #2 Well.

503.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Webster to enter into the F.S. Martin 2 Letter Agreement.

504.    Unaware the representations were false, Mr. Webster relied on the same, entered into the F.S. Martin 2 Letter Agreement and paid the Defendants a purchase price of $135,000.

505.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the F.S. Martin #2 Well.

506.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Webster suffered injury in an amount as yet to be determined for which he should be awarded both compensatory and punitive damages.

*Twenty-Well Program*

507.    Prior to the execution of the Twenty-Well Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Fontaine their ability and intention to drill the wells which made up the Twenty-Well Package. Said representations were known by the Defendants to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to enter into the Twenty-Well Letter Agreement.

508.    Unaware the representations were false, Mr. Fontaine relied on the same, entered into the Twenty-Well Program, and paid the Defendants $1,350,000.

509.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Twenty-Well Program.

510.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors, Jean Webster, Patricia Fontaine, Mary Fontaine Carlson suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Puckett #1 Well*

511.    Prior to the execution of the Puckett 1 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

    (a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

    (b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

    (c)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of Puckett #1 Well.

512.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Carlson to enter into the Puckett 1 Letter Agreement.

513.    Unaware the representations were false, Mr. Carlson relied on the same, entered into the Puckett 1 Letter Agreement and together with Cherry Driveway paid the Defendants a purchase price of $135,000.

514.   On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Puckett #1 Well.

515.   As a direct and proximate result of such reliance and the fraud of the Defendants, Mr. Carlson and Mary Fontaine Carlson, and Cherry Driveway suffered injury in an amount as yet to be determined for which he should be awarded both compensatory and punitive damages.

### *J.W. Howard #3 Well*

516.   Prior to the execution of the J.W. Howard 3 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)   That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)   That P&J would the investment by the thirtieth month following the date the wells were placed into production.

517.   On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to enter into the J.W. Howard 3 Letter Agreement.

518.   Unaware the representations were false, Mr. Fontaine relied on the same, entered into the J.W. Howard 3 Letter Agreement and paid the Defendants a purchase price of $67,500.

519.   On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the J.W. Howard #3 Well.

520.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Circle J. Farm #7 Well*

521.    Prior to the execution of the Circle J. Farm 7 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

    (a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

    (b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production.

522.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Klempner to enter into the Circle J. Farm 7 Letter Agreement.

523.    Unaware the representations were false, Mr. Klempner relied on the same, entered into the Circle J. Farm 7 Letter Agreement and paid the Defendants a purchase price of $67,500.

524.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Circle J. Farm #7 Well.

525.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Klempner suffered injury in an amount as yet to be determined for which he should be awarded both compensatory and punitive damages.

*Arnett #10 Well*

526.    Prior to the execution of the Arnett 10 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production;

(c)    That P&J would pay based on a guaranteed production of 100 MCF of gas per day from each of Arnett #10 Well.

527.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Ms. Everett to enter into the Arnett 10 Letter Agreement.

528.    Unaware the representations were false, Ms. Everett relied on the same, entered into the Arnett 10 Letter Agreement and paid the Defendants a purchase price of $67,500.

529.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Arnett #10 Well.

530.    As a direct and proximate result of such reliance and the fraud of the Defendants Ms. Everett, suffered injury in an amount as yet to be determined for which she should be awarded both compensatory and punitive damages.

*P&J #1 Well-Carlson*

531.    Prior to the execution of the Carlson P&J 1 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Carlson their ability and intention to drill the P&J #1 Well.  Said representations were known by the Defendants to be false at the time they were made, and they were made for the purpose of inducing Mr. Carlson to enter into the Carlson P&J 1 Letter  Agreement.

532.    Unaware the representations were false, Mr. Carlson relied on the same, entered into the Carlson P&J 1 Letter Agreement, and paid the Defendants $100,000.

533.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the P&J #1 Well.

534.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Carlson suffered injury in an amount as yet to be determined for which he should be awarded both compensatory and punitive damages.

*P&J #1 Well-Fontaine*

535.    Prior to the execution of the Fontaine P&J 1 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Fontaine their ability and intention to drill the P&J #1 Well.  Said representations were known by the Defendants to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to enter into the P&J 1 Letter Agreement.

536.    Unaware the representations were false, Mr. Fontaine relied on the same, entered into the Fontaine P&J 1 Letter Agreement, and paid the Defendants $150,000.

537.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the P&J #1 Well.

538.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*P&R Trust #8 and #9 Wells*

539.    Prior to the execution of the P&R Trust 8 and 9 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

    (a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

    (b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production.

540.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine, for the benefit of the Fontaine Foundation, to enter into the P&R Trust 8 and 9 Letter Agreement.

541.    Unaware the representations were false, Mr. Fontaine relied on the same, entered into the P&R Trust 8 and 9 Letter Agreement and paid the Defendants a purchase price of $135,000.

542.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the P&R Trust #8 and P&R Trust #9 Wells.

543.    As a direct and proximate result of such reliance and the fraud of the Defendants The Fontaine Foundation suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Fontaine #1Well-Fontaine*

544.    Prior to Mr. Fontaine causing the sum of $200,000 to be transmitted to P&J for a working and net revenue interest in the Fontaine #1 Well, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Fontaine their ability and intention to drill the Fontaine #1 Well.  Said representations were known by the Defendants to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to cause the sum of $200,000 to be transmitted to the Defendants.

545.    Unaware the representations were false, Mr. Fontaine relied on the same and paid the Defendants $200,000.

546.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Fontaine #1 Well.

547.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be

determined for which they should be awarded both compensatory and punitive damages.

*Fontaine #1 Well-Carlson*

548.    Prior to the execution of the Fontaine 1 Letter Agreement-Carlson, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Carlson their ability and intention to drill the Fontaine #1 Well.   Said representations were known by the Defendants to be false at the time they were made, and they were made for the purpose of inducing Mr. Carlson to enter into the Fontaine1 Letter Agreement-Carlson.

549.    Unaware the representations were false, Mr. Carlson relied on the same, entered into the Fontaine 1 Letter Agreement-Carlson, and paid the Defendants $100,000.

550.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Fontaine #1 Well.

551.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Carlson and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Johnson #1 Well*

552.    Prior to Mr. Fontaine causing the sum of $400,000 to be transmitted to P&J for a working and net revenue interest in the Johnson #1 Well, the Defendants,

individually and acting in concert, knowingly and falsely represented to Mr. Fontaine their ability and intention to drill the Johnson #1 Well. Said representations were known by the Defendants to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to cause the sum of $400,000 to be transmitted to them.

553.    Unaware the representations were false, Mr. Fontaine relied on the same, and paid the Defendants $400,000.

554.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Johnson #1 Well.

555.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Frazier #11 and #12 Wells*

556.    Prior to Mr. Fontaine's causing the sum of $700,000 to be transmitted to P&J for working and net revenue interests to the Frazier #11 and #12 Wells, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Fontaine their ability and intention to drill the Frazier #11 Well and Frazier #12 Well. Said representations were known by the Defendants to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to cause the sum of $700,000 to be transmitted to the Defendants.

557.    Unaware the representations were false, Mr. Fontaine relied on the same, and paid the Defendants $700,000.

558.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Frazier #11 Well.

559.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors, suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Circle J. Farm #11 and Circle J. Farm #12 Wells*

560.    Prior to the execution of the Circle J. Farm 11 and 12 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

   (a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

   (b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production.

561.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Ms. Casartello to enter into the Circle J Farms 11 and 12  Letter Agreement.

562.    Unaware the representations were false, Ms. Casartello relied on the same, entered into the Circle J. Farms 11 and 12 Letter Agreement and paid the Defendants a purchase price of $135,000.

563.   On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Circle J. Farms #11 and #12 Wells.

564.   As a direct and proximate result of such reliance and the fraud of the Defendants Ms. Casartello suffered injury in an amount as yet to be determined for which she should be awarded both compensatory and punitive damages.

*KN Salyer #2 and KN Salyer #3 Wells*

565.   Prior to the execution of the KN Salyer 2 and 3 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)   That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)   That P&J would repay the investment by the thirtieth month following the date the wells were placed into production.

566.   On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Ms. Schwartz to enter into the KN Salyer 2 and 3 Letter Agreement.

567.   Unaware the representations were false, Ms. Schwartz relied on the same, entered into the KN Salyer 2 and 3 Letter Agreement and paid the Defendants a purchase price of $135,000.

568.   On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the K.N. Salyer #2 and #3 Wells.

569.    As a direct and proximate result of such reliance and the fraud of the Defendants Ms. Schwartz suffered injury in an amount as yet to be determined for which she should be awarded both compensatory and punitive damages.

*Circle J. Farm #6 Well*

570.    Prior to the execution of the Circle J. Farm 6 Letter Agreement, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)    That they would make an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter;

(b)    That P&J would repay the investment by the thirtieth month following the date the wells were placed into production.

571.    On information and belief, the Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Piaker to enter into the Circle J. Farm 6 Letter Agreement.

572.    Unaware the representations were false, Mr. Piaker relied on the same, entered into the Circle J. Farm 6 Letter Agreement and paid the Defendants a purchase price of $67,500, for the benefit of the Piaker Trust.

573.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Circle J. Farm #6 Well.

574.    As a direct and proximate result of such reliance and the fraud of the Defendants the Piaker Trust suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Isom Stephens and K.N. Salyers Wells*

575.    Prior to Mr. Fontaine's payment of $700,000 for interests in the Isom Stephens #1, #2 and #3 Wells, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Fontaine that he would receive an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter.

576.    The Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to pay them for interest in the Isom Stephens #1, #2, and #3 Wells.

577.    Unaware the representations were false, Mr. Fontaine relied on the same and paid the Defendants the purchase price for said wells.

578.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Isom Stephens #1, #2 and #3 Wells.

579.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

580.    Prior to Mr. Fontaine's payment in connection with the K.N. Salyer #4 and #5 Wells, the Defendants, individually and acting in concert, knowingly and falsely represented to Mr. Fontaine their ability and intention to drill the K.N. Salyer #4 Well

and K.N. Salyer #5 Well.  Said representations were known by the Defendants to be

false at the time they were made, and they were made for the purpose of inducing Mr.

Fontaine to enter into the K.N. Salyer 4 and 5 Letter Agreement.

581.    Unaware the representations were false, Mr. Fontaine relied on the same, and

paid the Defendants the purchase price for those wells.

582.    On information and belief, the Defendants subsequently transmitted false,

fraudulent, incomplete or misleading information relating to the K.N. Salyer #4 Well

and K.N. Salyer #5 Well.

583.    On information and belief, the K.N. Salyer #4 and #5 Wells were never

drilled.

584.    As a direct and proximate result of such reliance and the fraud of the

Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be

determined for which they should be awarded both compensatory and punitive

damages.

*Three-Well Program*

585.    Prior to Jean Webster causing a payment of $187,500 to be sent to P&J on

behalf of the MPJ Trust in connection with the Three-Well Program referenced in

Paragraph 251, above, the Defendants, individually and acting in concert, knowingly

and falsely represented:

   (a)    Three wells would be drilled with the funds provided by the MPJ Trust for
          the benefit of Jean Webster, Patricia Fontaine and Mary Fontaine Carlson;

114

(b)     Jean Webster, Patricia Fontaine and Mary Fontaine Carlson would receive an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter.

586.    On information and belief, the Defendants knew these representations to be false at the time they were made and they were made for the purpose of inducing Jean Webster cause the sum of $187,500 to be transmitted to Defendants.

587.    Unaware the representations were false, Jean Webster relied on the same, authorized the payment of $187,500 in connection with the Three-Well Drilling Program, for the benefit of Jean Webster, Patricia Fontaine and Mary Fontaine Carlson.

588.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Three-Well Program and the J. Puckett #1 Well, the Martin #1 Well and Martin #5 Well.

589.    As a direct and proximate result of such reliance and the fraud of the Defendants Jean Webster, Patricia Fontaine and Mary Fontaine Carlson suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Three-Well Program II*

590.    Prior to the execution of the Three-Well Program II Letter Agreement, referenced in Paragraph 257, above, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)     Three wells would be drilled with the funds provided by Mr. Fontaine;

(b)     That P&J would repay the investment by the thirtieth month following the date the wells were placed into production.

(c)     He would receive an assignment of a 50% working interest and a 75% net revenue interest prior to Payout and a 50% revenue interest thereafter.

591.    On information and belief, the Defendants knew these representations to be false at the time they were made and they were made for the purpose of inducing Mr. Fontaine to enter into the Three-Well II Program Letter Agreement

592.    Unaware the representations were false, Mr. Fontaine relied on the same, made the payment of $187,500 in connection with the Three-Well Drilling Program II.

593.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Three-Well Program II.

594.    As a direct and proximate result of such reliance and the fraud of the Defendants Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

*Two-Well Program*

595.    Prior to Mr. Fontaine causing a payment of $284,000 to be sent to P&J in connection with the Two-Well Program, referenced in Paragraph 261, above, the Defendants, individually and acting in concert, knowingly and falsely represented:

(a)     Two wells would be drilled with the funds provided by Mr. Fontaine;

    (b)    He would receive an assignment of working interest and net revenue interest in the two wells.

596.    On information and belief, the Defendants knew these representations to be false at the time they were made and they were made for the purpose of inducing Mr. Fontaine to cause the sum of $284,000 to be transmitted to Defendants.

597.    Unaware the representations were false, Mr. Fontaine relied on the same, made the payment of $284,000 in connection with the Two-Well Drilling Program.

598.    On information and belief, the Defendants subsequently transmitted false, fraudulent, incomplete or misleading information relating to the Two-Well Program.

599.    As a direct and proximate result of such reliance and the fraud of the Defendants, Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

## COUNT VII
### (Conversion)

600.    The Plaintiff restates and re-alleges each and every averment contained in Paragraphs 1 through 268 as set out here in full.

601.    On information and belief, despite payment by Mr. Fontaine therefor, several of the wells promised by the Defendants to be drilled were not drilled.  Specifically, on information and belief, the following wells were never drilled:

    (a)    Minix #3 Well;

    (b)    Rowe #1 Well;

(c)     Dunn #2 Well;

(d)     Dunn #3 Well;

(e)     P&R Trust #5 Well;

(f)     P&J Well #1;

(g)     Fontaine #1 Well;

(h)     Johnson #1 Well;

(i)     Frazier #11 Well;

(j)     Frazier #12 Well;

(k)     K.N. Salyer #4 Well;

(l)     K.N. Salyer #5 Well;

(m)     Martin #1 Well;

(n)     Martin #5 Well;

(o)     Fred Howard #1 Well;

(p)     Kash Arnett #2 Well;

(q)     F.S. Martin #3 Well;

(r)     F.S. Martin #4 Well;

(s)     Arnett #10 Well;

(t)     Bailey #1 Well;

(u)     A. Bailey #2 Well;

(v)     P&R Trust #4 Well;

(w)     P&R Trust #8 Well;

(x)     P&R Trust #9 Well;

(y)     Minix #1 Well;

(z)     J.W. Howard #3 Well;

(aa)     Arnett #8;

(bb)   RC May #10;

(cc)   Circle J. Farms #11 Well;

(dd)   Circle J. Farms #12 Well;

(ee)   Arnett #8 Well;

(ff)   Puckett #1 Well;

(gg)   May #10 Well;

(hh)   Wells associated with the Three-Well Drilling Program II; and

(ii)   Wells associated with the Two-Well Drilling Program.

602.   On information and belief, the Defendants have converted the payments made by the Plaintiffs for the wells referenced above, and any other wells which were not actually drilled for their own use and benefit and to the detriment of the Plaintiffs and their relevant designee or successor, in an amount yet to be determined.  The relevant designee or successor should be awarded both compensatory and punitive damages for each of the Defendants' act of conversion.

## COUNT VIII
### (Accounting)

603.   The Plaintiffs restate and re-allege each and every averment contained in Paragraph 1 through 268, above.

604.   All information relating to the drilling of the wells referenced herein and the costs therefore, the production of such wells, the sales of gas or other products from such wells, the use of funds loaned or otherwise provided by the Plaintiffs to the Defendants is in the sole possession of the Defendants.

605.    Despite many requests therefor, the Defendants have failed and refused to provide an accounting to the Plaintiffs or their representatives for the funds provided by the Plaintiffs, the drilling and cost of drilling the wells, the identification of the wells in which the Plaintiffs were lead to believe they were purchasing interests, the production from those wells, the sale of the production of those wells, the payment of royalties on the leases and to other owners of those wells, and other information to which the Plaintiffs are entitled.

606.    Because the Defendants have failed to account to the Plaintiffs regarding these matters and have also refused to provide other information requested by the Plaintiffs, the Plaintiffs have been unable to definitively determine the existence, nature, and scope of the frauds perpetrated by the Defendants.

607.    The Court should require the Defendants to provide the full accounting to the Plaintiffs.

## COUNT IX
### (Judgments Joint And Several)

608.    The Plaintiffs restate and re-allege each and every averment contained in Paragraphs 1 through 268, above, as if set out here in full.

609.    P&J is a mere instrumentality of its shareholders, who are on information and belief, Richard Williams and Pamela Williams.   Richard Williams and Pamela Williams exercised control over P&J in such a way to defraud or harm Mr. Fontaine, and subsequently the Plaintiffs.

610.     The refusal by the Court to disregard the corporate entity of P&J would subject the Plaintiffs to unjust loss.

611.     P&J is not only influenced by Richard Williams and Pamela Williams, but there is such a unity of ownership in interest that their separateness has ceased.

612.     Treating P&J as a separate entity from Richard Williams and Pamela Williams would sanction a fraud and promote injustice.

613.     Because P&J was the instrumentality or alter ego of Richard Williams and Pamela Williams, all judgment granted herein should be granted jointly and severally against all of the Defendants.

WHEREFORE, the Plaintiffs request that the Court;

1.     Grant a trial by jury for all Plaintiffs.

*Fontaine Trust*

2.     Reform any and all contracts in which the Fontaine Trust has an interest to properly reflect the parties' true intent with respect to such contracts, including:

(a)     Circle J. Farm 5 Assignment,

(b)     Circle J. Farm 2 Assignment,

(c)     P&R Trust 4 Assignment,

(d)     Minix 1 and 2 Assignments,

(e)     Twenty-Well Assignments, and specifically the assignments associated with the Minix #3 Well, the Bailey #1 Well, the Prater #2 Well, the Prater #3 Well, the Bates #1 Well, the Arnett #7 Well, the Arnett#8 Well, the Reed #1 Well, the Reed #2 Well, the Reed #3 Well, the Reed #4 Well, the Rowe #1 Well, the Dunn #2 Well, the Dunn #3 Well, the P8R Trust #5 Well, and the A. Bailey #2 Well,

(f)     J.W. Howard 3 Assignment,

    (g)    Fontaine-P&J 1 Assignment,

    (h)    Fontaine 1-Fontaine Assignment,

    (i)    Johnson 1 Assignment,

    (j)    Frazier 11 and 12 Assignments, and

    (k)    The Five-Well Package Assignments, and specifically the assignments associated with the K.N. Salyer #4 Well and the K.N. Salyer #5 Well;

3.    Award the Fontaine Trust damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the following letter agreements:

    (l)    Circle J. Farm 1 and 2 Letter Agreement,

    (m)    Minix 1 and 2 Letter Agreement,

    (n)    P&R Trust 4 Letter Agreement,

    (o)    J.W. Howard 3 Letter Agreement, and

    (p)    Three-Well Program II Letter Agreement;

4.    Award the Fontaine Trust monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the following letter agreements:

    (a)    Circle J. Farm 1 and 2 Letter Agreement,

    (b)    Minix 1 and 2 Letter Agreement,

    (c)    P&R Trust 4 Letter Agreement, and

    (d)    J.W. Howard 3 Letter Agreement;

5.    Award the Fontaine Trust damages for Mr. Fontaine's purchase of any wells which were undrilled, including:

    (a)    P&R Trust #4 Well,

    (b)    Minix #1 Well,

    (c)    Minix #3 Well,

    (d)    Arnett #8 Well,

    (e)    P&R Trust #5 Well,

(f)     Dunn #2 Well,

(g)     Dunn #3 Well,

(h)     Rowe #1 Well,

(i)     Bailey #1 Well,

(j)     A. Bailey #2 Well,

(k)     J.W. Howard #3 Well,

(l)     P&J #1 Well,

(m)     Fontaine #1 Well,

(n)     Johnson #1 Well,

(o)     Frazier #11 Well,

(p)     Frazier #12 Well,

(q)     K.N. Salyer #4 Well,

(r)     K.N. Salyer #5 Well,

(s)     The three wells associated with the Three-Well Program II Letter Agreement and;

(t)     The two wells associated with the Two-Well Drilling Program.

6.      Award the Fontaine Trust damages for any and all loans currently due and payable, including principal and interest;

7.      Award the Fontaine Trust damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

8.      Award the Fontaine Trust damages for conversion associated with the following:

(a)     P&R Trust 4 Letter Agreement and the P&R Trust #4 Well,

(b)     Twenty-Well Letter Agreement and the Minix #3 Well, Arnett #8 Well, P&R Trust #5 Well, Dunn #2 Well, Dunn #3 Well, Rowe #1 Well, Bailey #1 Well, and the A. Bailey #2 Well,

(c)     J.W. Howard 3 Letter Agreement and the J.W. Howard #3 Well,

(d)     Fontaine P&J #1 Letter Agreement and the P&J #1 Well,

(e)     Fontaine #1 Well,

(f)     Johnson #1 Well,

(g)     Frazier #11 Well and Frazier #12 Well,

(h)     K.N. Salyer #4 Well and the K.N. Salyer #5 Well,

(i)     The Three-Well Program II Letter Agreement and any wells associated therewith; and

(j)     The Two-Well Drilling Program and any wells associated therewith.

9.      Grant the Fontaine Trust an accounting;

10.     Grant the Fontaine Trust pre-judgment and post-judgment interest;

11.     Award the Fontaine Trust the costs of the suit, including but not limited to attorney's fees; and

12.     Award the Fontaine Trust such other and further relief to which it may be entitled.

*MPJ Trust*

13.     Reform any and all contracts in which the MPJ Trust has an interest to properly reflect the parties' true intent with respect to such contracts, including the Prater 1 Assignment;

14.     Award the MPJ Trust damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Prater 1 Letter Agreement;

15.     Award the MPJ Trust monetary damages for Defendant's failure to make payments consistent with the 100 MCF Guarantee associated with the Prater 1 Letter Agreement;

124

16.     Award the MPJ Trust damages suffered as a result of with the fraudulent acts and misrepresentations of the Defendants;

17.     Grant the MPJ Trust an accounting;

18.     Grant the MPJ Trust pre-judgment and post-judgment interest;

19.     Award the MPJ Trust the costs of the suit, including but not limited to attorney's fees; and

20.     Award the MPJ Trust such other and further relief to which it may be entitled.

*Jean Webster*

21.     Reform any and all contracts in which Jean Webster has an interest to properly reflect the parties' true intent with respect to such contracts, including the Fred Howard 1 and Kash Arnett 2 Assignments, Twenty-Well Assignments, specifically being the assignments for the May #10 Well, the May #11 Well, and the May #12 Well, and the Three Well Program Assignments, specifically being the assignments for the J. Puckett #1 Well, the Martin #1 Well and the Martin #5 Well;

22.     Award Jean Webster monetary damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Fred Howard 1 and Kash Arnett 2 Letter Agreement.

23.     Award Jean Webster monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the Fred Howard #1 well and the Kash Arnett #2 Well;

24.     Award Jean Webster damages for the purchase of any wells which were undrilled, including the Fred Howard #1 Well, the Kash Arnett #2 Well, the May #10 Well, the Martin #1 Well and the Martin #5 Well;

25.     Award Jean Webster damages in suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

26.     Award Jean Webster damages for conversion associated the Fred Howard 1 and Kash Arnett 2 Letter Agreement and the Fred Howard #1 Well and the Kash Arnett #2 Well, the Twenty-Well Letter Agreement and the May #10 Well, and the Martin #1 Well and the Martin #5 Well;

27.     Grant Jean Webster an accounting;

28.     Grant Jean Webster pre-judgment and post-judgment interest;

29.     Award Jean Webster the costs of the suit, including but not limited to attorney's fees; and

30.     Award Jean Webster such other and further relief to which she may be entitled.

*Gary Webster*

31.     Reform any and all contracts in which Gary Webster has an interest to properly reflect the parties' true intent with respect to such contracts, including the F.S. Martin 2 Assignment;

126

32.     Award Gary Webster damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the F.S. Martin 2 Letter Agreement;

33.     Award Gary Webster monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the F.S. Martin 2 Letter Agreement;

34.     Award Gary Webster damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

35.     Grant Gary Webster an accounting;

36.     Grant Gary Webster pre-judgment and post-judgment interest;

37.     Award Gary Webster the costs of the suit, including but not limited to attorney's fees; and

38.     Award Gary Webster such other and further relief to which he may be entitled.

*Patricia Fontaine*

39.     Reform any and all contracts in which Patricia Fontaine has an interest to properly reflect the parties' true intent with respect to such contracts, including the Fred Howard 1 and Kash Arnett 2 Assignments, the Twenty-Well Assignments, specifically being the assignments for the May #10 Well, the R.C. May #11 Well, and

the May #12 Well, and the Three Well Program Assignments, specifically being the assignments for the J. Puckett #1 Well, the Martin #1 Well and the Martin #5 Well;

40.     Award Patricia Fontaine monetary damages for Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Fred Howard 1 and Kash Arnett 2 Letter Agreement.

41.     Award Patricia Fontaine monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the Fred Howard #1 well and the Kash Arnett #2 Well;

42.     Award Patricia Fontaine damages for the purchase of any wells which were undrilled, including the Fred Howard #1 Well, the Kash Arnett #2 Well, the May #10 Well, and the Martin #1 Well and the Martin #5 Well;

43.     Award Patricia Fontaine damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

44.     Award Patricia Fontaine damages for conversion associated the Fred Howard 1 and Kash Arnett 2 Letter Agreement and the Fred Howard #1 Well and the Kash Arnett #2 Well, the Twenty-Well Letter Agreement and the May #10 Well, and the Martin #1 Well and the Martin #5 Well;

45.     Grant Patricia Fontaine an accounting;

46.     Grant Patricia Fontaine pre-judgment and post-judgment interest;

47.    Award Patricia Fontaine the costs of the suit, including but not limited to attorney's fees; and

48.    Award Patricia Fontaine such other and further relief to which she may be entitled.

*Mary Fontaine Carlson*

49.    Reform any and all contracts in which Mary Fontaine Carlson has an interest to properly reflect the parties' true intent with respect to such contracts, including the Fred Howard 1 and Kash Arnett 2 Assignments, the Twenty Well Program Assignments, specifically being the assignments for the May #10 Well, the May #11 Well, and the May #12 Well, and the Three Well Program Assignments, specifically being the assignments for the J. Puckett #1 Well, the Martin #1 Well and the Martin #5 Well, and the Puckett #1 Assignment;

50.    Award Mary Fontaine Carlson monetary damages for Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Fred Howard 1 and Kash Arnett 2 Letter Agreement.

51.    Award Mary Fontaine Carlson monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the Fred Howard 1 and Kash Arnett 2 Letter Agreement, and the Puckett 1 Letter Agreement;

52.    Award Mary Fontaine Carlson damages for the purchase of any wells which were undrilled, including the Fred Howard #1 Well, the Kash Arnett #2 Well, the May #10 Well,  the Martin #1 Well and the Martin #5 Well, and the Puckett #1 Well;

53.     Award Mary Fontaine Carlson damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

54.     Award Mary Fontaine Carlson damages for conversion associated the Fred Howard 1 and Kash Arnett 2 Letter Agreement and  the Fred Howard #1 Well and the Kash Arnett #2 Well, the Twenty-Well Letter Agreement and the May #10 Well, and the Martin #1 Well and the Martin #5 Well, and the Puckett 1 Letter Agreement and the Puckett #1 Well;

55.     Grant Mary Fontaine Carlson an accounting;

56.     Grant Mary Fontaine Carlson pre-judgment and post-judgment interest;

57.     Award Mary Fontaine Carlson the costs of the suit, including but not limited to attorney's fees; and

58.     Award Mary Fontaine Carlson such other and further relief to which she may be entitled.

*Robert Carlson*

59.     Reform any and all contracts in which the Mr. Carlson has an interest to properly reflect the parties' true intent with respect to such contracts, including the Puckett 1 Assignment, and the Carlson P&J 1 Assignment;

60.     Award Mr. Carlson damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Puckett 1 Letter Agreement;

61.    Award Mr. Carlson monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the Puckett 1 Letter Agreement;

62.    Award Mr. Carlson damages for the purchase of any wells which were undrilled, including the Puckett #1 Well, the P&J #1 Well, and the Fontaine #1 Well;

63.    Award Mr. Carlson damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

64.    Award Mr. Carlson damages for conversion associated with the Puckett #1 Letter Agreement and the Puckett #1 Well, the Carlson P&J 1 Letter Agreement and the P&J #1 Well, and the Fontaine 1-Carlson Letter Agreement and the Fontaine #1 Well;

65.    Grant Mr. Carlson an accounting;

66.    Grant Mr. Carlson pre-judgment and post-judgment interest;

67.    Award Mr. Carlson the costs of the suit, including but not limited to attorney's fees; and

68.    Award Mr. Carlson such other and further relief to which he may be entitled.

### *Dylan Klempner*

69.    Reform any and all contracts in which the Dylan Klempner has an interest to properly reflect the parties' true intent with respect to such contracts, including the

F.S. Martin 3 Assignment, the Circle J. 7 Assignment, and the P&R Trust 2 Assignment;

70.    Award Dylan Klempner damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Circle J. 7 Letter Agreement and the P&R Trust 1 and 2 Letter Agreement, and the F.S. Martin 3 Letter Agreement;

71.    Award Dylan Klempner monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the P&R Trust 1 and 2 Letter Agreement, and the F.S. Martin 3 Letter Agreement;

72.    Award Dylan Klempner damages for the purchase of any wells which were undrilled, including the F.S. Martin #3 Well;

73.    Award Dylan Klempner damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

74.    Award Dylan Klempner damages for conversion associated with the F.S. Martin 3 Letter Agreement and the F.S. Martin #3 Well;

75.    Grant Dylan Klempner an accounting;

76.    Grant Dylan Klempner pre-judgment and post-judgment interest;

77.    Award Dylan Klempner the costs of the suit, including but not limited to attorney's fees; and

78.     Award Dylan Klempner such other and further relief to which he may be entitled.

*Fontaine Foundation*

79.     Reform any and all contracts in which the Fontaine Foundation has an interest to properly reflect the parties' true intent with respect to such contracts, including the P&R Trust 8 and 9 Assignments;

80.     Award the Foundation damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the P&R Trust 8 and 9 Letter Agreement.

81.     Award the Fontaine Foundation damages for the purchase of any wells which were undrilled, including the P&R Trust #8 Well and the P&R Trust #9 Well;

82.     Award the Fontaine Foundation damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

83.     Award Fontaine Foundation damages for conversion associated the P&R Trust 8 and 9 Letter Agreement, and the P&R Trust #8 Well and the P&R Trust #9 Well;

84.     Grant the Fontaine Foundation an accounting;

85.     Grant the Fontaine Foundation pre-judgment and post-judgment interest;

86.     Award the Fontaine Foundation the costs of the suit, including but not limited to attorney's fees; and

87.    Award the Fontaine Foundation such other and further relief to which it may be entitled.

*Carlson Trust*

88.    Reform any and all contracts in which the Carlson Trust has an interest to properly reflect the parties' true intent with respect to such contracts, including the F.S. Martin 4 Assignment;

89.    Award the Carlson Trust damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the F.S. Martin 4 Letter Agreement.

90.    Award the Carlson Trust monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the F.S. Martin 4 Letter Agreement;

91.    Award the Carlson Trust damages for the purchase of any wells which were undrilled, including the F.S. Martin #4 Well;

92.    Award the Carlson Trust damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

93.    Award the Carlson Trust damages for conversion associated with the F.S. Martin 4 Letter Agreement, and the F.S. Martin #4 Well;

94.    Grant the Carlson Trust an accounting;

95.    Grant the Carlson Trust pre-judgment and post-judgment interest;

96.    Award the Carlson Trust the costs of the suit, including but not limited to attorney's fees; and

97.    Award the Carlson Trust such other and further relief to which it may be entitled.

*Raymond Street Group*

98.    Reform any and all contracts in which the Raymond Street Group has an interest to properly reflect the parties' true intent with respect to such contracts, including the P&R Trust 3 Assignment;

99.    Award the Raymond Street Group damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the P&R Trust 3 Letter Agreement;

100.    Award the Raymond Street Group monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the P&R Trust 3 Letter Agreement;

101.    Award the Raymond Street Group damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

102.    Grant the Raymond Street Group an accounting;

103.    Grant the Raymond Street Group pre-judgment and post-judgment interest;

104.    Award the Raymond Street Group the costs of the suit, including but not limited to attorney's fees; and

105.    Award the Raymond Street Group such other and further relief to which it may be entitled.

*Cherry Driveway*

106.    Reform any and all contracts in which Cherry Driveway has an interest to properly reflect the parties' true intent with respect to such contracts, including the Puckett #1 Assignment;

107.    Award Cherry Driveway damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Puckett #1 Letter Agreement;

108.    Award Cherry Driveway monetary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the Puckett #1 Letter Agreement;

109.    Award Cherry Driveway damages for the purchase of any wells which were undrilled, including the Puckett #1 Well;

110.    Award Cherry Driveway damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

111.    Award Cherry Driveway damages for conversion associated with the Puckett #1 Letter Agreement and the Puckett #1 Well;

112.    Grant Cherry Driveway an accounting;

113.    Grant Cherry Driveway pre-judgment and post-judgment interest;

114.    Award Cherry Driveway the costs of the suit, including but not limited to attorney's fees; and

115.    Award Cherry Drive such other and further relief to which it may be entitled.

*Joan Casartello*

116.    Reform any and all contracts in which Joan Casartello has an interest to properly reflect the parties' true intent with respect to such contracts, including the Circle J. 11 and 12 Assignments;

117.    Award Joan Casartello damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Circle J. 11 and 12 Letter Agreement;

118.    Award Joan Casartello damages for the purchase of any wells which were undrilled, including the Circle J. Farm #11 Well and the Circle J. Farm #12 Well;

119.    Award Joan Casartello damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

120.    Award Joan Casartello damages for conversion associated with the Circle J. 11 and 12 Letter Agreement, and the Circle J. Farm #11 Well and the Circle J. Farm #12 Well;

121.    Grant Joan Casartello an accounting;

122.    Grant Joan Casartello pre-judgment and post-judgment interest;

123.    Award Joan Casartello the costs of the suit, including but not limited to attorney's fees; and

124.    Award Joan Casartello such other and further relief to which she may be entitled.

*Patricia Carucci Schwartz*

125.    Reform any and all contracts in which Patricia Carucci Schwartz has an interest to properly reflect the parties' true intent with respect to such contracts, including the K. N. Salyer 2 and 3 Assignments;

126.    Award Patricia Carucci Schwartz damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the K. N. Salyer 2 and 3 Letter Agreement;

127.    Award Patricia Carucci Schwartz damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

128.    Grant Patricia Carucci Schwartz an accounting;

129.    Grant Patricia Carucci Schwartz pre-judgment and post-judgment interest;

130.    Award Patricia Carucci Schwartz the costs of the suit, including but not limited to attorney's fees; and

131.    Award Patricia Carucci Schwartz such other and further relief to which she may be entitled.

*Piaker Trust*

132.    Reform any and all contracts in which the Piaker Trust has an interest to properly reflect the parties' true intent with respect to such contracts, including the Circle J. 6 Assignment;

133.    Award the Piaker Trust damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Circle J. 6 Letter Agreement;

134.    Award the Piaker Trust damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

135.    Grant the Piaker Trust an accounting;

136.    Grant the Piaker Trust pre-judgment and post-judgment interest;

137.    Award the Piaker Trust the costs of the suit, including but not limited to attorney's fees; and

138.    Award the Piaker Trust such other and further relief to which it may be entitled.

*Rosemary Hillary*

139.    Reform any and all contracts in which Rosemary Hillary has an interest to properly reflect the parties' true intent with respect to such contracts, including the Circle J. 4 Assignment and the Circle J. 1 Assignment;

140.    Award Rosemary Hillary damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Circle J. 1 and 2 Letter Agreement;

141.    Award Rosemary Hillary damages for Defendants' failure to make payments consistent with the 100 MCF Guarantee associated with the Circle J. 1 and 2 Letter Agreement;

142.    Award Rosemary Hillary damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

143.    Grant Rosemary Hillary an accounting;

144.    Grant Rosemary Hillary pre-judgment and post-judgment interest;

145.    Award Rosemary Hillary the costs of the suit, including but not limited to attorney's fees; and

146.    Award Rosemary Hillary such other and further relief to which she may be entitled.

*Arlene Everett*

147.    Reform any and all contracts in which Arlene Everett has an interest to properly reflect the parties' true intent, including the Arnett 10 Assignment;

148.    Award Arlene Everett damages as a result of Defendants' failure to make payments consistent with the 30-Month Guarantee associated with the Arnett 10 Letter Agreement.

149.    Award Arlene Everett monetary damages for Defendant's failure to make payments consistent with the 100 MCF Guarantee associated with the Arnett 10 Letter Agreement;

150.    Award Arlene Everett damages for the purchase of any wells which were undrilled, including the Arnett #10 Well;

151.    Award Arlene Everett damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

152.    Award Arlene Everett damages for conversion associated with the Arnett 10 Letter Agreement and the Arnett #10 Well;

153.    Grant Arlene Everett an accounting;

154.    Grant Arlene Everett pre-judgment and post-judgment interest;

155.    Award Arlene Everett the costs of the suit, including but not limited to attorney's fees; and

156.    Award Arlene Everett such other and further relief to which she may be entitled.

30503844.10

Respectfully submitted,


/s/ Karen J. Greenwell
Karen J. Greenwell
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507-1746
kgreenwell@wyattfirm.com
859.233.2012

Counsel for Plaintiffs


30503844.10

UNITED STATES DISTRICT COURT
PIKEVILLE DIVISION
CIVIL ACTION NO. 7:08-CV-220-ART

RAYMOND E. FONTAINE TRUST,                    )
DATED 12/2/88, AS AMENDED, BY                 )
AND THROUGH JEAN WEBSTER,                     )
PATRICIA FONTAINE, KATHLEEN                   )
FOWLER, AND MARY FONTAINE                     )
CARLSON, SUCCESSOR CO-                        )
TRUSTEES;                                     )
                                              )
and                                           )
                                              )
MPJ FONTAINE TRUST, U.A. DTD                  )
10/26/98, BY AND THROUGH JEAN                 )
WEBSTER, PATRICIA FONTAINE,                   )
AND MARY FONTAINE CARLSON,                    )
CO-TRUSTEES;                                  )
                                              )
and                                           )
                                              )
JEAN WEBSTER, INDIVIDUALLY;                   )
                                              )
and                                           )
                                              )
GARY WEBSTER, INDIVIDUALLY;                   )
                                              )
and                                           )
                                              )
PATRICIA FONTAINE,                            )
INDIVIDUALLY;                                 )
                                              )
and                                           )
                                              )
MARY FONTAINE CARLSON,                        )
INDIVIDUALLY;                                 )
                                              )
and                                           )
                                              )
ROBERT CARLSON, INDIVIDUALLY;                 )
                                              )
and                                           )
                                              )
DYLAN KLEMPNER,                               )



EXHIBIT

A

tabbies

INDIVIDUALLY;                          )
                                       )
and                                    )
                                       )
THE R.E. AND M.V. FONTAINE             )
FAMILY FOUNDATION, INC.;               )
                                       )
and                                    )
                                       )
THE NORA CARLSON                       )
IRREVOCABLE TRUST, BY AND              )
THROUGH ROBERT CARLSON, AND            )
MARY FONTAINE CARLSON, CO-             )
TRUSTEES;                              )
                                       )
and                                    )
                                       )
THE RAYMOND STREET GROUP,              )
LLC;                                   )
                                       )
and                                    )
                                       )
CHERRY DRIVEWAY, LLC;                  )
                                       )
and                                    )
                                       )
JOAN CASARTELLO,                       )
INDIVIDUALLY;                          )
                                       )
and                                    )
                                       )
PATRICIA CARUCCI SCHWARTZ,             )
INDIVIDUALLY;                          )
                                       )
and                                    )
                                       )
PIAKER FAMILY IRREVOCABLE              )
TRUST, BY AND THROUGH,                 )
MATTHEW PIAKER, ALAN PIAKER            )
AND SUSAN PIAKER, CO-TRUSTEES          )
                                       )
and                                    )
                                       )
ROSEMARY HILLERY,                      )
INDIVIDUALLY;                          )
                                       )

and                                          )
                                             )
ARLENE EVERETT, INDIVIDUALLY                 )  PLAINTIFFS
                                             )
                                             )
v.                                           )
                                             )
P& J RESOURCES, INC.                         )
SERVE:  JEAN WILLIAMS                         )
        P.O. Box 707                         )
        HC 60 Oakley Road                    )
        Salyersville, Kentucky 41465         )
                                             )
                                             )
and                                          )
                                             )
RICHARD WILLIAMS                             )
SERVE: RICHARD WILLIAMS                      )
        Lakeville Road                       )
        Salyersville, Kentucky 41465         )
                                             )
PAMELA WILLIAMS                              )
SERVE: PAMELA WILLIAMS                       )
        Lakeville Road                       )
        Salyersville, Kentucky 41465         )  DEFENDANTS
and                                          )
                                             )
CDDL, INC.                                   )
SERVE: PAMELA WILLIAMS                       )
        Lakeville Road                       )
        Salyersville, Kentucky 41465         )

## AMENDED COMPLAINT

For their Amended Complaint herein, the Plaintiffs, restate and reallege each and

every averment, claim or request for relief contained in their Original Complaint, filed

3

November 24, 2008 (the "Original Complaint") as if set out here in full.  In addition, the Plaintiffs add the following:

## COUNT X:

### (Declaratory Relief Regarding CDDL)

614.    The Defendant, CDDL, Inc. ("CDDL")  is a corporation created and existing pursuant to the laws of the Commonwealth of Kentucky, with its principal place of business located at Lakeville Road, Salyersville, Magoffin County, Kentucky 41465. Its agent for service of process is Pamela Williams at HC 60, Lakeville Road, Salyersville, Kentucky 41465.

615.    On information and belief, the Defendant Richard Williams, is an owner of P&J and CDDL.

616.    On information and belief, the Defendant Pamela Williams is the President of P&J and CDDL.

617.    Richard Williams and Pamela Williams both participate in the operation of CDDL and other business activities, and on information and belief they are father and daughter.

618.    On or about August 25, 2004, CDDL was incorporated under the laws of the Commonwealth of Kentucky by Pamela Williams, and on information and belief CDDL operates a landfill in Magoffin County, Kentucky.

619.    On information and belief, neither Mr. Fontaine nor any of the Plaintiffs, ever transmitted any funds to any of the Defendants for any shares or other ownership interests in CDDL.

620.    On information and belief neither Mr. Fontaine nor any of the Plaintiffs agreed to be an owner or shareholder of CDDL.

621.    On information and belief, Richard Williams has asserted to third parties that Raymond Fontaine was a shareholder of CDDL.

622.    An actual and justiciable controversy exists, and will continue to exist, between Plaintiffs and Defendants, Richard Williams, Pamela Williams, and CDDL, as to the status of the ownership of the shares or other ownership interests of CDDL, as well as to the rights and obligations, if any, of the parties pursuant thereto.

623.    This Court has jurisdiction to issue a declaratory judgment in this action pursuant to 28 USC §2201(a).

624.    The Plaintiffs are entitled to, and the Court should enter, a declaratory judgment holding that none of Mr. Fontaine or any of the Plaintiffs are not now, or ever have been an owner, office or director of CDDL.

## COUNT XI

### (Fraud - West Virginia Property)

625.    The Plaintiffs restate and re-allege each and every averment contained in Paragraphs 1 through 613 as if set out here in full.

5

626.    On or about October 6, 2006, Richard Williams transmitted to Mr. Fontaine by U.S. Mail in Massachusetts on behalf of P&J, a request for the payment of $125,000 to purchase a tract of land in situated in West Virginia with the understanding that a pipeline would be constructed on the real property to benefit interests in oil and gas wells which are currently owned by the Plaintiffs. A copy of the letter is attached hereto as Exhibit 110.

627.    On or about October 6, 2006, Mr. Fontaine caused a payment of $125,000 to be made to P&J for the purchase of the West Virginia Property.

628.    On information and belief, despite the payment of $125,000, Defendants. Richard Williams, Pamela Williams, and P&J Resources, Inc. (individually and collectively, the "Oil and Gas Defendants") did not use such payment to purchase the West Virginia Property, and the Oil and Gas Defendants never purchased the West Virginia Property.

629.    On information and belief, the Oil and Gas Defendants have converted the payment made by Mr. Fontaine for the West Virginia Property for their own use and benefit and to the detriment of Mr. Fontaine and his successors, in an amount yet to be determined. Mr. Fontaine's successors should be awarded both compensatory and punitive damages for each of the Oil and Gas Defendants' act of conversion.

## COUNT X

### (Fraud)

630.    The Plaintiffs restate and re-allege each and every averment contained in Paragraphs 1 through 613, and Paragraphs 625 through 629 as if set out here in full.

6

631.    Prior to Mr. Fontaine causing a payment of $125,000 to be sent to P&J in connection with the purchase of the West Virginia Property, the Oil and Gas Defendants, individually and acting in concert, knowingly and falsely represented that the Oil and Gas Defendants, or some of them, would use the funds to purchase the West Virginia Property;

632.    On information and belief, the Oil and Gas Defendants knew these representations to be false at the time they were made, and they were made for the purpose of inducing Mr. Fontaine to cause the sum of $125,000 to be transmitted to the Oil and Gas Defendants, or any of them.

633.    Unaware the representations were false, Mr. Fontaine relied on the same, made the payment of $125,000 in connection with the purchase of the West Virginia Property.

634.    As a direct and proximate result of such reliance and the fraud of the Oil and Gas Defendants, Mr. Fontaine and his successors suffered injury in an amount as yet to be determined for which they should be awarded both compensatory and punitive damages.

WHEREFORE, the Plaintiffs request that the Court;

1.    Grant a trial by jury for all Plaintiffs.

2.    Grant all claims for relief set forth in the Original Complaint, and in addition:

*Fontaine Trust*

3.    Award the Fontaine Trust damages suffered as a result of the fraudulent acts and misrepresentations of the Defendants;

4.    Award the Fontaine Trust damages for conversion associated with the West Virginia Property;

5.    Award the Fontaine Trust damages associated with failure of Defendants to purchase the West Virginia Property with the funds provided from Mr. Fontaine for that purpose;

6.    Declare that neither Mr. Fontaine nor any of the Plaintiffs is now, nor ever has been an owner, officer or director of CDDL;

7.    Grant the Fontaine Trust pre-judgment and post-judgment interest;

8.    Award the Fontaine Trust the costs of the suit, including but not limited to attorney's fees; and

9.    Award the Fontaine Trust such other and further relief to which it may be entitled.

30519387.2

Respectfully submitted,


/s/ Karen J. Greenwell
Karen J. Greenwell
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507-1746
kgreenwell@wyattfirm.com
859.233.2012

Counsel for Plaintiffs


30519387.2

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| RAYMOND E. FONTAINE TRUST, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 08-220-ART |
| v. | ) ) | **MEMORANDUM OPINION** |
| P & J RESOURCES, INC., et al., | ) ) | **AND ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The plaintiffs filed a motion for summary judgment, R. 79, to which the defendants responded, R. 87, and the plaintiffs replied, R. 88.  After a telephonic motion hearing, the Court ordered the parties to submit supplemental briefing on the issues of waiver, statute of frauds, and hearsay as they apply to this motion.  R. 91.  The parties each filed a supplemental brief, R. 92, 93, and a response, R. 94, 95.  For the reasons explained below, the Court partially grants, and partially denies the plaintiffs' motion for summary judgment, R. 79,

**BACKGROUND**

This is a contract dispute over payments from interests in gas wells in eastern Kentucky. The defendants[1] are:  P & J Resources ("P & J"), a Kentucky oil and gas drilling company, Pamela Williams, the sole owner and officer of P & J, and her husband Richard Williams, also

---

[1]The plaintiffs joined CDDL, Inc., as a defendant in this case in their amended complaint. *See* R. 22 (Am. Compl.).  CCDL is only involved in Claim X, the plaintiffs' claim for declaratory relief.  Therefore, unless otherwise specified, "the defendants" collectively refer to P & J, Richard Williams, and Pamela Williams.

an officer of P & J.  R. 48 ("R. Williams Dep.") at 103-05.  Raymond Fontaine was a wealthy businessman from Massachusetts that began investing with the defendants in 2002.  *Id.* at 348.  According to the plaintiffs, the investments totaled over $7,480,000 before Mr. Fontaine's death in 2007.  R. 79. at 3.  Mr. Fontaine provided the capital for over 60 wells and then was supposed to receive an interest in the wells.  R. Williams Dep. at 32-40.

For each well, the defendants conveyed a working interest to Mr. Fontaine through an Assignment.  *See, e.g.*, R. 1, Ex. 2 (Circle J. Farms Well No. 4 Assignment); R. 1, Ex. 3 (Circle J. Farms Well No. 5 Assignment).  The parties signed a Letter Agreement contract for each of the wells to memorialize the deal.  *See* R. 79, Ex. 2 ("Letter Agreements").  Each Letter Agreement was dated the same day as the corresponding Assignment.  *See, e.g.*, R. 1, Ex. 1 (Circle J. Farm Wells Nos. 4 & 5 Letter Agreement).  The typical Letter Agreement was structured so that Mr. Fontaine would receive 75% of the interest of the well until his initial capital investment was repaid.  *Id.*  After the capital was repaid, Mr. Fontaine and the defendants would split the interest equally (50/50).  *Id.*  After executing a Letter Agreement, Mr. Fontaine often directed the defendants to assign the actual interest in the well to one or more of his three daughters, his grandson, a trust, or some other person.  R. Williams Dep. at 258, 544-45.  Before his death, Mr. Fontaine transferred all of his own interests in the wells to the Raymond Fontaine Trust.  R. 79, Ex. 1 (Robert Carlson Aff.) ¶ 7.  That Trust, along with the other parties with interests in the wells, make up the plaintiffs in this case.  *See* R. 1 (Compl.).

On many wells, the defendants agreed to repay Mr. Fontaine his entire capital investment within 30 months after the well went into production.  This was memorialized in the Letter

2

Agreements with the following language ("30-Month Guarantee"):

> P & J Resources Inc., shall provide you on the anniversary of the thirtieth (30th)
> month after the wells are placed into production an accounting of the amount you
> received in the form of production payments.  In the event you have not received
> your total investment on or before the thirtieth (30th) month, as mentioned above,
> P & J Resources, Inc. shall pay you, on or before the tenth (10th) day following
> the anniversary date aforesaid, the difference between your investment and the
> amount paid to you based upon the production of the wells.

Letter Agreements at 1.  Many of the agreements also promised to pay Mr. Fontaine based on a

production of 100,000 cubic feet of gas per day, containing the following language ("100 MCF

guarantee"):

> P & J Resources Inc., shall guarantee to pay you based upon the production of
> 100,000 cubic feet of gas per day for each well, cumulatively or collectively.

*Id.*

On November 28, 2008, the plaintiffs filed a complaint against the defendants alleging

various fraud and breach of contract claims.  *See* R. 1 (Compl.).  They later amended that

complaint to add other fraud claims.  *See* R. 22 (Am. Compl.).  The instant motion for summary

judgment, filed February 19, 2010, addresses only some of their pending claims.[2]

The plaintiffs moved for summary judgment on their breach of contract claims.  They

argue that the defendants breached the 30-Month and 100-MCF Guarantee provisions by not

repaying Fontaine pursuant to the Letter Agreements.  R. 79 at 20.  The plaintiffs hired an expert

to calculate the damages, which appear to be in the millions of dollars.  R. 79, Exs. 6, 11.  The

---

[2]The plaintiffs have other claims pending that are not part of this motion.  *See* R. 1
(Compl.); R. 22 (Am. Compl.).  Namely, they claim fraud and conversion because the defendants
allegedly falsified production data from the wells and falsified regulatory filings.

3

defendants admit that Mr. Fontaine was never repaid in full for any of his investments in the wells.  R. 87, Ex. B ¶ 8; R. Williams Dep. at 441.

The plaintiffs also wish to collect on a $300,000 loan that Mr. Fontaine lent to P & J.  R. 79 at 15; R. 79, Ex. 13 (Letter to Mr. Fontaine re: Loan); R. 79, Ex. 14 (Promissory Note).  As security for the loan, P & J assigned five wells to Fontaine.  R. 67, Ex. 538.  The defendants admit that no payments of interest or principal on the loan have been made.  R. Williams Dep. at 901-02.  The plaintiffs also seek a declaratory judgment that they are not the owners of CDDL, Inc., a company (owned by the Williams) that operates a landfill on the Williams's property.  R. 22 ¶ 619; R 79 at 22.

In the event that the Court finds in their favor, the plaintiffs have also moved for an accounting of assets, R. 79 at 22, for joint and several liability against P & J and Richard and Pamela Williams, *id.* at 23, and moved for judgment under Fed. R. Civ. P. 54(b), *id.* at 34.

## DISCUSSION

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The defendants admit that they have not repaid Mr. Fontaine's investments in full and that they have not repaid the loan amount.  Thus, the plaintiffs moved for summary judgment on their breach of contract claims.

## I.    The 30-Month Guarantee and 100-MCF Production Guarantee - Counts II & III

The plaintiffs' claims center around breach of the various contracts.  The plaintiffs argue that the defendants breached the 30-Month and 100-MCF Production Guarantees in the Letter

4

Agreements by failing to pay Mr. Fontaine the money owed him from the gas production. In

response, the defendants claim that in 2005, Mr. Fontaine directed P & J to "shut in" the wells and

cease production. *See* R. 87, Ex. A ("R. Williams Aff.") at 2 ("On April 7, 2005, Mr. Fontaine

directed that P & J should not sell any additional gas to Jefferson Gas so that the sales commission

and transportation fees would not have to be paid. As a result, P & J shut in all the gas wells and

did not transmit any gas from that point forward."). Thus, the defendants claim they could not

have breached the Letter Agreements because the agreements changed; the wells stopped

producing under Mr. Fontaine's direction, and without production, the defendants could not pay

the plaintiffs. R. 87 at 7-9. "It was well understood that P & J would not be able to comply with

portions of the letter agreement relating to the guaranteed payment, due to Mr. Fontaine's actions."

R. Williams Aff. at 3. The defendants also state that the plaintiffs have waived their right to bring

claims for breach, or alternatively, that they are estopped from bringing the claims. *See* R. 87, Ex.

B at 1-2 ("The Defendants contend that they are not in breach of the 100 MCF Guarantee and/or

30 Month Guarantee due to Mr. Fontaine's direction to stop production from the wells on April

7, 2005 . . . and the legal principles of waiver and estoppel.").

In reply, the plaintiffs raise two issues. *See* R. 88. First, they allege that Richard

Williams's affidavit contains inadmissible hearsay with respect to the statements made by the

declarant, Mr. Fontaine, and that the statements do not fit within any of the hearsay exceptions.

*Id.* at 2-5. Second, they claim that the statute of frauds, Ky. Rev. Stat. § 371.010(6), prohibits any

oral modifications of the well contracts. *Id.* at 6-7. They also argue that neither waiver nor

estoppel applies to their claims. *Id.* at 7-9. As explained below, the statute of frauds prohibits oral

5

modification to the Letter Agreement, and neither estoppel nor waiver precludes the plaintiffs'

claims.  Thus, the Letter Agreements are enforced as written, and summary judgment is granted

in favor of the plaintiffs on the breach of contract issues.

### 1. Statute of Frauds

The plaintiffs claim the statute of frauds prohibits any oral modifications of the Letter

Agreements.  R. 88 at 7 ("The conveyance or assignment of a working interest in an oil and gas

lease constitutes an interest in real estate within the meaning of the statute of frauds." (quoting

*Owen v. Dayson*, 562 S.W.2d 647, 648 (Ky. Ct. App. 1977))).[3]  The plaintiffs are correct.

Under Ky. Rev. Stat. § 371.010(6), "[n]o action shall be brought to charge any person

[u]pon any contract for the sale of real estate, or any lease thereof for longer than one year unless

the promise . . . be in writing and signed by the party to be charged therewith."  The Assignments

and Letter Agreements between Mr. Fontaine and the defendants are in writing, in compliance

with the statute of frauds.  Any subsequent modifications to those contracts, when they materially

affect their terms, must also be in writing.  *Farmers Bank and Trust Co. of Georgetown Ky. v.*

*Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 8 (Ky. 2005) ("If the contract is required to be in

writing, evidence will not be admitted to prove a subsequent parole agreements which materially

modifies the writing; that is, if the subsequent agreement itself is within the statute of frauds, and

---

[3]The plaintiffs also argue that with respect to the 30-Month Guarantee, a separate provision of the statute of frauds applies.  Ky. Rev. Stat. § 371.010(7) applies to any agreement that cannot be performed within a year.  Since the 30-Month Agreement could only apply after two and a half years, any modification to it would have to be in writing.  Since the plaintiffs have correctly established that § 371.010(6) applies, the Court need not consider another section of the statute.

6

of a nature required by law to be in writing." (quoting *Murray v. Boyd*, 177 S.W. 468, 471-72 (Ky. 1915))). Mr. Fontaine's instruction to shut in the wells and stop production would materially change the contracts, because without production P & J could not fulfill the terms of the Letter Agreements. Thus, such a change must be memorialized in writing.

The defendants assert several reasons why the statute of frauds should not apply. First, they argue that the real estate section of statute of frauds applies to interests in a lease, but not to interests in an individual well like Mr. Fontaine's. R. 92 at 1-2. Parties have made and courts have rejected this argument in the past. The Kentucky Supreme Court held that the statute of frauds applies to an agreement to convey a working interest in a gas well. *Barnett v. Hagans*, 445 S.W.2d 839, 842 (Ky. 1969). After acknowledging that an oil or gas *lease* is an interest in real estate subject to the statute of frauds, the defendant in *Barnett* argued—just like the defendants do here—that "a working interest in a gas well is not an interest in real estate." *Id.* at 841. The court disagreed, holding that "the phrase 'working interest' means a portion of the oil and gas that may be produced . . . [t]he working interest which Hagans claims was an integral part of Barnett's leasehold estate. The property embraced by it-gas below the surface and not reduced to possession-was an interest in real estate." *Id.* at 842 (*citing Hammer v. Sanders*, 127 N.E.2d 492 (Ill. App. Ct. 1955); *Arrington v. United Royalty Co.*, 65 S.W.2d 36 (Ark. 1933)). Similarly here, the defendants' argument must be rejected. Under *Barnett*, a working interest in a well and the property below it are part of a real estate interest. The Letter Agreements clearly state that the defendants conveyed a "working interest in each well" to Mr. Fontaine. *See* Letter Agreements at 1; *see also Adkins v. Cornett*, 684 S.W.2d 853, 855 (Ky. Ct. App. 1985) (barring enforcement

7

of an oral contract for an interest in coal production as payment for negotiating a lease); Williams and Meyers, Oil & Gas Law, Vol. 1 § 213.1 ("By the great weight of authority, conveyances of royalty, mineral and leasehold interests are included within the statute of frauds.").

More recently, the Sixth Circuit acknowledged the position of Kentucky courts on this issue. *Colvin v. Magnum Drilling of Ohio, Inc.*, No. 90-6369, 1991 WL 78759, at *4 (6th Cir. May 15, 1991). The Circuit affirmed the district court ruling against the plaintiff in *Colvin*, holding that the contract language did not convey to the plaintiff an interest in the well. *Id.* It noted, however, that had the contract language been sufficient, "the Kentucky statute of frauds would require that the assignment be in writing as a sale or lease of real estate." *Id.* (citing Kentucky law). The interest in *Colvin* was only to use a well as a water disposal—even less like a traditional real estate contract than the interest in this case. The plaintiffs' interest in the production from a well, or the working interest, under Kentucky law is subject to the statute of frauds.

Second, the defendants argue that the Assignments, not the Letter Agreements, convey the interest in real estate to Mr. Fontaine. R. 94 at 1-2. Thus, according to the defendants, the Assignments only, and not the Letter Agreements, are subject to the statute of frauds. This argument also fails.

The Letter Agreements are the focus of this dispute. The statute of frauds applies to "any *contract* for the sale of real estate, or any lease thereof for longer than one year." Ky. Rev. Stat. § 371.010(6) (emphasis added). The Letter Agreements state: "This letter when accepted by you in the space provided below shall constitute our agreement as to the completion of the well . . . ."

8

Letter Agreements at 1.  Mr. Fontaine did not sign the Assignments, and they do not contain any detail on the terms between the parties.  The Letter Agreements, on the other hand, are signed by both parties and explain the details of Mr. Fontaine's interest.  Each Letter Agreement is dated the same day as the Assignment for the corresponding well, which demonstrates that the two documents were meant as part of a single transaction for a real estate interest.

Since all contracts for an interest in real estate must be in writing, and the Letter Agreements are the central part of the contract, the Letter Agreements are subject to the statute of frauds:  they must be in writing, and any modifications to them must also be in writing.  Thus, any oral agreements to alter the terms of the Letter Agreements are inadmissible.

### 2. Waiver

The defendants also argue that the plaintiffs waived their right to enforce the Letter Agreements, because they never advised the defendants of their intent to enforce them.  R. 87 at 8-9.[4]  The defendants are incorrect.

The defendants do not point to any statements by the plaintiffs to demonstrate an express or an implied waiver.  Waiver is the "voluntary and intentional surrender or relinquishment of a

---

[4]Despite having been giving additional time to brief this issue, the defendants did not supplement their waiver argument.  In fact, it seems that they may have abandoned this argument entirely:

> The Defendants have previously argued that the Plaintiffs had waived their right to enforce the 100 MCF and 30 Month Guarantees in the Letter Agreements.  Upon further review it is the position of the Defendants that the Plaintiffs should be estopped from demanding compliance with the guarantees as a result of Mr. Fontaine's statements to shut well production, which was relied upon by the Defendants.

R. 92 at 6.

known right." *Greathouse v. Shreve*, 891 S.W.2d 387, 390 (Ky. 1995) (quoting *Barker v. Stearns Coal & Lumber Co.*, 163 S.W.2d 466, 470 (Ky. 1942). Further, proof of waiver must be "clear and convincing." *Id.* at 391. The fact that the plaintiffs waited to bring their claims does not prove that they waived their rights to do so. The plaintiffs filed their complaint well within the 15-year statute of limitations for breach of contract. Ky. Rev. Stat. § 413.090(2). And, the defendants have put forth no evidence supporting their waiver argument. Thus, the defendants have not met their burden of proving the plaintiffs waived their claims.

### 3. Estoppel

The defendants raise an estoppel defense to the plaintiffs' breach of contract claims. R. 92 at 6. Estoppel is a question of fact to be determined by the circumstances of each case. *Weiand v. Bd. of Trs. of Ky. Ret. Sys.*, 25 S.W.3d 88, 91-92 (Ky. 2000) (citations omitted). When the dismissal of a nonmoving party's equitable estoppel claim is sought via summary judgment, it is the nonmoving party's obligation to "present some evidence to support his theory of estoppel." *Gailor v. Alsabi*, 990 S.W.2d 597, 604 (Ky. 1999) (citations omitted). Because the defendants have failed to show an essential element—bad faith—of their estoppel defense, the defense is rejected.

There are two types of estoppel, promissory and equitable, and the defendants do not explain which they allege. The defendants listed estoppel in their answer, R. 15, and in their response to the motion for summary judgment, R. 87, Ex. B, but did not elaborate until asked to brief the waiver issue. Even then, the entirety of their estoppel argument is one paragraph in their supplemental brief:

10

As argued by the Plaintiffs, citing *Codell v. American Sur. Co*. 149 F. 2d 854 (6th Cir. 1945), the party seeking estopple [sic] must show some detrimental reliance upon the statement of the other party.  In this case, the Defendants would have never ceased production of the wells if they were not ordered to do so by Mr. Fontaine.  When the Defendants did shut down production they were not only affected by their own loss of income from the wells, they certainly had no idea that after the death of Mr. Fontaine, the Plaintiffs would seek to enforce the Letter Agreement guarantees.

R. 92 at 6.  These allegations are insufficient to meet either type of estoppel defense.

First, promissory estoppel requires "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance."  *Sawyer v. Mills*, 295 S.W.3d 79, 90 (Ky. 2009) (quoting *Meade Constr. Co. v. Mansfield Comm. Elec., Inc.*, 579 S.W.2d 105, 106 (Ky. 1979)).  Although the defendants allege detrimental reliance, they never reference any promise made by Mr. Fontaine or any other plaintiff.  Thus, any potential promissory estoppel defense would not pass muster based on the facts of this case.  The elements the defendants must show for the second type, equitable estoppel, are:

(1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;
(2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and
(3) knowledge, actual or constructive, of the real facts.

*Sebastian-Voor Prop., LLC v. Lexington-Fayette Urban County Gov't,* 265 S.W.3d 190 (Ky. 2008) (citations omitted).  Other cases have emphasized the requirement of bad faith intent that runs through these elements.  *See Gailor*, 990 S.W.2d at 604 ("In order to prevail on a theory of

11

estoppel, there must be proof . . . of an intent to induce inaction on the party to be estopped")

(citation omitted); *Adams v. Ison*, 249 S.W.2d 791, 793 (Ky. 1952) ("Under either statutory or

equitable estoppel, however, the representation, or act, intentional or otherwise, must have been

calculated to mislead or deceive and to induce inaction by the injured party."). The defendants

ignore this bad faith element.

The plaintiffs point out that the defendants fail to show evidence of bad faith intent, fail

to show that the defendants relied on Mr. Fontaine's statements,[5] and therefore cannot succeed

in an estoppel defense. *See* R. 95 at 5-7. Thus, as the movants on the summary judgment motion,

the plaintiffs have met their burden of showing deficiencies in the defendants' argument. *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Then, the burden of production shifts and Rule

56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of

evidentiary material in support of its position. *Id.* at 324. The defendants have completely failed

in this respect. The defendants do not argue, nor do they even mention, bad faith in their estoppel

argument. *See* R. 92 at 6. They do not address the possible intent of Mr. Fontaine at all. They

fail to cite a single fact other than Mr. Fontaine's statements, and they fail to show any connection

---

[5]The defendants' own behavior must also meet certain elements to succeed on an estoppel claim. The defendants must show "reliance, in good faith, upon the conduct or statements of the party to be estopped." *Mourtadier v. Ky. Ret. Sys.*, 2010 WL 1132552, at *4 (Ky. Ct. App. Mar. 26, 2010) (citations omitted). The Court need not reach this issue because the defendants already fail on the lack of evidence of the plaintiffs' bad faith. If it did, however, the defendants also fail to prove that they relied on Mr. Fontaine's statements in shutting down the wells. Although Richard Williams states that P & J shut down the wells based on Mr. Fontaine's statements, R. Williams Aff. at 2, P & J gave other individuals different reasons for shutting down the well production. They blamed the shutdown on a flood or bad weather, *see* R. 88, Ex.1 (Letter to Joan Casartello), and often called the shutdown temporary in nature, *see* R. 88, Exs. 2, 3.

12

between his statement to shut in the wells and the claims filed in this lawsuit.

For the reasons explained above, the defendants have failed to meet their burden, and thus their estoppel defense must be rejected at the summary judgment stage. "Estoppel is a doctrine of equity, and equitable relief may be granted to relieve the harsh effects of the statute of frauds." *Willmott Hardwoods*, 171 S.W.3d at 10 (citations omitted). Therefore, the estoppel exception should only be applied "under the most limited of circumstances, lest the Court run afoul of judicially amending the statute in violation of separation of powers." *Id.* (citation omitted). This is not one of those limited circumstances. Since the defendants admit that they have not paid the plaintiffs pursuant to the written Letter Agreements, and have not presented a valid defense to the claims, the Court grants summary judgment for the plaintiffs on the breach of contract claims.

### 4. Hearsay

The plaintiffs also argue that Mr. Fontaine's statements are inadmissible hearsay. R. 88 at 2-5. The Court need not reach this issue since even considering the statements, summary judgment is appropriate for the reasons given. The statute of frauds prohibits use of the statements as a breach of contract defense. And since the defendants' estoppel claim fails out of the gate, the Court need not consider any possible reliance on the statement.

## II.    The $300,000 Loan - Count V

The plaintiffs have also moved for summary judgment on another breach of contract claim, this one based upon Mr. Fontaine's Loan Agreement with P & J. Mr. Fontaine lent P & J $300,000 in 2004 to construct Section 8 Housing and Urban Development apartments. *See* R. 79, Ex. 13 (Letter to Fontaine re: Loan); R. 79, Ex. 14 (Promissory Note). The defendants admit that

13

they have made no payments of interest or principal on the loan. R. Williams Dep. at 901-02.

They believe, however, that they have repaid the loan in full based on an oral modification. R. 87

at 6. The defendants claim, again based on Mr. Fontaine's conversations with Richard Williams,

that Mr. Fontaine stated that he did not want repayment of the loan. R. Williams Aff. at 4.

According to Williams, Mr. Fontaine wanted the five wells that were pledged as security rather

than the $300,000 as repayment. *See id.* ("[Mr. Fontaine] indicated that he did not want the money

back, but indeed would rather keep the five wells as security for the loan."). The defendants do

not submit any written proof of this modification.

Again, the statute of frauds applies; this time, a separate section for loan agreements. "No

action shall be brought to charge any person [u]pon any promise, contract, agreement,

undertaking, or commitment to loan money, to grant, extend, or renew credit, or make any

financial accommodation to establish or assist a business enterprise or an existing business

enterprise unless the agreement . . . is in writing." Ky. Rev. Stat. § 370.010(9).

Further, the defendants assigned an interest in gas wells as security for the loan. The Loan

Agreement reads: "In consideration of your advancing the sum of Three hundred thousand dollars

($300,000.00) loan Resources, as additional collateral, shall assign five wells to Raymond

Fontaine. You shall receive fifty percent (50%) of eighty-one and one-half percent (81.5%)

*working interest* in these wells." R. 67, Ex. 538 (emphasis added). Thus, the statute of frauds

analysis applied to the statements that would modify the 30-Month and 100-MCF Guarantees

apply to Mr. Fontaine's statements modifying the Loan Agreements as well. *See Barnett v.

Hagans*, 445 S.W.2d at 841-42 (a working interest in a well qualifies as a real estate

14

interest/contract for statute of frauds purposes).  Therefore, the statute of frauds bars the consideration of these statements as modification to the Loan Agreement.

The defendants list the same estoppel and waiver defenses to the Loan Agreement that they argued for the Letter Agreement claims.  As explained above, neither of these arguments is fully developed, and thus they fall short.  Because the defendants have not repaid the principal or the interest on the loan to Mr. Fontaine, and fail to prove any change to that Loan Agreement, summary judgment is granted in favor of the plaintiffs on this claim.

## III.    CDDL - Count X

The plaintiffs seek a declaratory judgment that they are not the owners of CDDL, a company (owned by the Williamses) that operates a landfill on the Williams' property.  R. 79 at 22.  It is not clear from the complaint or motion why this is relevant, but the defendants agree that none of the plaintiffs have any interest in this entity.  R. 87 at 9.  Thus, summary judgment is appropriate on this claim.

## IV.    Joint & Several Liability/Pierce the Corporate Veil - Count IX

Now with a breach of contract judgment in hand, the plaintiffs have already anticipated collecting damages from P & J.  They seek to hold Pamela and Richard Williams personally liable by piercing the corporate veil, and have moved for summary judgment on this claim.  R. 79 at 23-34.  The decision whether to pierce the corporate veil is an equitable one for the court—not the jury.  *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 213 (Ky. Ct. App. 2009).  For the reasons explained below, the plaintiffs have not shown that the Court must pierce P & J's corporate veil at this time.

15

The plaintiffs want to pierce P & J's corporate veil because "P & J is nothing more than the alter ego or instrumentality of Mr. and Mrs. Williams."[6]  R. 79 at 23.  Kentucky law instructs courts to pierce the corporate veil "reluctantly and cautiously."  *White v. Winchester Land Dev. Corp.*, 584 S.W.2d 56, 62 (Ky. Ct. App. 1979).  "The corporate veil should not be pierced unless there is (1) 'such a unity of ownership and interest' that the separate personalities of the corporation and its owner cease to exist, and (2) 'the facts are such that an adherence to the normal attributes . . . of separate corporate existence would sanction a fraud or promote injustice.'"  *Hodak v. Madison Capital Mgmt., LLC*, 348 F. App'x 83, 95 (6th Cir. 2009) (quoting *Sudamax Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841, 847 (W.D. Ky. 2007)).  The plaintiffs put forth a great deal of evidence to prove the "unity of ownership and interest" between P & J and the Williamses.  *See* R. 29 at 23-29.  They must also show, however, a link between the abuse of the corporate form and a fraud or injustice caused to them.  "Absent evidence of some fraud or injustice resulting *directly* from the abuse of the corporate form, 'the specific, unusual circumstances' necessary to justify piercing the corporate veil are lacking."  *Hodak*, 348 F. App'x at 95 (citations omitted) (emphasis added).  This is where the plaintiffs' argument fails.

The plaintiffs have offered proof that the Williamses failed to observe legally required

---

[6]Kentucky law provides different theories under which shareholders can be found liable for corporate liabilities:  the equity formulation, the alter ego theory, and the instrumentality theory.  *White v. Winchester Land Development Corp.*, 584 S.W.2d 56, 61 (Ky. Ct. App. 1979).  The plaintiffs argue based on all three theories.  *See* R. 79 at 23-34.

16

corporate formalities in their governance of P & J. *See* R. 79 at 25-32.[7] But they have neither (1) shown that the Williamses caused them a fraud or injustice, nor (2) linked this abuse of the corporate form with their injury. First, the plaintiffs have not proved fraud or injustice—on this motion, they have only proved breach of contract. The plaintiffs do have a fraud claim pending in this case. R. 22 at 89-116 (Am. Compl. Count VI). They attempt to link the facts they allege on that claim to the Williamses' misuse of P & J. R. 79 at 24-25. However, the plaintiffs have not moved for judgment on the fraud claim, and the Court is not prepared to address fraud arguments at this time. The only other injustice that the plaintiffs allege is that they are unlikely to recover the amount owed from P & J. *Id.* at 33-34; R. 88 at 11-12. However, difficulty in collecting a judgment is not reason enough to disregard corporate protections and reach into the Williamses' personal assets. "[T]he corporate veil may not be pierced without a showing of injury caused by fraud or injustice separate and apart from the defendant corporation's inability to pay its debt." *Scarbrough v. Perez*, 870 F.2d 1079, 1084 (6th Cir. 1989); *see also Sudamax*, 516 F. Supp. 2d at 849 (citations omitted). Thus, the plaintiffs have not proved a fraud or injustice.[8]

---

[7]Whether looking at the equity, alter ego or instrumentality theory, the mandated factors of the equity formulation "are considered in all the cases no matter what 'test' is being applied." *White*, 584 S.W.2d at 62. These factors shed light on the lack of separation between the corporation and its owner: (1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends; (4) a siphoning off of funds by the dominant shareholder(s); and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities." *Id.*

[8]Actual fraud itself is not required to pierce the corporate veil. *See, e.g., United States v. WRW Corp.*, 778 F.Supp. 919, 923-24 (E.D. Ky. 1991) (piercing the corporate veil because the individual defendants' actions taken without board approval led to an accident and subsequent judgment against the corporation); *see also Bear, Inc. v. Smith*, 303 S.W.3d 137, 148 (Ky. Ct. App. 2010) ("while we have determined that no fraud has occurred under the circumstances of

17

Second, the plaintiffs cannot link their injury to the defendants' misuse of the corporate form.  Currently, their only proven injury is breach of the well and loan agreements.  The plaintiffs' situation mirrors that of the plaintiff in *Hodak*.  348 F. App'x at 95-96.  Hodak had only a breach of contract claim against the defendants, and "admitted that he [was] unaware of any way in which the defendants' corporate structural formation harmed him." *Id.* at 95-96.  Without this connection, the court refused to pierce the corporate veil. *Id.* at 96.  Similarly here, the plaintiffs have not shown that the Williamses' alleged abuse of P & J's corporate form caused the breach of contract.  P & J breached its contracts with the plaintiffs because it admittedly failed to pay Mr. Fontaine the return on his investment and the debt on the loan.  As the evidence was presented, this was in no way linked to any misuse of the P & J corporate "shield" to protect the Williamses' from any personal liability based on their actions.  It resulted from P & J's simple failure to pay its debt.  The Williamses' commingling of their funds with P & J's funds, P & J's failure to keep corporate records as required by law, and its refusal to pay dividends to its shareholder—all alleged by the plaintiffs—did not directly cause the breach.

Like in *Hodak*, the plaintiffs do not meet their burden on veil-piercing by proving breach of contract and alleging misuse of P & J funds.  They must connect the two.  The contractual injury "has not been shown to be attributable to any use of [P & J's] separate legal identity by the [Williamses] to 'justify wrong, protect fraud, or defend crime.'" *Hodak*, 348 F. App'x at 95 (quoting *Daniels*, 300 S.W.3d at 211).  If Richard and Pamela Williams have committed other

---

this case, and while the record fails to demonstrate that the corporate form of Smith Services was used to defend a crime, Laker Express has presented some evidence . . . demonstrating . . . the justification of a wrong.").

18

wrongs against the plaintiffs, the plaintiffs have not related them to the judgment entered today.

Thus, because the record at this time lacks evidence supporting this essential element of the plaintiffs' veil-piercing theory, there are genuine material issues of fact. Summary judgment on the veil-piercing claim is denied.

## CONCLUSION

For the reasons explained above, it is **ORDERED** that the plaintiffs' motion for summary judgment, R. 79, is **GRANTED IN PART** and **DENIED IN PART**:

(1)     On counts II & III, the plaintiffs' claims for breach of the 30-Month Guarantee and 100-MCF Production Guarantee, summary judgment is **GRANTED**;

(2)     On count V, the plaintiffs' claim for breach of the $300,000 Loan Agreement, summary judgment is **GRANTED**;

(3)     On count X, the plaintiffs' claim for a declaration that it is not part of CDDL, summary judgment is **GRANTED**;

(4)     On count IX, joint and several liability/pierce the corporate veil, summary judgment is **DENIED**; and

(5)     A telephonic conference between the parties and the undersigned is set for **April 22, 2010**, at **2:30 p.m.**  The undersigned's chambers shall initiate the conference call, and the lead counsel for each party shall be prepared to discuss the status of the remaining claims.  A court reporter is needed and will be provided by the Court.

This the 15th day of April, 2010.

**Signed By:**

*__Amul R. Thapar__*

**United States District Judge**

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| RAYMOND E. FONTAINE TRUST | ) | |
| DATED 12/2/88, AS AMENDED | ) | |
| ET AL, | ) | |
| | ) | Civil Action No. 07:08-CV-220-ART |
| Plaintiffs | ) | |
| | ) | ELECTRONICALLY FILED |
| v. | ) | |
| | ) | |
| P&J RESOURCES, INC., ET AL | ) | |
| the Defendants. | ) | |

## ORDER

The Plaintiffs having moved the Court for Summary Judgment pursuant to FRCP 56, and the Court having considered the same and being otherwise duly and sufficiently advised, it is hereby ORDERED that Plaintiffs' Motion for Summary Judgment is GRANTED as set out below.

A.    Judgment is granted to the Raymond E. Fontaine Trust Dated 12/2/88, As Amended, in the amounts of:

1. $293,108.99 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Circle J. Farm #2 Well, plus post judgment interest.

2. $579,173.92 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Minix #1 Well, plus post judgment interest.

1

3. $575,855.26 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Minix #2 Well, plus post judgment interest.

4. $478,985.85 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the P&R Trust #4 Well, plus post judgment interest.

5. $59,736.03 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the J. W. Howard #3 Well, plus post judgment interest.

6. $504,860.40 as a result of Defendants' breach of the Promissory Note, dated June 14, 2004, and referenced in ¶264 of the Complaint, and attached thereto as <u>Exhibit 104</u> by their failure to make any payments of principal or interest, plus post judgment interest.

B.    Judgment is granted to the MPJ Fontaine Trust, U.A. DTD 10/26/98, in the amount of $588,707.68 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Clay Prater #1 Well, plus post judgment interest.

C.    Judgment is granted to Rosemary Hillery in the amount of $293,478.62 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Circle J. Farm #1 Well, plus post judgment interest.

D.    Judgment is granted to Dylan Klempner in the amounts of:

1.  $585,253.72 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the F. S. Martin #3 Well, plus post judgment interest.

2.  $65,364.83 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the Circle J. Farm #7 Well, plus post judgment interest.

3.  $290,935.08 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the P&R Trust #2 Well, plus post judgment interest.

E.    Judgment is granted to Gary Webster in the amount of $582,384.61 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the F. S. Martin #2 Well, plus post judgment interest.

F.    Judgment is granted to Jean Webster, Patricia Fontaine and Mary Fontaine Carlson in the amounts of:

1.  $293,767.72, one third to each, as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Kash Arnett #2 Well, plus post judgment interest.

2.  $285,985.48 one third to each, to Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Fred Howard #1 Well, plus post judgment interest.

3. $291,020.97 one third to each, to Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the P&R Trust #1 Well, plus post judgment interest.

G.     Judgment is granted to the Nora Carlson Irrevocable Trust in the amount of $500,782.92 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the F. S. Martin #4 Well, plus post judgment interest.

H.     Judgment is granted to Cherry Driveway, LLC in the amount of $199,006.52 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Harry Puckett #1 Well, plus post judgment interest.

I.     Judgment is granted to Robert Carlson and Mary Fontaine Carlson in the amount of $198,739.47 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the Harry Puckett #1 Well, plus post judgment interest.

J.     Judgment is granted to Raymond Street Group, LLC in the amount of $483,794.30 as a result of Defendants' breach of the 100-MCF Guarantee referenced in the letter agreement associated with the P&R Trust #3 Well, plus post judgment interest.

K.     Judgment is granted to the Raymond E. and Marie V. Fontaine Family Foundation, Inc. in the amounts of:

1. $70,455.38 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the P&R Trust #8 Well, plus post judgment interest.

2.  71,672.45 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the P&R Trust #9 Well, plus post judgment interest.

L.      Judgment is granted to the Piaker Family Irrevocable Trust in the amount of $52,543.85 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the Circle J. Farm #6 Well, plus post judgment interest.

M.      Judgment is granted to Arlene Everett in the amount of $50,975.11 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the Arnett #10 Well, plus post judgment interest.

N.      Judgment is granted to Joan Casartello in the amounts of:

1.  $67,990.74 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the Circle J. Farm #11 Well, plus post judgment interest.

2.  $69,441.67 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the Circle J. Farm #12 Well, plus post judgment interest.

O.      Judgment is granted to Patricia C. Schwartz in the amounts of:

1.  $71,287.56 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the KN Salyer #2 Well, plus post judgment interest.

2.  $71,924.26 as a result of the Defendants' breach of the 30 Month Guarantee referenced in the letter agreement associated with the KN Salyer #3 Well, plus post judgment interest.

## II.    UNDRILLED WELLS

A.    Judgment is granted to the Raymond E. Fontaine Trust Dated 12/2/88, As Amended, in the amounts of:

1.  $187,500.00, plus applicable penalties and interest, in connection with the Defendants' failure to drill any of the wells associated with the Three Well Drilling Program II referenced in ¶¶257-260 in the Complaint, plus post judgment interest.

2.  $284,000.00, plus applicable penalties and interest, in connection with the Defendants' failure to drill any of the wells associated with the Two-Well Drilling Program referenced in ¶¶261-263 in the Complaint, plus post judgment interest.

## III.    CDDL, INC.

The Court hereby DECLARES that none of the Plaintiffs nor Mr. Fontaine are now, nor have ever been, employees, representatives, agents, officers, directors, controllers of CDDL, Inc., and that none of the Plaintiffs nor Mr. Fontaine maintain, nor have any of them ever maintained in the past, an ownership interest in CDDL, Inc.

### IV.     EQUITABLE ACCOUNTING

Defendants are hereby ORDERED to provide an equitable accounting to the Plaintiffs for all of the funds transmitted to them by Mr. Fontaine or any of the Plaintiffs and the proceeds of any such funds.

### V.     LAWSON JOHNSON #2 WELL

The Court hereby DECLARES that the Raymond E. Fontaine Trust Dated 12/2/88, As Amended, is the owner of 100% of the working interest in the Lawson Johnson #2 Well and that it is entitled to control the development and operation of that well.

### VI.     JOINT AND SEVERAL LIABILITY

The Court hereby DECLARES that the Defendants, and each of them, will be jointly and severally liable for any judgment obtained by any of the Plaintiffs in this action.

### VII.     JUDGMENT FINAL AND APPEALABLE

The Court hereby CERTIFIES and ENTERS this judgment pursuant to Rule 54(b) of FRCP and the parties shall consider the Court's ruling hereto FINAL and APPEALABLE.

30547804.2